1  MORGAN, LEWIS & BOCKIUS, LLP
   REBECCA EISEN, State Bar No. 96129
2  THOMAS M. PETERSON, State Bar No. 96011
   KENT M. ROGER, State Bar No. 95987
3  ERIC MECKLEY, State Bar No. 168181
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel: (415) 442-1000; Fax: (415)442-1001
5  Email:  reisen@morganlewis.com
           tmpeterson@morganlewis.com
6          kroger@morganlewis.com
           emeckley@morganlewis.com
7
   Attorneys for Defendant
8  WAL-MART STORES, INC.

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                   OAKLAND DIVISION

13

14  In Re WAL-MART STORES, INC. WAGE    Case No. C 06-02069 SBA (BZ)
    AND HOUR LITIGATION,                         C 06-05411 SBA (BZ)
15
                                        **OPPOSITION TO PLAINTIFFS'**
16                                      **MOTION FOR CLASS**
    This document relates to Case Nos.: **CERTIFICATION**
17  C 06-02069 SBA (Smith) and
    C 06-05411 SBA (Ballard)            Date:      December 18, 2007
18                                      Time:      1:00 p.m.
                                        Place:     Courtroom 3
19                                      Judge:     Hon. Saundra B. Armstrong

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

OPPOSITION TO PLAINTIFFS' MOTION                USDC – N.D. of CA Case No. C 06-02069 SBA (BZ)
FOR CLASS CERTIFICATION
1-SF/7625739.23

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................................ 1

II.   PROCEDURAL HISTORY ............................................................................................ 2

      A.   The Claims At Issue .............................................................................................. 2

      B.   The Sub-Classes And Claims That Are The Subject Of Plaintiffs' Motion ............ 3

III.  FACTUAL BACKGROUND ......................................................................................... 3

      A.   Vacation and Personal Time Off Policies ............................................................. 4

      B.   The Regular Payroll Process ................................................................................. 4

      C.   Final Pay Requirements ........................................................................................ 5

      D.   The Circumstances Surrounding the Four Named Plaintiffs ................................. 8

            1.    Danton Ballard: ......................................................................................... 8

            2.    Michael Wiggins: ....................................................................................... 9

            3.    Barry Smith: ............................................................................................ 10

            4.    Nathan Lyons: .......................................................................................... 11

      E.   Dr. Shapiro's Faulty Methodology ..................................................................... 11

IV.   ARGUMENT ............................................................................................................... 15

      A.   Plaintiffs' Claims Are Not Amenable To Certification ........................................ 15

      B.   Pervasive, Across-The-Board Defects Require Denial Of Plaintiffs' Class
           Certification Motion ........................................................................................... 16

            1.    Shapiro's Analysis of Electronic Data Does Not Support A Finding Of
                  Predominance .......................................................................................... 16

            2.    Reliance on Shapiro's Testimony Without Individualized Inquiry
                  Would Violate Defendant's Constitutional Right To Due Process ............. 18

            3.    Other Courts Have Rejected Shapiro's Testimony .................................... 19

            4.    For Each Claim And Each Subclass, Key Liability Issues Require
                  Individualized Scrutiny ............................................................................ 20

      C.   Plaintiffs Have Not Established That *Any* Of Their Three Subclasses Should
           Be Certified ........................................................................................................ 24

            1.    Individual Issues Render Certification Of Plaintiffs' "Vacation"
                  Claims Improper ...................................................................................... 24

            2.    Plaintiffs' "Wage" Claim May Not Properly Be Certified Because Of
                  Material Defects As To That Claim ........................................................... 24

            3.    Individual Issues Overwhelm Plaintiffs' "Late Pay" Claims ..................... 25

      D.   Class Issues Will Not Predominate With Respect To Plaintiffs' Claim For
           Waiting Time Penalties Under Labor Code §203 ................................................ 26

            1.    Plaintiffs' Burden To Establish Willfulness Necessitates An
                  Individualized Inquiry .............................................................................. 26

            2.    Section 203 And The Duties Associated With The Law Of Tender
                  Necessitate Individualized Analysis Of Liability ...................................... 29

3.   An Individual Inquiry Will Still Be Necessary To Determine Whether A Penalty Comports With Due Process ........................................................ 29

E.   A Class Action Is Neither A Manageable Nor Superior Means By Which To Litigate The Claims In This Case ...................................................................... 31

1.   Manageability Issues Defeat a Finding of Superiority ................................ 31

2.   Administrative Remedies Provide Adequate, Speedier Redress ................... 32

F.   Plaintiffs Fail To Identify Ascertainable Subclasses ............................................ 33

G.   Plaintiffs' Motion Fails To Satisfy The Requirements Of Rule 23(a) .................... 34

1.   Named Plaintiffs Lack Claims That Are Typical Of Class Claims Causing Them To Be Inadequate Representatives Of The Class ................. 34

2.   Plaintiffs Fail To Establish That There Are Common Questions Of Law Or Fact Pursuant To Rule 23(a)(1) ...................................................... 35

V.   CONCLUSION .......................................................................................................... 35

1

**INDEX OF AUTHORITIES**

2

Page

3

**Cases**

4

*Alix v. Wal-Mart Stores, Inc.*, 838 N.Y.S.2d 885 (N.Y. Sup. Ct. June 11, 2007) ...............18, 20

5

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................16, 18

*Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D. Pa. 1997) .......................................... 18

6

*Armstrong v. Manzo*, 380 U.S. 545 (1965)........................................................................... 18

7

*Arth Main Street Drugs v. Beer Distribs. of Ind., Inc.*, 1978 WL 1357 (N.D. Ind. 1978)........................................................................................................... 19

8

*Barnhill v. Robert Saunders & Co.*,125 Cal.App.3d 1 (1981) ...........................................27, 28

9

*Briggs v. Countrywide Funding Corp.*, 188 F.R.D. 645 (M.D. Al. 1999) ............................... 29

10

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998)................................................................................................................. 18

11

*Brown v. Wal-Mar Stores, Inc.*, 2001 L 85 (Rock Island County, Ill. March 9, 2007)................................................................................................................. 20

12

*Cimino v. Raymark Indus., Inc.*,151 F.3d 297 (5th Cir. 1998) ............................................... 19

13

*Cutler v. Wal-Mart Stores, Inc.*, 927 A.2d 1 (Md.App. 2007) ............................................... 20

14

*Davis v. Morris*, 37 Cal.App.2d 269 (1940) ......................................................................... 27

*French v. First Union Securities Inc.*, 209 F.Supp.2d 818 (M.D. Tenn. 2002) ....................... 24

15

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ................................... 34

16

*Hagen v. City of Winnemucca*, 108 F.R.D. 61 (D. Nev. 1985) .............................................. 33

17

*Hale v. Morgan*, 22 Cal.3d 388 (1978) ................................................................................ 30

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ............................................... 15

18

*In re Bridgestone/Firestone*, 288 F.3d 1012 (7th Cir. 2002).................................................. 19

19

*In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 194 F.R.D. 484 (D.N.J. 2000) ............................................................................................... 17

20

*In re Initial Public Offerings Securities Litigation*, 471 F.3d 24 (2nd Cir. 2006)............................................................................................................... 16

21

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003) ..................................... 17

22

*In re Paxil Litigation*, 212 F.R.D. 539 (C.D. Cal. 2003). ..................................................... 33

23

*In re Trombley*, 31 Cal.2d 801 (1948).............................................................................26, 27

24

*In re Wal-Mart Employee Litig.*, 290 Wis.2d 225 (Wis. Ct. App. 2006)................................. 32

*Indiana State Employers Ass'n v. Indiana State Highway Com'n*, 78 F.R.D. 724 (S.D. Ind. 1978)................................................................................................... 33

25

*Jackson v. Wal-Mart Stores, Inc.*, 2005 WL 3191394 (Mich. Ct. App. Nov. 29, 2005)................................................................................................................20, 32

26

*Jimenez v. Domino's Pizza, Inc.* 238 F.R.D. 241 (C.D. Cal. 2006)........................................ 21

27

*Kamm v. California City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975).......................................... 33

28

*Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) .................................. 30

*Kwan v. Mercedes-Benz of North America, Inc.*, 23 Cal.App.4th 174 (1994) ................. 27

*Layton v. West*, 271 Cal.App.2d 508 (1969) ..................................................................... 29

*Lockheed Aircraft Corp. v. Superior Court*, 28 Cal.2d 481 (1996). ................................ 23

*Manford v. Singh,* 40 Cal.App. 700 (1919) ...................................................................... 28

*Mantolete v. Bolger,* 767 F.2d 1416 (9th Cir. 1985) ......................................................... 15

*O'Connor v. Boeing N.Am., Inc.,* 197 F.R.D. 404 (C.D. Cal. 2000) ................................ 31

*Oppenheimer v. Sunkist Growers*, 153 Cal.App.2d Supp. 897 (1957) ............................. 31

*Ortiz v. Fibreboard Corp.* 527 U.S. 815 (1999) ............................................................... 19

*Osuna v. Wal-Mart Stores, Inc.*, 2004 WL 3255430 (Ariz. Super. Ct. Dec. 23,
   2004)................................................................................................................................ 20

*Pattillo v. Schlesinger,* 625 F.2d 262 (9th Cir. 1980) ...................................................... 33

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 37 Cal.4th 707 (2005)................. 30

*Poulos v. Caesars World, Inc.*, 379 F.3d 654  (9th Cir. 2004) ......................................... 16

*Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ................................................. 34

*Ray Thomas, Inc. v. Cowan*, 99 Cal.App. 140 (1929) ...................................................... 23

*Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655 (N.D. Ga. 2001).................. 30

*Reid v. Overland Machined Prods.*, 55 Cal.2d 203 (1961) ................................................. 5

*Road Sprinkler Fitters Local Union No. 669 v. G&G Fire Sprinklers, Inc.*, 102
   Cal.App.4th 765 (2002) ................................................................................................. 27

*Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668 (9th Cir. 1975)........................... 16

*Safeco Ins. Co. v. Burr*, 127 S.Ct. 2201 (2007) ............................................................... 26

*Salvas v. Wal-Mart Stores,* 2006 WL 4472492 (Mass. Super. Nov. 7, 2006).................. 19

*Semas v. Bergmann*, 178 Cal.App.2d 758 (1960).............................................................. 23

*Smith v. Rae-Venter Law Group*, 29 Cal.4th 345 (2002) .................................................. 27

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) ...............................34, 35

*State Farm Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408 (2003). .............................. 30

*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001)...................................... 16

*Thompson v. Dubois*, 215 Cal. 577 (1932) ....................................................................... 24

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)................................15, 34

*Valverde v. AT&T Corp.*, 2006 WL 13196133 (E.D. Cal. 2006)........................................ 7

*Villafuerte v. Inter-Con Security Systems, Inc.*, 96 Cal.App.4th Supp. 45
   (2002) .........................................................................................................................5, 22

*Walker v. Houston*, 215 Cal. 742 (1932)........................................................................5, 29

*Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548 (Tex. App. 2002)................................... 20

*Walsh v. Pittsburgh Press Co.*, 160 F.R.D. 527 (W.D. Pa. 1994)..................................... 22

*Western Elec. Co., Inc. v. Stern*, 544 F.2d 1196 (3d Cir. 1976)....................................... 32

*Whiteway v. Fedex Kinko's Office and Print Services, Inc.*, 2006 WL 2642528
  (N.D. Cal. 2006)...................................................................................................... 34

*Woods-Drury v. Superior Court*, 18 Cal.App.2d 340 (1936) .................................. 23

**Statutes**

28 U.S.C. §2072(b) (Rules Enabling Act) ............................................................... 19

Business & Professions Code §17200 ....................................................................... 3

Cal. Civil Code §1489 .............................................................................................. 23

Cal. Civil Code §1504 .............................................................................................. 29

Cal. Civil Code §1511 .............................................................................................. 23

Cal. Civil Code §1512 .............................................................................................. 23

Cal. Labor Code §1174(d) ........................................................................................ 28

Cal. Labor Code §1194 .............................................................................................. 3

Cal. Labor Code §201 ......................................................................................passim

Cal. Labor Code §201.5 ............................................................................................. 6

Cal. Labor Code §202 ......................................................................................passim

Cal. Labor Code §203 ............................................................................................ 3, 6

Cal. Labor Code §205.5 ............................................................................................. 6

Cal. Labor Code §208 ......................................................................... 5, 21, 22, 26

Cal. Labor Code §216(a) ......................................................................................... 26

Cal. Labor Code §218 ................................................................................................ 3

Cal. Labor Code §226 ................................................................................................ 3

Cal. Labor Code §227.3 .....................................................................................3, 6, 30

Cal. Labor Code §500 ................................................................................................ 3

Cal. Labor Code §510 ................................................................................................ 3

F.R.Civ.P. Rule 23 .....................................................................................1, 2, 16, 35

F.R.Civ.P. Rule 23(a) ....................................................................... 15, 16, 34, 35

F.R.Civ.P. Rule 23(b) ......................................................................... 15, 16, 33

Mich. Admin. Code r. 408.9007 ............................................................................... 5

N.J. Stat. Ann. §34:11-4.3 ......................................................................................... 5

N.Y. Lab. Law §191 .................................................................................................. 5

**Other Authorities**

Division of Labor Standards Enforcement Policies and Interpretations Manual
  2002 ........................................................................................................................ 5

DLSE Op. Ltr. 1986.09.15 ...................................................................5, 22, 25, 29

DLSE Op. Ltr. 1986.12.23 ........................................................................................ 5

MOORE'S FEDERAL PRACTICE ¶23.21 ....................................................................... 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   **INTRODUCTION**

Named Plaintiffs urge the Court to certify various subclasses against Wal-Mart for its alleged failure to meet statutory obligations to provide final pay to its terminated employees (called "associates"). Specifically, in spite of the fact that three of the four named plaintiffs have suffered no injury at all, and one was in fact overpaid, Plaintiffs allege that they have not been timely paid for accrued and unused vacation time, personal time, and wages upon termination.

In their haste to certify, Plaintiffs urge the Court to overlook the individual circumstances of each class member and of the named Plaintiffs themselves, and summarily assume that three of Wal-Mart's many computerized databases suffice to establish not only a common basis upon which to proceed with class litigation, but also to adjudicate the merits of each class member's claim. These assumptions are premised upon a basic misunderstanding of both F.R.Civ.P. Rule 23 requirements and California law.

Though California law does provide that final pay is "due and payable" either "immediately," or within 72 hours of termination, California also has a "workplace" tender rule, never mentioned by Plaintiffs. To trigger Wal-Mart's statutory obligation to tender final pay, thereby activating the "immediate" or "72 hour" statutory timeframes, terminating associates *must be at the store where they worked* to receive the tender, or have previously directed Wal-Mart to mail sums owed. Whether each class member was physically present at the store cannot be established through common, class-wide proof. Plaintiffs hope to overcome the necessity for individualized proof, claiming both liability and damages can be established through their expert's analysis of Wal-Mart's computerized time records. But Shapiro's methodologies are fatally unreliable. In fact, the majority of courts to have considered Shapiro's testimony in class actions against Wal-Mart have rejected it as unsound. *See, infra*, pp. 19-20.

Wal-Mart's *regular* payroll system, upon which Shapiro relies (and which he grossly misinterprets), does not contain the information necessary to resolve factual issues at the heart of Plaintiffs' claims:

- Were Wal-Mart's obligations to tender final pay to particular associates triggered, given the circumstances of each termination;

- Did the associate quit or was he/she discharged;

- Did the quitting associate provide 72 hours notice;

- Does the "termination date" in the computer payroll system correspond to the date when statutory final pay duties were triggered;

- What portions of final pay were calculable and when;

- Was final pay tendered at the store where the associate worked;

- Did Wal-Mart prevent or discourage the associate from accepting its tender;

- Did the associate make him/herself available to receive tender at the store within 72 hours;

- Did the associate accept Wal-Mart's tender, or fail to come to the store to receive payment;

- Did the associate provide prior express authorization to pay by mail;

- Was any final pay "willfully" withheld or delayed, meaning not paid or delayed with knowledge or notice that sums were due and owing, so as to create eligibility for penalties;

- If any particular tender was inadequate, was it nevertheless made in good faith, thereby negating willfulness and penalties;

- If any particular tender was inadequate, were such inadequacies *de minimis* or the result of accident or negligence, thereby negating willfulness and penalties.

Here, despite the overwhelming evidence showing that Wal-Mart's records cannot be used for the purposes Plaintiffs desire, Plaintiffs continue to maintain that the factfinder need look only at select electronic databases to determine both liability and damages.  But these claims cannot be fairly adjudicated in a single legal proceeding for numerous reasons, the most fundamental of which is the predominance of individualized issues of fact and law inherent in Plaintiffs' allegations.  These individual issues not only predominate, but overwhelm any common issues, rendering Rule 23 class certification inappropriate.

## II.    PROCEDURAL HISTORY

### A.    The Claims At Issue

On March 20, 2006, plaintiffs Smith and Wiggins filed suit in this Court against Wal-Mart.  On May 17, 2006, plaintiffs Ballard and Lyons filed a similar suit in Los Angeles state court.  The *Ballard/Lyons* case was removed, transferred, and consolidated with *Smith/Wiggins*.  On March 27, 2007, Plaintiffs filed a First Amended Consolidated Complaint ("FACC"), alleging claims previously alleged in one or both of the original complaints, namely:  (1) penalties for wages allegedly not fully or

timely paid upon termination of employment (Labor Code §§201-203);[1] (2) failure to pay accrued vacation at termination (§227.3); (3) failure to pay overtime and straight time wages to terminated employees (§§500, 510, 1194); (4) failure to accurately record and report wages of terminated employees (§226), (5) tortious conversion of wages; and (6) unfair business practices in connection with the foregoing (Business & Professions Code §17200).  One claim previously alleged — *breach of contract* — was *not* realleged in the FACC.[2]

### B.   The Sub-Classes And Claims That Are The Subject Of Plaintiffs' Motion

In its May 29, 2007 Order, the Court stated that the FACC's class definitions were "suspicious" and "may in fact be improper" as merits-based and lacking ascertainability.  Nonetheless, the Court allowed Plaintiffs to conduct discovery.  Since then, Plaintiffs have not amended; however, in their certification motion, they purport to change their class definitions.[3]

Using three sub-classes, Plaintiffs seek to certify four claims:  (1) on behalf of all subclasses, the "First Claim" for statutory penalties under §203; (2) on behalf of Sub-Class Number 1, the Second Claim for underpayment of vested vacation benefits; (3) on behalf of Sub-Class Number 2, a "Third" Claim, said to be for "breach of contract" with respect to unpaid wages;[4] and (4) on behalf of all classes, the Sixth Claim for unfair business practices.[5]

## III.   FACTUAL BACKGROUND

Wal-Mart operates more than 200 Wal-Mart stores and Sam's Clubs in California.  Each store employs hundreds of non-exempt hourly workers.  Over the past five years, Wal-Mart has employed at

---

[1] All further statutory citations are to the California Labor Code, unless otherwise indicated. Emphasis in quoted material has been added unless otherwise indicated.

[2] On May 29, 2007, the Court dismissed the conversion claim, and the unfair business practices claim insofar as it was based on violations of anything other than §227.3.  On July 30, 2007, the Court dismissed, pursuant to stipulation, Plaintiffs' Third Claim for failure to pay wages.

[3] We attach a chart (Exhibit A) comparing the class definitions in the FACC with those in the motion, noting which named Plaintiffs are proffered as representatives of each subclass, and which claims are alleged by each subclass.

[4] Plaintiffs' appellation of "First," "Second," "Third," and "Sixth" claims presumably correlates to the FACC.  As to the "First," "Second," and "Sixth," a correlation does exist.  As to the "Third," it does not.  As discussed in detail below, the "Third" Claim for "breach of contract," with Plaintiff Ballard as its sole representative, does not appear at all in the FACC.  *See, infra* at p. 24.

[5] Plaintiffs assert this "Sixth" Claim on behalf of *all* subclasses despite this Court's order that §17200 claims may proceed *only* with respect to §227.3 claimants (Subclass Number 1).  Plaintiffs also make repeated reference to §218 as a predicate to their Bus. & Prof. Code §17200 claim.  (*See* Plaintiffs' Brief, pp. 16-17).  Section 218 is nowhere mentioned in the FACC.

1  any given time approximately 61,000 workers in California.  Wal-Mart's *biweekly* payroll in California

2  is approximately $60 million.  McChristian Decl. ¶3; Nam Decl. ¶3.

3       Wal-Mart associates stock shelves, operate cash registers, greet customers, and process final pay

4  amounts for other Wal-Mart associates.  Wal-Mart provides many individuals with their first workplace

5  opportunity to gain basic job skills; Wal-Mart also has a large retiree work force, thereby providing

6  many with their last job.  Twenty-five percent of the workforce are part-time.  Nam Decl. ¶5.

7       Consistent with these demographics and with the retail environment, turnover is common.  Of

8  the more than 170,000 terminations that occurred in California since March 2002, 12% involved

9  associates who had worked *less than one month* and 50% less than *six months*.  Martin Decl. ¶I.2.b.iv.

10       Ninety-five percent or more of Wal-Mart's associates are classified as non-exempt hourly

11  associates.  Hourly associates receive hourly wages, overtime, and shift premiums and are eligible for

12  different bonuses and prizes.  Salaried associates also receive various bonuses, prizes, and other salary

13  add-ons, including geographic pay adjustments.  McChristian Decl. ¶3; Nam Decl. ¶3.

14      **A.**    <u>**Vacation and Personal Time Off Policies**</u>

15       All associates are eligible to accrue vacation and personal time off (hereafter "vacation").  After

16  one year of employment, accrued hours become "available" to full-time employees.  Part time hourly

17  associates accrue vacation beginning their second year.  Associates can take vacation only once it

18  becomes "available." At the end of the second year of employment, any "available" but unused vacation

19  is automatically paid out at the then-current wage rate.  By this time, the associate will have accrued

20  another year's worth of vacation based  on "service hours" logged in the second year.  This *accrued*

21  vacation becomes *available* on the second employment anniversary, replenishing previously used or

22  cashed out vacation.  Any paid time off used (such as vacation) is recorded in the computerized "time

23  and attendance" database.  Wigger Decl. ¶3, 4, 5, 8; Nam Decl. ¶ 3, 11.

24      **B.**    <u>**The Regular Payroll Process**</u>

25       Wal-Mart's *regular* biweekly payroll process is scheduled, largely automated and centralized.

26  The payroll period ends every other Friday at midnight in California.  Hours worked and recorded at

27  each store in the prior two weeks are uploaded into a database and all calculations, deductions and tax

28  withholdings are processed; corresponding pay checks and direct deposit pay statements are sent to each

OPPOSITION TO PLAINTIFFS' MOTION        4                        
FOR CLASS CERTIFICATION                           USDC – N.D. of CA Case No. C 06-02069 SBA (BZ)
1-SF/7625739.23

1   store the following Monday.  In California, every other Thursday, associates may pick up their checks.

2   The regular payroll is documented in a computerized payroll database — the principal source of the

3   "opinions" that underlie Plaintiffs' motion.  McChristian Decl. ¶4, 5.

4       **C.   Final Pay Requirements**

5       California's intricate *final pay* requirements necessitate a different process.  First, unlike most

6   states, California accelerates the date final pay is due.  If an employee is discharged, "wages earned and

7   unpaid at the time of discharge are due and payable immediately."  §201.  If an employee quits, wages

8   are "due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous

9   notice …" in which case wages are due at the time of quitting.  §202.[6]

10      These timing requirements are expressly qualified by three other requirements (none mentioned

11  in Plaintiffs' motion).  First, the employer's statutory obligation is to tender or deliver final pay.  *See*

12  *Villafuerte v. Inter-Con Sec. Sys., Inc.*, 96 Cal.App.4th Supp. 45, 50 (2002) (in unpaid wage dispute, "an

13  obligation to pay money requires that the payor tender or deliver payment to the payee.").  "Tender is an

14  *offer* of performance.…"  *Walker v. Houston*, 215 Cal. 742, 745 (1932) (emphasis original).[7]

15      Second, tender is to occur at the workplace premises.  §208 (final pay must be at the place labor

16  is performed).  The employer is not to tender elsewhere, and is not even to *mail* final pay unless a

17  quitting employee expressly "requests and designates a mailing address" to which final pay should be

18  sent.  §§201, 202; RJN Exh. A at § 3.7 (2002 Division of Labor Standards Enforcement Policies and

19  Interpretations Manual) ("DLSE Manual"); RJN Exh. C (DLSE Op. Ltr. 1986.09.15); *Villafuerte*, *supra*

20  (if an employer mails the check without an express request, it bears the risk if payment is not received).

21      Third, wages are not payable until calculable.  RJN Exh. A at §4.6, 5.2.4-5.2.5 (DLSE Manual).

22  The law permits an employer a reasonable time to calculate and pay such amounts.  *See, e.g., Reid v.*

23  *Overland Machined Prods.*, 55 Cal.2d 203, 206 (1961); RJN Exh. A at §34.2.1 (DLSE Manual); RJN

24  Exh. B (DLSE Op. Ltr. 1986.12.23).

25

26      [6] Over half of the states allow payment of final pay at the "next regular payroll" date.  *See, e.g.*,
Mich. Admin. Code r. 408.9007; N.J. Stat. Ann. §34:11-4.3; N.Y. Lab. Law §191.

27      [7] Plaintiffs intermittently acknowledge the relevance of tender or an "attempt to pay" in their brief.
28  *See* Plaintiffs' Brief, pp. 4, 8, 20, 23, and 27; *see* especially Plaintiffs' definition of Subclass 3 in Exhibit
A (those to whom final pay was not "made available.").

In addition to the foregoing are the rules regarding vacation.  Although California employers have no obligation to provide vacation benefits, when provided, they are not normally paid in monetary form (most vacation is "paid" as time off work).  Nevertheless, on termination of employment, California accelerates the vesting of vacation and requires the monetary value of such "vested vacation time . . . be paid . . . as wages at [the employee's] final rate in accordance with such contract of employment or employer policy respecting eligibility or time served . . . ."  §227.3.

Under Wal-Mart's policies, associates accrue vacation for every "service hour," including hours up until termination.  Wigger Decl. ¶4, 12, Exhs. 1-3.  Wal-Mart's computerized payroll system thus contains an inherent lag between when an associate records service hours (principally by time card swipes) and the time when the accrual on those hours, and thus the recording of additional vacation, occurs.  The regular payroll system cannot automatically record that an associate has *used* or should be paid vacation.  Such data has to be entered *manually* into the database.  *Id*. at 10, 11.

Finally, overlaying some of California's final pay requirements is §203.  It provides that "[i]f an employer *willfully* fails to pay … in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor[e] is commenced; but the wages shall not continue for more than 30 days."

**The Final Pay Process:**  To satisfy California's unique and complex final pay requirements, Wal-Mart has developed an in-store, cash-based termination payout process.  In Wal-Mart stores, Personnel Managers ("PMs") are tasked with the proper administration of payroll policies.  They are in charge of processing and calculating final pay.  A summary chart of the testimony provided by Personnel Managers (referred to as "PM Chart, ¶ ___") is attached as Exhibit B.  PM Chart, ¶3.

PMs are trained on final pay processes, and Wal-Mart's payroll webpage contains policies and procedures regarding final pay, with links to various policies (like payment of vacation).  To process final pay, Wal-Mart uses a California Payout Worksheet that lists each potential component of the overall calculation, including "Vacation Hours (used)," "Vacation Hours (unused)," "Personal Hours (used)," and "Personal Hours (unused)."  PMs also use a Termination Checklist, Exit Interview Form, and Separation Notice to document and process terminations and final pay.  PM Chart, ¶¶4-6; Wigger

1    Decl. ¶9, 18-21, Exhs. 6-9.

2         Upon learning that an associate has terminated employment, the PM calculates what the asso-

3    ciate is owed using the California Payout Worksheet.  The PM adds both "available" and "accrued"

4    vacation, and determines the monetary value using the applicable wage rate.  From this total, the PM

5    calculates and deducts estimated taxes.  If the associate is in the store, the associate is taken to the store's

6    Cash Office, where the associate is paid in cash the amount on the Payout worksheet.  Copies of relevant

7    documents are typically placed in the associate's personnel file.  The Cash Office retains the Payout

8    Worksheet and maintains its own log showing amounts paid in cash.  At or about the time final payment

9    is made, termination and final payout information is typically entered into the store's "SMART" system,

10   which links to Wal-Mart's payroll system.  McChristian Decl., ¶7; PM Chart, ¶¶7-12.

11        After a cash payout, and at the end of the payroll period in which a termination occurs, the

12   payroll process will — as it does with regular payroll — compute and calculate amounts owed and taxes

13   to be withheld.  If a cash payment has been made and that information keyed in, the cash payment will

14   appear as a "draw" or advance payment.  After calculating wages earned, debiting cash payments, and

15   applying proper tax deductions, a positive, negative or zero amount may remain.  Negative amounts are

16   not recovered from the overpaid associate.  Positive amounts become checks sent to the store which are

17   then immediately tendered.  Although *all wages* have previously been timely paid, the electronic data

18   may show payments some days after termination.[8]  PM Chart, ¶13; McChristian Decl. ¶9.[9]

19        Of course, associates leave Wal-Mart for many different reasons — they move, take other jobs,

20   are injured, stop working to care for others, return to school, die, and so on.  A relatively small fraction

21   (approximately 20%) are involuntarily terminated for misconduct or other reasons.  Although Wal-Mart

22   has many "termination codes" that managers can apply, these are certainly not chosen with an eye to

23

24        [8] If a subsequent "true up" payment is needed once precise amounts of tax withholdings are
     calculated, the amount paid is not "wages."  While Shapiro may consider such amounts late paid wages,
25   the IRS would likely disagree.  The legality of such tax-related true-up payments has been upheld.
     *Valverde v. AT&T Corp.*, 2006 WL 1319613, *3 (E.D. Cal. 2006).  *See also* Eisen Decl. Exh. D (DLSE
26   claims no "jurisdiction" over tax true-up payments).

27        [9] In the case of a salaried *manager*, regional personnel perform the final pay calculation, aided by
     Market Assistants ("MAs").  The MA calculates the amount of available unused vacation, using
28   vacation records maintained in the store.  As with hourly associates, the termination and final pay
     information is typically entered into the "SMART" system.  PM Chart, ¶¶14-17; Wigger Decl. ¶33.

§201 and §202 requirements.  The termination codes may or may not fully or accurately reflect the circumstances leading to severance of the employment relationship.  PM Chart, ¶¶19-20.

Far and away the most commonly used termination code is "three day no show" or "job abandonment."  This code is used when an associate walks off the job or simply stops coming to work. PM Chart, ¶¶21, 24; Martin Decl. ¶V.B.1.  Once Wal-Mart managers realize an associate has stopped reporting to work, the manager may try to locate the associate and learn the reason.  If efforts are unsuccessful or unsatisfactory, the manager will then have to establish a "termination date."  The date assigned might be the last day the associate actually worked, the first or last of the three "no show" days, the date a leave of absence was supposed to end, or the date the manager learned the associate did not intend to return.  Depending on the circumstances of each individual associate's failure to appear for work, the associate's work schedule, and the effort to locate the associate, the final pay process may not begin until weeks after the associate last appeared for work.  PM Chart, ¶¶22-23.

Once a termination date is assigned, the *associate must be at or return to the store to receive tender of the final payout*.  Any of the following scenarios (and many others) may occur:

• The associate may decline to come in at all, or may ask that their monies be mailed. Accommodating such a request will necessitate obtaining a money order or waiting for the regular payroll process to issue a proper check.  PM Chart, ¶¶27, 28(a); Martin Decl. ¶VI.C.1.

• The associate may come in on a payday, pick up a normal payroll check, but neglect to pick up cash for accumulated vacation.  PM Chart, ¶28(c).

• The associate may come in substantially later than when she/he terminated and receive a cash payout, or cash plus a payroll check.  PM Chart, ¶28(d).

In each of these scenarios, *although Wal-Mart's legal obligations have been met*, a review solely of the electronic data could result in an initial and ultimately improper conclusion that Wal-Mart either underpaid or paid late a terminated associate.

## D.   The Circumstances Surrounding the Four Named Plaintiffs

1.   **Danton Ballard:**  Danton Ballard was hired on July 30, 2004 as an hourly associate.  He accrued vacation his first year but was paid for those hours on his one-year employment

anniversary (July 2005).  In September 2005, Ballard converted to a salaried non-exempt manager-in-training.  As of that date, Ballard had accrued 8.48 vacation hours.  Thereafter, like other salaried associates, Ballard's accrued vacation was not tracked electronically, but rather by management at his store.  On January 7, 2006, Ballard was promoted to an exempt assistant manager position.  Martin Decl. ¶VI.F.1.

Ballard worked for four pay periods as a salaried manager, and was involuntarily terminated on March 3, 2006 for gross misconduct.  During his stint as an exempt associate, Ballard accrued additional vacation.  Thus, at the time of termination, Ballard would have accrued as much as 48.68 hours of vacation, assuming he had not taken off any time after July 2005, with a gross monetary value of $1,170.75.  Martin Decl. ¶VI.F.1.  In calculating Ballard's final vacation pay, Wal-Mart concluded that Ballard was owed $1,184.03 in vacation pay which he was paid.  Wigger Decl. ¶21, Exh. 9 (Ballard unsigned Payout Worksheet).[10]  As a result, Wal-Mart *overpaid* Ballard with respect to his vacation in the minimum amount of $13.28.[11]  Martin Decl. ¶VI.F.1.

For unexplained reasons, the payroll database for the pay period after Ballard terminated shows a payment of $2,929.92 gross for vacation and $1,486.41 for gross regular wages, and a corresponding net cash draw in the amount of $2,840.23.  Martin Decl. ¶VI.F.1.  But Ballard's file and the Payout Worksheet show *Ballard was not owed any of these sums*.  The erroneous entries relate to *another* Wal-Mart assistant manager (Richard Madala) whose employment terminated during that pay period.  It was Madala who was owed vacation and wages upon termination and who received a full cash payout for those amounts.  Martin Decl. ¶VI.F.1.  *The information pertaining to Madala forms the basis for Dr. Shapiro's incorrect conclusion that Ballard was improperly paid*.

2.  **Michael Wiggins:**  Wal-Mart hired Wiggins on April 30, 2004.  A file within

_____

[10] Deposition excerpts for the named Plaintiffs are attached to the Declaration of Rebecca Eisen.

[11] At the time of his promotion, Ballard had 7.35 hours of personal time recorded in the payroll database that had accrued prior to his becoming a manager-in-training.  Martin Decl. ¶VI.F.1.  This personal time was not paid to Ballard upon termination but may have been used by Ballard at some time between July 2005 and March 2006.  Without testimony from store management and/or Ballard, it is not possible to know — and therefore Shapiro just speculates — whether Ballard received the correct amount for his personal time.

the payroll database contains an entry *suggesting* that Wiggins was terminated on July 4, 2004.  The payroll file also indicates Wiggins received payment for 4.31 vacation hours and 1.75 personal hours in his check for the pay period ending July 9, 2004.  These hours correspond to the vacation Wiggins had accrued as of pay period ending June 11, 2004 (two pay periods prior).  Martin Decl. ¶VI.F.2.

However, Wiggins' personnel file does not indicate *actual* termination on July 4, 2004; nor is there any data indicating he was "re-hired."  Annatone Decl. ¶¶5-6.  Wal-Mart's time and attendance records show that Wiggins worked on July 4, and again on July 8.  Martin Decl. ¶VI.F.2.

Only by assuming that Wiggins did in fact terminate on July 4 can it be concluded that he was underpaid by approximately $32 in vacation accrued through that date.  However, as evidence beyond the electronic database establishes, Wiggins *did not terminate* July 4, and was in fact *overpaid* in October when his employment clearly did terminate because Wiggins' vacation hours were never adjusted to reflect the hours of vacation paid to him in July.  Annatone Decl. ¶8.  He was paid (again) for those same hours in October.[12]  Martin Decl. ¶VI.F.2.

*Shapiro, apparently unaware that the earlier vacation payout was not credited, concludes erroneously from his review of limited data that Wiggins was underpaid.*

3.  **Barry Smith:**  Smith was hired as a "management trainee" on September 22, 2003, and became a salaried exempt assistant manager on March 6, 2004.  Smith last worked on Friday, December 17, 2004, but it is unclear what happened that day.  Smith testified that on December 17 he attended a meeting with Store Manager Kevin Throneberry in which Throneberry told Smith that he did not want Smith in the store.  Smith Depo. 52:20-53:18.  After that conversation, Smith claimed he "didn't think about" asking for final wages, and left the store.  *Id.* 75:21-76:20.  Instead, Smith went home, received a message about a sick relative, made immediate travel arrangements, and flew on

---

[12] On October 20, the store PM spoke with Wiggins about his termination, but Wiggins did not come to the store that day to receive his final pay; rather, he requested that his final pay be mailed to him. Wiggins Depo. 52:3-14, 58:4-12, 67:4-68:24; Annatone Decl. ¶¶10-11, Exh. 5. Wiggins was sent a money order for the net amount shown on the Payout Worksheet, including the vacation *overpayment*. *Id.* at ¶9, Exh. 3. The post office returned the money order as undeliverable. Annatone Decl. at ¶14, Exh. 6.  On December 1, 2004, the PM enclosed the money order again for the "monies still owed to you following your payout".  *Id.* at ¶¶18-19, Exh. 10.  This letter *was also returned* as undeliverable. *Id.*. at ¶20, Exh. 11.  Finally, in December, Wiggins came to the Martinez store and immediately received a cash payout for his vacation. *Id.* at ¶¶21-22, Exhs. 12-13.

OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION
1-SF/7625739.23

USDC – N.D. of CA Case No. C 06-02069 SBA (BZ)

December 17 to Michigan. *Id.* at 71:2-75:20. Smith did not return to the store until January 2, when he received the full amount of all sums owed to him through December 17. *Id.* at 79:4-23, 84:6-85:21, 91:9-92:11, 99:13-20, 151:21-152:12, 189:8-192:7.

Based on a review of limited data, Shapiro concludes that Smith was paid late. Shapiro claims that the payroll database demonstrates that Smith was terminated December 18 and paid on December 24. *Shapiro never read Smith's deposition and is apparently unaware Smith failed to come to the store and was out of town.* Martin Decl. ¶VI.F.3; Shapiro Depo. 35: 11-18.[13]

4.   **Nathan Lyons:** Nathan Lyons was hired on November 13, 2004 as an hourly associate. He was terminated on March 23, 2006, for misconduct. In calculating Lyons' final cash pay, the store's PM failed to add vacation and PTO that had accrued based upon the 21.45 hours Lyons had just worked during the pay period in which he was terminated. Thus, Lyons was underpaid by $10.30.

**E.   Dr. Shapiro's Faulty Methodology**

Plaintiffs' proffered expert, Martin Shapiro, summarily assumes that a review of three databases is all that is needed to establish damages for each putative class member with exactitude: "[I]t is my expert opinion that I currently have all of the necessary information and procedures for calculating individual class member damages in the instant cases. The calculations are not approximations. The calculations are exact." Shapiro Depo. 4:26-5:1. Shapiro says, "I am data bound." Shapiro Depo. 233:12-13. "All of my conclusions are drawn just from the data.…" *Id.* at 99:9-14.[14]

Shapiro's data universe is the Associate, Payroll, and PeopleSoft databases. Shapiro Decl. ¶11 and Depo. 19:20-20:3. In selecting these, Shapiro was neither driven nor limited by Wal-Mart's discovery responses; Shapiro was asked by Plaintiffs' lawyers what *he* thought would be relevant and Shapiro chose the three databases, Depo. 18:9-20:3. "I currently have all of the necessary information and procedures for calculating individual class member damages." Depo. 25:18-25.

---

[13] All excerpts from Dr. Shapiro's deposition are attached to the Declaration of Rebecca Eisen.

[14] Shapiro says his engagement is limited to analyzing potential damages, not legal obligations, such as whether Wal-Mart's actions were "willful." Shapiro Depo. 13:3-15:13, 92:13-16. But Shapiro's analysis and the Plaintiffs' "Trial Plan" erroneously equate disparities in numerical fields in databases with Wal-Mart's *liability* to pay that amount in damages. *See* Trial Plan 2:8-15.

OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION
1-SF/7625739.23

USDC – N.D. of CA Case No. C 06-02069 SBA (BZ)

1    Shapiro concedes he made no attempt to validate the data: "[t]he data do not require validation."

2    Shapiro Depo., 51:23-52:13. Shapiro plainly knew of other databases he might have consulted, like

3    Wal-Mart's Cash Office Database which captures cash paid to employees, because Shapiro used the

4    Cash Office Database in other engagements. *Id.* at 28:6-29:23. He deliberately disregards it here; sup-

5    posing it "would simply be redundant." *Id.* at 31:8-25. Shapiro did not test the veracity of the Associate

6    Database by cross-reference to records showing actual cash payments. *Id.* at 34:23-35:6.

7    Shapiro did not read the depositions or talk to any of the Plaintiffs. Depo. 43:8-44:16, 233:14-

8    21. Consequently, he does not know or care that Plaintiff Wiggins testified that he received cash in

9    November 2004 for all his vacation. Wiggins Depo., 58:20-63:5. Per Shapiro: "[I]t would have to be in

10   the data" for it to be of any concern. Shapiro Depo., 223:14-234:5. Shapiro did not speak to any class

11   member: "There's no reason, I just didn't." *Id.* at 45:20-46:4. He did not review a single personnel file

12   to corroborate or detect inconsistency with the information he saw in his databases. Depo. 53:11-19.

13   Shapiro did not even verify his facts describing the named Plaintiffs. Shapiro Decl. ¶¶39-42; Depo.

14   37:19-38:4. Yet, Shapiro stubbornly concludes that his "calculations are exact." Decl. ¶10.

15   Dr. Denise Neumann Martin, NERA Economic Consulting (Ph.D., Harvard in Economics), has

16   studied Shapiro's declaration, his approach, and his calculations. As detailed in her accompanying

17   report, Dr. Martin concludes that Shapiro's methodology could not enable anyone to identify class

18   members or to estimate alleged damages, and therefore his conclusions are unreliable. She finds, based

19   on her analysis of relevant Wal-Mart records beyond Shapiro's limited dataset, but available to Shapiro,

20   that, whether any given terminated Wal-Mart associate potentially has a claim requires an individualized

21   determination. Moreover, she identifies associates for whom Shapiro calculates damages but who were

22   in fact paid in full. Specifically, Dr. Martin finds that Shapiro's exclusive reliance on his three selected

23   databases causes him to assess and calculate damages where none exist because he fails to account for

24   critical additional information that is not included in those databases. Martin Decl. ¶I.

25      • Shapiro misses cash payments *actually made* for available and accrued vacation and personal

26   time but reported by the paying store by way of the time and attendance system only in gross amounts

27   along with regular wages. The Payroll Database records the total as satisfying and, indeed, overpaying

28   the regular wages that are then recorded in the Payroll Database as "Arrears." Shapiro does not credit

1   the wage overage to the already paid vacation and personal time.  Therefore, Shapiro sees damages

2   where none exist.  Dr. Martin concludes that 19,000 terminated associates show this phenomenon for

3   which Shapiro calculates $13.5 million in damages.  Yet these associates may have been fully

4   compensated by cash draws.  Martin Decl. ¶I.1.a; I.3.a.iii.

5       • The pervasiveness of this particular Shapiro error is exemplified by the fact that of the 47

6   associates for whom he calculated damages greater than $10,000, 40 suffered from Shapiro's multiple

7   aggregating error.  Martin Decl. ¶I.3.b.iv.

8       • Shapiro observes in the Payroll Database gross earnings to be paid, but does not then see an

9   entry for "net earnings," which he concludes is the only record that would document that the process of

10  calculating tax and other deductions (so a "net" check can be cut) has occurred.  He therefore assumes

11  that no such check was cut and that the associate was not paid.  Because of his refusal to consider the

12  Cash Office Database, he fails to ascertain that on termination the associate was in fact paid earnings in

13  cash at the store.  Shapiro calculates damages for 13,080 claimants in this group, at $9.9 million.  Martin

14  Decl. ¶¶ I.1.b.; I.3.a.4.

15      • Shapiro observes "negative" entries of vacation and personal time in the Payroll Database and

16  concludes that such amounts were owing to associates but were wrongfully cancelled rather than being

17  paid.  Shapiro Decl. ¶30, 31.  He ignores other records, such as the Cash Office Database and

18  termination and pay related documents contained in personnel files, that establish the associate was in

19  fact paid in cash at the store.  Martin Decl. ¶I.1.c.

20      • Based on Shapiro's observation of multiple repetitions of such negative entries for vacation

21  time across multiple pay periods, he erroneously adds them all up to arrive at damages that grossly

22  exceed the amount of hours, if any, actually accumulated and owed.  Martin Decl. ¶I.1.d.

23      • Shapiro also notes "negative" entries for unused sick hours and assigns damages to them,

24  even though such hours are *not* an item for which terminating employees are entitled to a cash payout.

25  Then, as with vacation, he compounds his error by adding up repetitions of negative sick time entries

26  across multiple pay periods to arrive at an incorrect total of damages for hours the associate was not

27  entitled to in the first instance.  Martin Decl. ¶I.1.e.

28      • Over 4,000 terminated associates had multiple entries of identical vacation hours or multiple

1  entries of negative sick hours, for which Shapiro calculated damages of $4.0 million.  Martin Decl.
2  ¶¶I.1.c-e.; I.3.b.

3      • Consistent with the above incomplete analysis, Shapiro fails to consider critical information
4  bearing on the timeliness of Wal-Mart's termination payments.  Although California law requires Wal-
5  Mart to tender payment at the associate's store (and to mail only if specifically requested), Shapiro
6  cannot see in his data whether tender was made and ignores available evidence indicating that the
7  associates for whom he has calculated damages failed to present themselves for tender of payment.
8  Martin Decl. ¶¶I.2.  Nothing in the databases Shapiro used shows or could show whether associates
9  appeared to collect their payments.  Indeed, the failure of large numbers of associates to collect could be
10  expected (Shapiro does nothing to study this):  more than one third, almost 49,000 of Shapiro's
11  claimants, appear to have abandoned their jobs — walked off.  Almost 1,500 failed to provide necessary
12  employment documents or falsified them.  Almost 500 associates were terminated because they died.
13  Martin Decl. ¶I.2.b. According to Shapiro's own methodology, one-third of the putative class members
14  were owed less than $21; over 31,000 were owed less than $10; another 14,000 were owed between $10
15  and $21.  Martin Decl. ¶I.2.b.

16      • Through review of a random sample of personnel files, all produced to Plaintiffs prior to the
17  date of Shapiro's declaration, Dr. Martin has confirmed numerous instances of Shapiro's erroneous
18  calculations, including these examples:

19      ➢ Shapiro calculates $621 for M. Bismallah and $1,382 for A. Armenta as a result of a
20  "net earnings" error as described above.  Shapiro fails to note that both were paid via a cash draw at the
21  store, shown in the Cash Office Database.  Martin Decl. ¶¶VI.A.1-2.

22      ➢ Shapiro calculates damages to E. Gomez *of over $10,000* as a result of improper
23  aggregation of multiple negative vacation and sick hour entries as described above, and he misses the
24  payment of almost all vacation and personal time in cash.  Martin Decl. ¶VI.B.1.

25      ➢ Shapiro's quantification of damages for D.Cunliffe in the amount of $26,487
26  overestimates any conceivable damages by over $20,000 due to this same addition and multiplication of
27  negative entries.  A simple reality check would have shown Shapiro that this claimant's supposed
28  damages far exceed what he could possibly have earned under Wal-Mart's vacation policy.  Martin

1   Decl. ¶VI.B.2.

2           ➢ Shapiro erroneously aggregated multiple sick and vacation time for F. Haro to arrive

3   at $1,783 in supposed damages for these hours.  He concludes similarly as to E. Aguilera, with $928 in

4   damages; R. Zepeda, with $441; and P. Cardenas, with *$16,496*, all on account of negative sick hour

5   entries, even though terminating associates are not entitled to termination pay for unused sick hours.

6   Martin Decl. ¶VI.B.3.

7           ➢ Shapiro erroneously estimates damages for associates who received cash termination

8   payments that did not appear in the Payroll Database.  For example, Shapiro calculates 10.69 vacation

9   and 8.47 personal hours, for a total of $144.45 for A.Carroll.  No payment entry appeared in the DOE

10  Table of the Payroll Database, and Shapiro did not consider the Payout Worksheet in Carroll's personnel

11  file or entries in the Cash Office Database.  Those records show he was paid for 6.47 vacation and 7.64

12  personal hours.  Those records also show he may have been double-paid for work in his final payroll

13  period, receiving both a cash draw *and* his regular payroll check.  Martin Decl. ¶VI.D.

14      Shapiro failed properly to analyze the data to the tune of millions of dollars.  Coupled with these

15  gross errors is the overriding problem that Shapiro relies on data not tied to the legal elements of

16  Plaintiffs' claims. Shapiro's methodology cannot form the basis for class certification.[15]

17  **IV.   ARGUMENT**

18      **A.   Plaintiffs' Claims Are Not Amenable To Certification**

19      Class certification is not proper unless Plaintiffs establish each of the four prerequisites of

20  Fed.R.Civ.P. 23(a) and the requirements of at least one subpart of Rule 23(b) — here, Rule 23(b)(3).

21  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  To satisfy Rule 23(a), it is

22  incumbent upon Plaintiffs to prove that:  (1) Plaintiffs are so numerous that joinder is impractical; (2)

23  there are questions of law or fact common to the class; (3) the named Plaintiffs' claims are typical of

24  those of the rest of the class; and (4) named Plaintiffs can adequately protect the interests of the class.

25  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Plaintiffs bear the burden of

26  establishing each of these prerequisites. *Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir. 1985). The

27  _____

28      [15] Filed with this Brief in Opposition are Defendant's Objections to Evidence and the Declaration of
    Martin M. Shapiro, Ph.D.

1    failure to satisfy even one of the Rule 23 prerequisites warrants denial of certification.  *See Amchem*

2    *Products, Inc. v. Windsor*, 521 U.S. 591, 622 (1997).

3          To satisfy the criteria of Rule 23(b)(3), Plaintiffs must further establish that:  (1) common

4    questions of law and fact predominate over questions affecting individuals; and (2) a class action is

5    superior to other available methods for the fair and efficient adjudication of the controversy.  *Poulos v.*

6    *Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).  The predominance criterion is *far more*

7    *demanding* than Rule 23(a)'s commonality requirement, *Amchem*, 521 U.S. at 623-24, and is frequently

8    the principal obstacle to certification.  The superiority prerequisite ensures that class-wide resolution of a

9    dispute is not merely as good or comparable, but rather a *superior* method of resolving the controversy.

10   *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 673 (9th Cir. 1975).

11         In determining whether class certification is warranted, a court may not merely accept Plaintiffs'

12   assertions at face value, but must instead conduct a rigorous analysis of Rule 23 criteria, even if this

13   analysis involves a preliminary inquiry into the merits of the case:

14         (1) a district judge may certify a class only after making determinations that each of the Rule
           23 requirements has been met; (2) such determinations can be made only if the judge resolves
15         factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts
           are relevant to a particular Rule 23 requirement have been established and is persuaded to rule,
16         based on the relevant facts and the applicable legal standard, that the requirement is met; (3)
           the obligation to make such determinations is not lessened by overlap between a Rule 23
17         requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement;
           (4) in making such determinations, a district judge should not assess any aspect of the merits
18         unrelated to a Rule 23 requirement; . . .

19   *In re Initial Public Offerings Securities Litig.,* 471 F.3d 24, 41 (2nd Cir. 2006); *see also Szabo v.*

20   *Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) ("Before deciding whether to allow a case to

21   proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary

22   under Rule 23" even if "the judge must make a preliminary inquiry into the merits.").  Here, a rigorous

23   analysis of Plaintiffs' claims demonstrates the impropriety of class treatment.

24   **B.    Pervasive, Across-The-Board Defects Require Denial Of Plaintiffs' Class
              Certification Motion**
25

                 **1.    Shapiro's Analysis of Electronic Data Does Not Support A Finding Of
26                        Predominance**

27         Plaintiffs "must adduce sufficient evidence and a plausible theory to convince the Court that

28   class-wide [liability and damages] may be proven by evidence common to all class members."  *In re*

---

1    *Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 190 (D.N.J. 2003). Plaintiffs have the burden to

2    demonstrate that their theories are methodologically "valid" and "suitable for classwide use." *Id*.

3         Plaintiffs fail to meet their burden. Shapiro's use of select databases to establish class-wide

4    liability is fatally flawed. Martin Decl. ¶I. Shapiro performed no reliability test on the databases for the

5    purposes for which he purports to use them, and failed to consider *any other* evidence that would show

6    whether Wal-Mart met its statutory obligations. Shapiro Depo. 99:9-14; Martin Decl. ¶IV.

7         And Shapiro ignores flashing-light indicia that his databases do not accurately reflect whether

8    the named Plaintiffs were timely tendered final pay. Had Shapiro considered the evidence, he would

9    have found that three of the four were fully and timely paid (one overpaid) and the fourth was underpaid

10   only $10.30. Martin Decl. ¶VI.F. Shapiro's electronic data simply do not fully disclose these relevant

11   facts: payment to Wiggins; whether Smith absented himself from timely receipt of his pay; inadvertent

12   errors suggesting underpayments to Ballard when none occurred. Martin Decl. ¶VI.F.

13        Most importantly, Shapiro's limited electronic data tells an incomplete story: Shapiro is focused

14   on *regular biweekly* payroll records, not the exception-based records generated during the final pay

15   process. Liability cannot be "presumed" from electronic databases; a proper assessment requires

16   consideration of all proper evidence, most notably the evidence specific to the termination and pay

17   tendered to each associate — Exit Interview forms, Payout Worksheets, manager notes, cash payment

18   records, and communications with the employees themselves. Martin Decl. ¶VI.

19        At best, Shapiro's analysis does nothing but flag instances that may require further

20   individualized inquiry. *See In re Ford Motor Co. Ignition Switch Products Liability Litig.*, 194 F.R.D.

21   484, 491 (D.N.J. 2000): "statistical analysis may greatly *aid* the proof of individual incidents through

22   the use of inferential evidence, [but] the continued need for individual litigation of causation makes this

23   case unsuitable for class action treatment." In this case, with or absent Shapiro's work, the fact-finder

24   must still make the following individualized determination: whether and when each associate was

25   involuntarily or voluntarily terminated; what notice was given and when; what portions of final pay

26   were then or only later calculable; whether Wal-Mart tendered final pay at the store where the associate

27   worked; whether the associate expressly and previously authorized final payment by mail; whether the

28   associate made him/herself available to receive tender at the workplace; whether any final pay was

1    willfully withheld or delayed; whether a particular tender was made in good faith; and whether a

2    particular tender was negligent or insufficient. *None* of these critical issues can be resolved solely by

3    reference to the records upon which Shapiro relies. *See Alix v. Wal-Mart Stores, Inc.*, 838 N.Y.S.2d

4    885, 894-895 (N.Y. Sup. Ct. June 11, 2007) ("Plaintiffs suggest that expert testimony might be a

5    satisfactory substitute for individualized proof… [However], [i]n the present case, the facts and

6    circumstances surrounding the allegedly unpaid work vary substantially from associate to associate…

7    [E]ven if plaintiffs could overcome these formidable barriers and rely upon an expert analysis of

8    defendant's computer time records to prove their case in chief, the need for numerous, individualized,

9    fact-specific inquiries remains.").

### 2.   Reliance on Shapiro's Testimony Without Individualized Inquiry Would Violate Defendant's Constitutional Right To Due Process

11         To allow Plaintiffs to presume liability on the basis of Shapiro's methodology would violate

12   Wal-Mart's due process rights.  The fundamental requirement of due process is the opportunity to be

13   heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552

14   (1965). Rule 23 cannot be used to alter substantive rights. *Amchem*, 521 U.S. at 613.

15         Plaintiffs' approach is tantamount to introducing the collective "testimony" of all class members

16   against Wal-Mart through Shapiro.  But in such a scheme Wal-Mart would be denied the ability to cross-

17   examine or defend against individual class members "testifying" in that way.  A class action violates due

18   process where it deprives a defendant of the opportunity to rebut evidence introduced against it.[16]

19   Courts have rejected similar proposals for proof to be proffered through experts like Shapiro. *E.g.*, RJN

20   Exh. I at 4 (Memorandum of Court and Order in *Pittman v. Wal-Mart Stores, Inc.*, No. 02-10206 (Md.

21   Cir. Ct. June 8, 2004)), *aff'd*, 927 A.2d 1 (Md. Ct. App. June 29, 2007) ("The Court finds that Plaintiffs'

22   proposed expert [Shapiro's] testimony violates the Defendants' procedural due process rights by

23   precluding cross-examination of the current or former employees who together comprise each expert's

---

[16] *See, e.g., Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) (defendant was improperly "forced to defend against a fictional composite without the benefit of deposing or cross-examining the disparate individuals behind the composite creation."); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 489 n.21 (E.D. Pa. 1997) ("use of questionnaires to establish the elements of causation and injury … without cross-examination or rebuttal evidence would [have] violate[d] defendants' due process rights.").

1    opinion").[17]

2         Here, Plaintiffs freely concede in their Trial Plan that they do not intend to inquire into the

3    specifics of even one class member.  Were this an individual action, Wal-Mart would have the right to

4    examine the claimant, introduce evidence demonstrating it tendered final pay to that claimant, and have

5    the factfinder assess the relevance and weight of the parties' evidence.  A class action may not be used

6    to deny Wal-Mart's fundamental rights, rooted in the Federal and California Constitutions.  *See, e.g.,*

7    *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 312 (5th Cir. 1998) ("the applicability of the Seventh

8    Amendment is not altered simply because [a] case is [a] class action"); *Arth Main Street Drugs v. Beer*

9    *Distribs. of Ind., Inc.*, 1978 WL 1357, *5 (N.D. Ind. 1978) ("[w]hile this court is mindful of the

10    important policy considerations which underlie Rule 23 actions, these considerations must never be

11    allowed to create the kind of situation which experience teaches will in all probability result in denying

12    defendants a fair trial.").  "Tempting as it is to alter doctrine in order to facilitate class treatment, judges

13    must resist so that all parties' legal rights may be respected."  *In re Bridgestone/Firestone*, 288 F.3d

14    1012, 1020 (7th Cir. 2002).[18]

15              **3.   Other Courts Have Rejected Shapiro's Testimony**

16         A number of other courts presiding over wage and hour cases against Wal-Mart have rejected

17    expert analysis similar to that offered here, including from Shapiro.  For example, in *Salvas v. Wal-Mart*

18    *Stores*, the Massachusetts Superior Court initially certified a class of hourly associates based on

19    plaintiffs' assurance that expert opinion testimony could establish liability and damages on a class-wide

20    basis.  Later, when the court examined the proffered expert testimony of Shapiro, the court decertified

21    the class, holding that common issues did not predominate and that Shapiro's testimony was unreliable.

22    The court concluded that "[t]he time records of Wal-Mart are not adequate of themselves to establish

23    entitlement to compensation in a case like this."  2006 WL 4472492, *12 (Mass. Super. Nov. 7, 2006).

24    With respect to the expert testimony on which plaintiffs relied to establish class-wide liability, the court

25

26            [17] All unpublished opinions are attached to the Request for Judicial Notice filed herewith.

           [18] In seeking to abrogate Wal-Mart's right to confront witnesses and challenge each putative class

27    member's claims, Plaintiffs would abridge the Rules Enabling Act, 28 U.S.C. §2072(b):  rules of
procedure "shall not abridge, enlarge, or modify any substantive right."  *Ortiz v. Fibreboard Corp.*, 527

28    U.S. 815, 845 (1999) ("no reading of [Rule 23] can ignore the [Enabling] Act's mandate that 'rules of
procedure 'shall not abridge, enlarge, or modify any substantive right.''").

found "that Shapiro's rigid refusal to do anything to ascertain the accuracy of the records on which his

opinions are based by determining whether reality comported with the policies Wal-Mart had in place

makes his methodology unreliable." *Id.* at *20.

More recently, in *Brown v. Wal-Mart Stores, Inc.,* 2001 L 85 (Rock Island County, Ill. March 9,

2007), the Court denied certification because a class trial based on Shapiro's proposed analysis of Wal-

Mart's records would violate Defendant's right to due process.  RJN Exh. G at 25 (Order on Class

Certification in *Brown v. Wal-Mart Stores, Inc.*).[19]

### 4.    For Each Claim And Each Subclass, Key Liability Issues Require Individualized Scrutiny

Every one of Plaintiffs' four claims presupposes that California's final pay statute obligations

were triggered as to each subclass and each subclass member.  But these critical issues cannot be

resolved by class-wide proof, nor by Plaintiffs' proffered trial plan.[20]

"To determine whether common issues predominate, this Court must first examine the subs-

tantive issues raised by Plaintiffs and second inquire into the proof relevant to each issue." *Jimenez v.*

---

[19] The Michigan Court of Appeals has also rejected Shapiro's analysis:  "plaintiffs' 'proposed statistical analysis ignores the highly individual issues.'" *Jackson v. Wal-Mart Stores, Inc.*, Case No. 258498, 2005 WL 3191394, at *5 (Mich. Ct. App. Nov. 29, 2005).  The Arizona Superior Court proceeded likewise, holding:

> This Court does not accept that Plaintiffs' experts' "formulaic methodologies" can supplant the individualized inquiry necessary to establish Wal-Mart's liability for unjust enrichment.…  The various affidavits submitted by Defendant (whether credible or not) set out some catalog of the variety of reasons there may be no expectation of payment.  Plaintiff's mere showing that these events did occur cannot, in itself, establish general liability nor quantify damages.

*Osuna v. Wal-Mart Stores, Inc.*, 2004 WL 3255430, at *6 (Ariz. Super. Ct. Dec. 23, 2004).  Most recently, the New York Supreme Court also denied certification based, in part, on the unreliability of Shapiro's testimony:

> "[E]ven if plaintiffs could overcome [Daubert challenges to their expert analysis and the substantial variation in the circumstances surrounding each putative class member's claims of allegedly unpaid work] and rely upon an expert analysis of defendant's computer time records to prove their case in-chief, the need for numerous, individualized, fact-specific inquiries remains.  Finally, even if plaintiffs were content to present their case on an aggregated basis, defendant would insist on being provided the opportunity to offer numerous individualized, employee-specific defenses as to liability and damages.  The parties disagree on whether due process would require that defendant be given such an opportunity, but certainly considerations of fundamental fairness would counsel in favor of defendant's position."

*Alix*, 838 N.Y.S.2d at 856-7; *accord*, *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 560 (Tex. App. 2002) ("[a]ppellees . . . ignore the fact that such statistical evidence will preclude any individual inquiry in the presence of the jury regarding the formation of each alleged contract or the varied circumstances ... when determining Wal-Mart's liability for any alleged breach of each contract."); *see also Cutler v. Wal-Mart Stores, Inc.*, 927 A.2d 1, 12-13 (Md.App. 2007).

[20] Filed with this Brief in Opposition is Defendant's Response to Plaintiffs' Proposed Trial Plan.

1    *Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006). Before any class representative or member

2    may proceed on claims under California's final pay statutes, the Court must first determine whether

3    Wal-Mart's statutory obligations to tender final pay were even triggered under the relevant statutes.

4    Then, but only if those obligations were triggered as to a particular terminating associate, the Court must

5    consider the totality of what final pay Wal-Mart tendered, when, under what circumstances, and in what

6    form. These pervasively significant issues require case-by-case proof.

7         The key final pay statutes (§§201, 202) are triggered not only by termination of employment but

8    by the affected associate performing his/her duty *to be at the store to receive tender* of final pay or to

9    give Wal-Mart specific mailing instructions. §208.

10        Plaintiffs and Shapiro erroneously assume that Wal-Mart's statutory final pay obligations were

11   triggered on the "termination" date recorded in certain Wal-Mart databases. Shapiro Decl. ¶21. But

12   there is no fixed or universal policy governing the assignment of the "termination date" entered into the

13   computer. Accordingly, the dates entered are no more than starting points in analyzing whether and

14   when Wal-Mart became statutorily obligated to tender payment. The assignment of "termination dates"

15   depends on the individual discretion and practice of the manager involved.

16        Consider for example the many "three-day no show" or job abandonment terminations, where

17   the affected associate severs the employment relationship, without excuse or explanation. The assigned

18   termination date in these cases might be the last day actually worked, *or* three scheduled shifts after that

19   last work day (under the three-day no show policy), *or* the day the manager ascertains that the associate

20   is no longer going to report for work, *or* some other date. The point is simple: the assigned termination

21   dates are based on variable, case-specific considerations and do not establish the duty of "discharge" or

22   "quit" for purposes of the final pay laws.

23        Even after a final-pay-triggering "termination date" is ascertained, additional, claimant-specific

24   factual issues must be addressed. Plaintiffs assume that, once the termination date is ascertained, the

25   only relevant dichotomy is between those associates entitled to "immediate" pay under §201, and those

26   who quit but did not give notice, thereby entitling Wal-Mart to 72 more hours within which to tender

27

28

1   final pay under §202.[21]  But California law directs a broader inquiry that Plaintiffs ignore.

2           Of critical importance, *Wal-Mart must tender payment at the place of employment* (the store)

3   except in rare circumstances when quitting employees expressly and previously "request[] and desig-

4   nate[] a mailing address" to which final pay should be sent.  §§201, 202, 208.  A non-conforming tender

5   would not satisfy California's final pay statutes.  *Villafuerte*, 96 Cal.App.4th Supp. at 50-51.  Thus, the

6   location and form of tender will qualify and limit the statutory date when tender is to take place:

7           Labor Code section 208 further provides that the wages of an employee who quits shall be
8           paid at the office or agency of the employer in the county where the employee has been
            performing labor.  You are correct when you state that *this provision would require the*
9           *quitting employee to return to the office or agency where the employee has been performing*
            *labor* to collect his or her wages.  You are also correct in stating that *waiting time penalties*
10          *would not accrue to an employee who fails to return to the place of employment 72 hours after*
            *quitting* (unless, of course, the employee has given at least 72 hours prior notice of intention to
11          quit in which event the wages are due at time of quitting (Labor Code section 202).)

12  RJN Exh. C (DLSE Op. Ltr. 1986.09.15).  Indeed, the DLSE recognizes "[t]here are also situations

13  where the conditions of the termination are in issue and investigation is necessary."  *Id.*

14          Wal-Mart's statutory obligations (and any statutory liability) depend on an examination of the

15  facts concerning each termination and tender.  The fact is that thousands of terminating Wal-Mart

16  employees do *not* present themselves at the store where they worked to receive final pay, do not give

17  Wal-Mart adequate prior mailing instructions, or present themselves at the store long after the

18  termination date recorded in the computer payroll system.[22]  PM Chart, ¶¶21-26.

19          When, as here, a party is to tender at a particular place, or under certain conditions, the tender

20  obligation arises at the place once (and if) the conditions are satisfied.  "In 62 C.J. 657 the author says:

21  'A formal tender is unnecessary if the party to whom performance is due be absent from the place of

22  performance, in those cases where his presence is necessary'. . .  The rule stated in Corpus Juris has been

23      [21] Dr. Shapiro admits that Wal-Mart's computer records do not show when a quitting associate gave
    Wal-Mart notice of termination.  Shapiro Decl. ¶23.  Such notice is legally critical because, depending
24  on whether advance notice is given, §202 gives Wal-Mart up to 72 hours to carry out the final pay
    process.  Thus, even in cases where the computerized "termination date" might otherwise be an accurate
25  trigger date, that date is legally insufficient to identify when Wal-Mart's tender duties arose for the vast
    majority of associates who voluntarily terminate without advance notice.  Martin Decl. ¶ I.1.f.; PM
26  Chart ¶20.

    [22] Plaintiffs repeatedly cite *Walsh v. Pittsburgh Press Co.*, 160 F.R.D. 527 (W.D. Pa. 1994).  That
27  case is poles apart.  It involves terminations associated with a shuttered business where the rights at issue
    concerned "Dismissal Pay" and "Severance" Plans.  *Id.* at 529.  This case, by contrast, involves no plans
28  applicable to simultaneously laid off workers.  It involves the many permutations raised by individual
    facts and the varied aspects of California law.

1   followed in nearly all of the states, including this state." *Woods-Drury v. Superior Court,* 18 Cal.App.2d

2   340, 348 (1936); *accord* Civil Code §1489 (place of performance rules subject to "express provision" of

3   the parties).

4          Performance of an obligation (here, to the associate), and the offer of performance (here, by

5   Wal-Mart), are each excused when prevented or delayed by acts of the creditor (here, the associate).

6   Civil Code §1511; *Ray Thomas, Inc. v. Cowan*, 99 Cal.App. 140, 145 (1929) ("[t]he rule set forth in 13

7   C.J., p. 647, §721, [] is: 'A party to a contract cannot take advantage of his own act or omission, to

8   escape liability thereon . . . . Under this rule performance of a contract is excused when it is prevented by

9   the acts of the opposite party, or is rendered impossible by him.'").   The employment contract

10  "incorporate[s] the provisions of existing law." *Lockheed Aircraft Corp. v. Superior Court*, 28 Cal.2d

11  481, 486 (1996).

12         An associate's failure to fulfill his/her statutory duties in the final pay process (e.g., by failing to

13  return to the store) suspends and excuses Wal-Mart's obligation to perform under the statutory scheme,

14  at least until the terminating associate fulfills his/her duties. *Semas v. Bergmann*, 178 Cal.App.2d 758,

15  762 (1960) ("A promisor's delay in performance is excused to the extent acts of the promisee caused

16  such delay.").   While an associate's failure to appear at the store may not *extinguish* Wal-Mart's

17  indebtedness, *it abates Wal-Mart's statutory final pay obligations*, which dictate tender in accord with

18  the statutory scheme.  Civil Code §1512 ("If the performance of an obligation be prevented by the

19  creditor, the debtor is entitled to all the benefits which he would have obtained if it had been performed

20  by both parties.").  If Wal-Mart mails a terminated associate a regular paycheck generated by payroll

21  because the associate did not come to the store to accept tender of final pay, the pay date may

22  superficially appear "late" under the §§201 and 202 scheme.  But there is no statutory violation because

23  the statutory final pay process was never triggered -- the associate failed to come to the place where

24  Wal-Mart is required to tender.  Only once the process is triggered can Wal-Mart's statutory compliance

25  be evaluated.[23]

26  ───────────────

27         [23] Wal-Mart makes every effort to pay even those associates who do not perform their duties under
    the statutory scheme.   But Wal-Mart's extra-statutory payment efforts are not statutory final pay
28  violations.  The deviations in process that are made necessary because associates do not fulfill their
    statutory obligations do not trigger the statutory final pay scheme.  *See Thompson v. Dubois*, 215 Cal.

**C.**   **Plaintiffs Have Not Established That *Any* Of Their Three Subclasses Should Be Certified**

1.   **Individual Issues Render Certification Of Plaintiffs' "Vacation" Claims Improper**

The claims of underpaid vacation on behalf of Subclass 1 require examination of individual facts relating to the termination of each putative class member.  To begin, information on accrued vacation and the vacation used by *salaried* associates is not recorded in any computerized database.  Shapiro Depo, 86:25-87:5. For these Subclass 1 members,[24] it is impossible to determine whether vacation was underpaid without knowing what vacation accrued and was used before termination.  The computerized database is useless in assessing this imperative inquiry, as Shapiro concedes.  *Id.*

Second, while Shapiro claims to have found a multitude of "short" pays, close scrutiny of the data, along with the other available information from personnel files and the cash office database, confirms that the electronic data shows "phantom" short payments if not read correctly.  Martin Decl. ¶IV, VI.

Third, and most importantly, the electronic data will most commonly show that, to the extent vacation was never paid, it is directly attributable to the fact *the associate never came to the store*. Shapiro counts this as a short pay even if Wal-Mart has fully met its statutory obligations.  Martin Decl. ¶V.

2.   **Plaintiffs' "Wage" Claim May Not Properly Be Certified Because Of Material Defects As To That Claim**

Plaintiffs' underpaid "wage claim" (Subclass 2) is predicated on a "Third Claim" for "breach of contract."  Plaintiffs' Brief, p. 2, lines 13-14.  But there is no such claim in the operative complaint.  The Third Claim (originally a claim for overtime and straight time wages, FACC ¶67) was dismissed by stipulation and Court order.  No "breach of contract" claim is alleged separately in the FACC.  The Court certainly cannot certify a class as to claims that are not alleged and have been dismissed.  *See, e.g., French v. First Union Securities Inc.*, 209 F.Supp.2d 818, 834-835 (M.D. Tenn. 2002).

---

577, 581 (1932) ("Under the circumstances, the plaintiff did all that he could be expected to do.  He mailed a document to the maker's last place of residence and left a copy thereof at the place where the notes were payable.  We think this was sufficient.").

[24] Of course, if it cannot be determined "from the computerized records" that *salaried* associates were not paid earned vacation then, according to Plaintiffs' class definition, *they are not members of the class at all!  See, infra,* p. 33.

In addition, like the other two class claims, the wage claim presents key liability issues that can be determined *only* by assessment of individualized evidence concerning each class claimant.  In this instance, in addition to all of the previously discussed flaws in his methodology, Shapiro has erroneously counted as "unpaid wages" amounts in the electronic record that do not relate to wages at all.  Martin Decl. ¶I.1.c.e.  Indeed, it may well be that nearly all of the $8.6 million Shapiro classifies as unpaid is another phantom product of Shapiro's misread data.

### 3.   **Individual Issues Overwhelm Plaintiffs' "Late Pay" Claims**

In Subclass 3, Plaintiffs claim that in 8,920 out of more than 174,000 terminations, associates were fully (but belatedly) paid and thus have penalty claims under §203.  But, as with the other two subclasses, the existence of such a statutory violation cannot be ascertained solely from the computerized payroll database.

For example, a payment may *appear* late but, on review *of all* the evidence, including the *individual circumstances of each final pay tender*, it will be revealed that payment was not late at all.  The passage of time between termination and tender of final pay may have any number of explanations that establish no "late" tender at all.  In other instances, the terminating associate may delay coming to the store (Plaintiff Smith as an example), thereby delaying trigger of the statutory final pay process.[25]  The associate may opt to pick up a regularly generated paycheck rather than cash.  An associate may be sent an additional payment, after statutory tender was timely made, covering previously incalculable bonuses or a "true up" distribution made after payroll calculates withholding taxes.  These payments do *not* make the tender of final pay late, though they may cause the computer to show a seeming delay in tender.

The inadequacy of the payroll databases to assess "late" claims is evident from the story of the sole "late pay" class representative - Smith.  Whether Smith has a valid late pay claim cannot be ascertained without examining why Smith left his store on December 17 and why he did not receive payment until January 2. If, by walking out of the store on December 17, Smith quit, then Wal-Mart had

---

[25] The DLSE has recognized that "[t]here have been instances where the employee is prevented by the employer from returning for his wages; or where the employer has informed the employee that the wages will not be available even if he does return.  Such situations are handled on a *case-by-case basis*." RJN Exh. C (DLSE Op. Ltr. 1986.09.15).

1   72 additional hours to tender (§202). The evidence shows that Smith was paid in full the very first day

2   he accepted that tender, i.e., on January 2. And if Smith was fired on December 17, it is necessary to

3   explore why tender was not made on that day, (i.e., did Smith refuse to stay at the store, was he sent

4   away, and if so under what circumstances). Martin Decl. ¶VI.F.3.[26]

5       Facts like these must be explored for each putative class member to determine whether any

6   liability for late pay exists. These issues cannot, by their very nature, be evaluated on a generic class-

7   wide basis. Indeed, the phenomenon of late pay purportedly detected by Plaintiffs (in only 5% of all

8   cases — 8,920 out of 174,000) hardly bespeaks a policy or practice ripe for class litigation. At most, it

9   suggests isolated departures from policy requiring individualized examination and explanation.

10      **D.   Class Issues Will Not Predominate With Respect To Plaintiffs' Claim For
             Waiting Time Penalties Under Labor Code §203**

11

12      Plaintiffs' "First Claim" for statutory "waiting time penalties" cannot be determined on a "class-

13  wide" basis. To incur liability for waiting time penalties under §203, an employer must have failed to

14  make payment when contemplated by the Labor Code (here, §§201, 202, and 227.3). But in addition,

    *the failure must be "willful."* Proper determination of whether Wal-Mart failed to comply with the

15  Labor Code and, if so, whether such failure was willful, will entail highly individualized assessments.

16

17      **1.   Plaintiffs' Burden To Establish Willfulness Necessitates An Individualized
             Inquiry**

18      Section 203 penalties require proof that "an employer *willfully* fails to pay . . . any wages of an

19  employee who is discharged or who quits." Statutory liabilities dependent on "willfulness" envision

20  different conduct, depending on the context. *See Safeco Ins. Co. v. Burr*, 127 S.Ct. 2201, 2208 (2007).

21      An employer's intentional conduct is not sufficient alone to establish "willful" underpayment or

22  late payment of wages. *In re Trombley*, 31 Cal.2d 801 (1948), defines the words "willfully fails to pay"

23  for purposes of §203 and a corollary criminal statute, also applicable to employers who willfully fail to

24  pay wages, §216(a):

25      The word "willfully" as used in criminal statutes *implies a purpose or willingness to commit
        the act*, and although it does not require an evil intent, it implies that the person knows what he

26

---

27  [26] Shapiro treats Smith's termination date as December 18 because that is what the data show.
    Shapiro Decl. ¶42. If so, Smith has no late pay claim at all because he was out of town that day,
28  unavailable to be paid. None of these factual questions can be resolved using computerized records.

1   is doing, intends to do what he is doing, and is a free agent. [Labor Code §216(a)], construed
2   together with the Penal Code definition of the word "willful," makes it a crime for an employer having the ability to pay, knowingly and intentionally to refuse to pay wages *which he knows are due*. A similar construction was placed on section 203 of the Labor Code….

3   *Trombley*, 31 Cal.2d at 807-808 (citations omitted).

4       Plaintiffs' motion defines a "willful" employer as one who "intentionally failed or refused to

5   perform an act *which was required to be done*." Plaintiffs' Brief 28.[27] This definition is useful *if*

6   emphasis is placed on the italicized words and the need to prove that the employer had notice of, but did

7   not tender, wages that were payable and unpaid. Justice Werdegar described the requirement for such

8   employer knowledge in *Kwan v. Mercedes-Benz of North America, Inc.*, 23 Cal.App.4th 174, 183

9   (1994), an auto warranty case that relies on §203 precedent:

10
11      The slipperiness of the term "willfulness" is illustrated by a simple definition quoted in several cases . . . Willfulness, it is said, " 'amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.' " While this adage has a
12      definitive ring to it, it seems to beg the crucial question: to "know[ ] what he is doing" and "intend [ ] to do what he is doing," *must a person know, or at least have notice of, the*
13      *circumstantial or consequential facts that bring the action within the strictures of the law*?

14   *Id.* at 183 (citations omitted).

15       The answer to Justice Werdegar's question is "yes" under §203 case law, and the policy factors

16   discussed in *Kwan, id.* at 185. The employer's intentional failure to pay *must* be accompanied by

17   evidence alerting the employer that money was due and presently payable. No penalties can arise where

18   the employer's action "was the result of a good faith and reasonable belief [that] *the facts imposing the*

19   *statutory obligation* were not present." *Id.*

20       Under §203, a mistaken employer does not act willfully. *Road Sprinkler Fitters Local Union*

21   *No. 669 v. G&G Fire Sprinklers, Inc.*, 102 Cal.App.4th 765, 782 (2002). A negligent employer does not

22   act willfully. An employer's "good faith mistaken belief that wages are not owed," does not indicate

23   willfulness. *Id.*; *Smith v. Rae-Venter Law Group*, 29 Cal.4th 345, 354 n.3 (2002) (" 'A good faith

24   dispute that any wages are due will preclude imposition of waiting time penalties under Section 203.'

25   (Cal. Code Regs., tit. 8, §13520)"). Uncertainties about the requirements of the law can negate

26   willfulness. *See Barnhill v. Robert Saunders & Co.*, 125 Cal.App.3d 1, 8-9 (1981). Culpable employee

27

28      [27] *Davis v. Morris*, 37 Cal.App.2d 269 (1940) (a case preceding and cited by the Supreme Court in *Trombley*), uses similar language.

1    conduct also negates willfulness. *Manford v. Singh,* 40 Cal.App. 700, 702-703 (1919).

2          Thus, willfulness and any penalty liability depend on individual circumstances surrounding any

3    underpaid or delayed wages. The individualized wage liability issues (availability to receive funds at the

4    store, mailing instructions, tender) all bear equally on whether Wal-Mart acted willfully.[28] For example,

5    as penalties will not accrue to a quitting associate who does not come to the store, and as no database

6    tells whether and when the associate did come to the store, this individualized issue must be explored as

7    to each class member claiming penalties. In addition, where delay or underpayment may appear to have

8    occurred, the trier of fact must consider the amount involved and facts showing whether Wal-Mart

9    appreciated that those sums were due and owing, and had to be tendered under the final pay statutes.

10   Evidence reflecting the payment calculations and tender efforts made are essential to assess whether

11   individualized delays or underpayments were the result of mere error or negligence, either of which

12   would foreclose penalty liability.

13         Plaintiffs contend that individual assessments are unnecessary because Wal-Mart's store-

14   oriented final pay system was inadequate, and Wal-Mart acted willfully simply by using its existing final

15   pay system. But California's statutorily mandated final pay process does not include or require any

16   automated or audit requirements. Wal-Mart's final pay at termination procedures and practices in fact

17   fully comply with California's wage record-keeping requirements, which make no reference to

18   automation. §1174(d). Willfulness and penalty liability are negated under §203 when an employer

19   relies in good faith on existing legal requirements, or makes a reasonable selection from among

20   competing interpretations of what the law requires. *See Barnhill*, 125 Cal.App.3d at 8.

21         Even if Plaintiffs could pursue their claims based on the hypothesis that Wal-Mart should have

22   used a different final pay system, the comparative merits of a different system cannot be assessed

23   without individualized, case-specific inquiries about the current system. Plaintiff's indictment of it rests

24   entirely on Shapiro's self-defined, incomplete, and grossly mistaken conclusions drawn from selected

25   computer databases. Those databases do not establish either final pay violations or systemic short-

26

27         [28] In their brief, Plaintiffs contend the "question of Wal-Mart's willfulness" is "entirely common"
     because, say Plaintiffs, there is a "complete lack of evidence of . . . any *attempt to pay* . . . ." Plaintiffs'
     Brief at p. 27. But the databases say nothing of any "attempt to pay." Thus neither the question of
28   Wal-Mart's "attempts to pay" nor its willfulness can be decided based on common proof.

comings.  Even if the computer databases provide relevant evidence, Wal-Mart is entitled to have the factfinder consider whether final pay shortcomings are based solely or at least largely on individual mistakes or departures from Wal-Mart policies and procedures.  Class certification cannot be used as a device to deprive litigants of their full opportunity to present relevant evidence.  *See Briggs v. Countrywide Funding Corp.*, 188 F.R.D. 645, 649-50 (M.D. Al. 1999).

> 2. **Section 203 And The Duties Associated With The Law Of Tender Necessitate Individualized Analysis Of Liability**

The need to consider individual class member evidence is inherent in §203 itself.  Penalties are assessed (or not) based on employer conduct toward the "wages of *an* employee who is discharged or who quits."  Penalties are to be calculated based on the wages of each particular affected employee.  Individual employee conduct can also eliminate or abate penalty liability, per §203 itself:

> An employee who secretes or absents himself or herself to avoid payment to him or her, or who refuses to receive the payment when fully tendered to him or her, including any penalty then accrued under this section, is not entitled to any benefit under this section for the time during which he or she so avoids payment.

Even apart from §203, a valid tender "stops the running of interest on the obligation, and *has the same effect upon all its incidents* as a performance thereof," *Walker*, 215 Cal. at 746 (emphasis in original); Civil Code §1504; *see* RJN Exh. C (DLSE Op. Ltr. 1986.09.15) (no penalties can be assessed if an employee fails to return to the workplace to receive payment).  Tender also envisions an interactive opportunity for mistake correction before any penalties or interest will accrue.  "The rationale of the requirement of specific objection is that the offeror should be permitted to remedy any defects in his tender; the offeree is therefore not allowed to remain silent at the time of the tender and later surprise the offeror with hidden objections." *Layton v. West*, 271 Cal.App.2d 508, 512 (1969).  Thus, in assessing §203 liability, the circumstances need to be explored because the parties' respective conduct can negate or promote penalty liability.

> 3. **An Individual Inquiry Will Still Be Necessary To Determine Whether A Penalty Comports With Due Process**

Even if willfulness could be established, other issues arise that also depend on an examination of individualized associate-specific evidence.  If, for example, it were somehow determined that Wal-Mart willfully underpaid Plaintiff Lyons by $10.30, the Court would then need to analyze the constitutionality

of the penalties sought.  Plaintiffs contend that the alleged $10.30 transgression triggers §203 penalties

in the amount of thirty times Lyons' final wage rate.  If the court accepted this argument, the penalty on

a $10.30 shortfall would be more than $2,400 (based on Lyons' $10.10 per hour wage rate).  Such a

penalty would be almost *240 times* the $10.30 vacation shortfall.[29]

The California Supreme Court has held that both the Federal and California Constitutions limit

the maximum amount of penalty assessments, under their respective provisions guaranteeing due

process and prohibiting excessive fines.  *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 37

Cal.4th 707, 728 (2005).  When, as here, a penalty statute is based on an automatic formula, courts are

directed to use discretion to limit particular penalties to constitutionally permissible amounts.  *See Hale*

*v. Morgan*, 22 Cal.3d 388 (1978).  The Court would be obligated to consider:

> (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the
> penalties imposed in similar statutes; and (4) the defendant's ability to pay.

*Lockyer*, 37 Cal.4th at 728.  In addition, the defendants' "good faith" and "equitable considerations" are

relevant to whether a penalty is excessive or would offend due process.  *Id.* at 730.[30]

The Court will have to identify each individual case where a penalty raises the specter of a

constitutional violation.  In those cases, the Court would then need to apply the constitutional analysis,

which requires an examination of the facts of the particular case where there was delay or

underpayment.[31]  *E.g., Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 681 (N.D. Ga. 2001)

(assessment of punitive damages requires individual inquiry; unsuited for class certification).

The situation of Plaintiff Lyons again provides an instructive example.  Because Lyons' apparent

shortfall involves a minor underpayment of vacation, the threshold issue will be whether his underpaid

wage amount is *de minimis* or excused by application of equitable considerations.  Under §227.3, "[t]he

Labor Commissioner or a designated representative, in the resolution of any dispute with regard to

---

[29] Lyons' situation is not an isolated one.  *Most* of Shapiro's asserted underpayments are of
relatively small sums.  Martin Decl. ¶I.2.a.

[30] Similar standards are used to assess the constitutionality of punitive damages.  *See State Farm*
*Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003).

[31] Courts deny class certification when it would tend to create thorny constitutional issues by
exposing defendants to excessive punishment as a result of the aggregation of individual claims into a
class action.  *See, e.g., Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 234-35 (9th Cir. 1974).

1  vested vacation time, shall apply the *principles of equity and fairness*."   In order to exercise this

2  equitable discretion, it would clearly be necessary to assess the facts concerning how and why vested

3  vacation was calculated and tendered in particular instances.

4       If, after this analysis, a particular Plaintiff remains eligible, the Court will then have to determine

5  what amount, if any, is a constitutionally permissible penalty.   This requires consideration of:

6  Wal-Mart's culpability or good faith, in the final pay process; how possible penalties compare with

7  analogous, capped penalty statutes; what level of harm actually befell the particular Plaintiff and how

8  the proposed penalty compares; and whether a *de minimis* vacation pay shortfall justifies no more than a

9  *de minimis* penalty.[32]   The foregoing analysis requires an individualized examination of each final pay

10  shortfall and the propriety of any penalty (amount) under constitutional principles.[33]

11

12  **E.    A Class Action Is Neither A Manageable Nor Superior Means By Which To Litigate The Claims In This Case**

13       **1.    Manageability Issues Defeat a Finding of Superiority**

14       As set forth above, the presence of individual issues and the myriad associate-specific

15  determinations to be made in this action impede judicial efficiency.   *O'Connor v. Boeing N.Am., Inc.,*

16  197 F.R.D. 404, 414-15 (C.D. Cal. 2000).  Plaintiffs' "Proposed Trial Plan" does nothing to remedy this

17  formidable obstacle to certification.

18       According to their "Proposed Trial Plan," Plaintiffs can prove both liability and damages on

19  behalf of three subclasses involving more than 145,000 individuals and as to four separate legal claims

20  during a mere "seven to ten day trial" by jury.  Plaintiffs claim they can accomplish this feat through the

21  testimony of a *single* expert witness, Shapiro (and by playing videotaped excerpts of four witnesses

22  Wal-Mart produced for deposition).   Of course, a trial could be so expedited only because, under

23  Plaintiffs' plan, there would be no need even to consider the merits.  *See* Plaintiffs' Brief 2, 3, 4, 5, 7, 8,

24  wherein Plaintiffs assert that Wal-Mart's "liability" is "unquestionable."

25

26  [32] *See Oppenheimer v. Sunkist Growers*, 153 Cal.App.2d Supp. 897, 899 (1957) (finding effective tender even though *de minimis* sums for interest and previously accrued penalties were not included).

27  [33] The Court will also need to decide how such a penalty should be calculated under §203. California courts have never addressed the *amount* of any penalty in a case of only delayed or underpaid vacation.  A penalty measured by the full amount of the employee's wage will almost always produce a

28  penalty disproportionate to the vacation amounts delayed or underpaid.

1    Plaintiffs' proposal is absurdly unrealistic and would violate Defendant's due process rights.

2    While the databases reviewed by Shapiro certainly provide relevant evidence, they are far from

3    conclusive.  As described in Defendant's Objections to Evidence, the fact-finder will still need to

4    examine on an individual class member basis the circumstances surrounding final pay.  In addition,

5    Wal-Mart "must be allowed to present any relevant rebuttal evidence [it] choose[s], including evidence

6    that there was no [liability to] one or more members of the class." *Western Elec. Co., Inc. v. Stern*, 544

7    F.2d 1196, 1199 (3d Cir. 1976).

8    Given that this individualized inquiry will be necessary to make a finding *as to liability*, Plain-

9    tiffs fail to present a manageable method for resolving the claims at issue.  Wal-Mart will need and must

10   be permitted to present documents and live witness testimony regarding each class member who

11   Plaintiffs claim did not have the full amount of his/her wages timely made available.  Shapiro concludes

12   (erroneously) that 145,000 employees never received timely full payment.  Assuming trial were in

13   session 5 days per week, 52 weeks per year, and the parties could present evidence as to 32 individual

14   class members per day (i.e., one every 15 minutes in an 8-hour day), the trial would last more than 16

15   years.  Problems managing the evidentiary issues would be overwhelming.  *See, e.g., In re Wal-Mart*

16   *Employee Litig.,* 290 Wis.2d 225, 233 (Wis. Ct. App. 2006) (plaintiffs' claims "would require not only

17   the examination of each and every member of the proposed class, but, also, their co-workers and

18   supervisors, and, in some or many cases, their friends and family.… *To say that such a trial would be*

19   *unmanageable is somewhat akin to saying that the sun is warm or that the universe is large.*"); *Jackson*

20   *v. Wal-Mart Stores, Inc.,* 2005 WL 3191394, at *7 (Mich. Ct. App. 2005) ("Here, the problems inherent

21   in managing the proposed class action include the involvement of more than 96,000 potential plaintiffs

22   spread across the sate, who have worked or are currently working in more than forty different

23   departments of eighty-five stores over a period of six years.  Given these factors, we cannot conclude

24   that the district court erred in finding . . . this matter . . . unmanageable and, therefore, not superior, as a

25   class action suit.").  Simply put, Plaintiffs have failed entirely to demonstrate a realistic and workable

26   solution for managing a trial in this case.

27             2.   **Administrative Remedies Provide Adequate, Speedier Redress**

28       "Since the purpose of the superiority requirement is to assure that the class action is the most

---

1   efficient and effective means of settling the controversy, it seems consistent with that purpose to

2   determine whether any administrative methods of settling the dispute exists." *Kamm v. California City*

3   *Dev. Co.,* 509 F.2d 205, 211 (9th Cir. 1975) (quoting Wright & Miller, FEDERAL PRACTICE &

4   PROCEDURE: CIVIL §1779 (1973 Supp.)).  Here, an associate who believes he/she has been underpaid, or

5   had payment unduly delayed, may proceed by administrative claim using a detailed and effective

6   enforcement scheme provided by the DLSE.  In fact, two of the four Plaintiffs initially chose this very

7   method.[34]  There is no compelling reason for an associate who believes she was not adequately paid

8   upon termination to join a massive class where her individual claim will likely never be heard and will

9   be eclipsed by thousands of other claims.  Given the availability of administrative remedies provided by

10  the DLSE, class certification is not warranted here.  *See Pattillo v. Schlesinger,* 625 F.2d 262, 265 (9th

11  Cir. 1980) (affirming denial of class certification where use of the class action procedure was not

12  superior to administrative proceedings).

13      **F.   Plaintiffs Fail To Identify Ascertainable Subclasses**

14      In its May 29, 2007 Order on Wal-Mart's motion to dismiss, the Court recognized that classes

15  must be ascertainable if they are to be certified.  Indeed, Rule 23(b)(3) certification is not proper unless

16  an "[i]dentifiable class . . . exist[s]."  MOORE'S FEDERAL PRACTICE ¶23.21.  *See also In re Paxil Litig.*,

17  212 F.R.D. 539 (C.D. Cal. 2003).  An ascertainable class is one whose members can be identified

18  readily, without extensive litigation of issues bearing on membership.  *Indiana State Employers Ass'n v.*

19  *Indiana State Highway Com'n*, 78 F.R.D. 724, 725 (S.D. Ind. 1978); *Hagen v. City of Winnemucca*, 108

20  F.R.D. 61, 63 (D. Nev. 1985).

21      Plaintiffs' redefined subclasses do not cure this problem.  These subclasses now state that

22  members shall be those who "according to Wal-Mart's computerized records, have not been paid...."

23  See attached Exhibit  A. But Wal-Mart's computerized records do not address "payment" as that term is

24  defined by California's final pay statutes.  Thus, to determine if someone falls within subclass

---

[34] Smith and Wiggins both filed claims initially with the DLSE.  Annatone Decl. ¶17; Wiggins
Depo. 85:25-89:7, 93:6-17; Smith Depo. 135:3-19, 158:2-159:2.  Attached to the Declaration of
Rebecca Eisen are numerous excerpts from produced documents indicating that other former associates
made use of the DLSE's processes, and that the DLSE considers non-database evidence as highly
relevant.  The DLSE also permits Wal-Mart to defend on grounds that mispayments were not willful,
that good faith disputes existed and that sufficient efforts were made to tender amounts due.

1   membership, the Court would be required to do the very thing prohibited by class action precedent,

2   namely, litigate the relevance and accuracy of Wal-Mart's computer records as a means of determining

3   whether statutory "payment" occurred.  Contrast *Whiteway v. Fedex Kinko's Office and Print Servs.,*

4   *Inc.*, 2006 WL 2642528, at *4 (N.D. Cal. 2006), where a class was ascertainable by reference to names

5   and periods of employment in defendant's records.

6

7   **G.   Plaintiffs' Motion Fails To Satisfy The Requirements Of Rule 23(a)**

8   1.   **Named Plaintiffs Lack Claims That Are Typical Of Class Claims
        Causing Them To Be Inadequate Representatives Of The Class**

9   "The premise of the typicality requirement [of Rule 23(a)(3)] is simply stated:  as goes the claim

10  of the named plaintiff, so go the claims of the class."  *Sprague v. General Motors Corp.*, 133 F.3d 388,

11  399 (6th Cir. 1998).  "[A] class representative must be part of the class and 'possess the same interest

12  and suffer the same injury' as the class members."  *General Telephone Co. of Southwest v. Falcon*, 457

13  U.S. 147, 156 (1982).

14  In this case, named Plaintiffs Ballard, Wiggins, and Smith were each fully and timely paid.

15  Ballard was paid on the date his employment ended.  Wiggins was timely paid in relation to an October

16  2004 termination, the only one that likely occurred.  And Smith was timely tendered all final pay on the

17  very first date he reported to the store following his termination.  It can hardly be maintained that

18  individuals who have suffered no injury from the claims they allege can represent a class of individuals

19  who allegedly did suffer harm.[35]

20  For similar reasons, these named representatives are not *adequate* representatives for purposes of

21  Rule 23(a)(4).  A class representative is inadequate if he has not suffered in the same manner as other

22  members of the purported class, *Valentino*, 97 F.3d at 1234 or if, as here, his claim is subject to

23  individualized fact issues or defenses, like those concerning Lyons and Wiggins.[36]  "[T]he presence of

24  _____

25  [35] Ballard and Smith arguably are not members of any class.  They were exempt salaried managerial
    associates.  Plaintiffs concede that the computerized records do not contain information sufficient to
    determine if salaried associates were properly paid.  Thus, as they have defined the class – by reference

26  to computer records – Ballard and Smith would not be included.  It is axiomatic that one may not
    represent a class he is not in.  *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("[I]t should

27  be obvious that there cannot be adequate typicality between a class and a named representative unless
    the named representative has individual standing to raise the legal claims of the class.").

28  [36] Lyons and Wiggins, both hourly associates, may have had their claims already adjudicated in an

defenses unique to a particular class member precludes certification on representativeness and typicality grounds." *Gartin v. S&M Nutech LLC,* 2007 WL 1424654 at *10 (C.D.Cal. April 4, 2007). Plaintiffs proffer Ballard as the sole representative for their allegedly unpaid wages claim (other than vacation) and Smith for their allegedly delayed final pay claim. Neither, however, has standing or typical claims or is adequate to act in a representative capacity.

> 2.  **Plaintiffs Fail To Establish That There Are Common Questions Of Law Or Fact Pursuant To Rule 23(a)(1)**

"[A]t a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Sprague*, 133 F.3d at 397. "Common issues" within the meaning of Rule 23(a)(1) are only those that have the capacity to "advance the litigation." *Id.* In essence, the commonality prerequisite directs an analysis of whether common proof exists to establish liability for each class member. Here, no uniform proof exists. The trigger of statutory final pay obligations under California law and Wal-Mart's discharge of those obligations are critical issues. They require examination of the circumstances of each terminated associate. To suggest there are common issues in this case is to frame issues at such a level of abstraction that those "issues" lack the capacity of expediting or efficiently leading to case resolution.

## V.  **CONCLUSION**

A failure to satisfy even one of the prerequisites of Rule 23 compels the denial of class certification. Here, Plaintiffs fail to satisfy not one, but nearly all. As a result, class treatment of Plaintiffs' claims would be improper. For all the foregoing reasons, Wal-Mart respectfully requests the Court deny Plaintiffs' Motion as to all subclasses and all claims.

Dated: November 20, 2007

MORGAN, LEWIS & BOCKIUS LLP

By: _____/S/_____
Rebecca D. Eisen

Attorneys for Defendant
WAL-MART STORES, INC.

---

earlier action against Wal-Mart. *See* discussion in Defendant's Response to Plaintiffs' Trial Plan. If so, they too have no standing and they are inadequate class representatives.