MORGAN, LEWIS & BOCKIUS, LLP
REBECCA EISEN, State Bar No. 96129
THOMAS M. PETERSON State Bar No. 96011
KENT M. ROGER, State Bar No. 95987
ERIC MECKLEY, State Bar No. 168181
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: (415) 442-1000; Fax: (415)442-1001
Email: reisen@morganlewis.com
       tmpeterson@morganlewis.com
       kroger@morganlewis.com
       emeckley@morganlewis.com

Attorneys for Defendant
WAL-MART STORES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In Re WAL-MART STORES, INC. WAGE AND HOUR LITIGATION, <br><br> This document relates to Case Nos.: <br> C 06-02069 SBA (Smith) and <br> C 06-05411 SBA (Ballard) | Case No. C 06-02069 SBA (BZ) <br> C 06-05411 SBA (BZ) <br><br> **DECLARATION OF DENISE NEUMANN MARTIN IN SUPPORT OF DEFENDANT WAL-MART STORES, INC.'S MOTIONS FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION** <br><br> Date: April 22, 2008 <br> Time: 1 p.m. <br> Place: Courtroom 3 <br> Judge: Hon. Saundra Brown Armstrong |

I, DENISE NEUMANN MARTIN, declare as follows:

I am a Senior Vice President of NERA Economic Consulting. If called as a witness, I could and would testify competently to the following.

## I. ASSIGNMENT AND SUMMARY OF FINDINGS

We were asked by counsel for Wal-Mart to assess whether any purported claim for

damages ("wage claim") exists as to any claimant in Sub-Class 2, defined by the Court as "class members who, according to Wal-Mart's computerized records, have not been paid all wages they earned while employed by defendant. As used in this Class Definition, the term "wages" includes hourly pay, salary and geographical assistance pay."[1] To value the alleged wage claim, Plaintiffs relied on the analysis of Dr. Martin Shapiro, who prepared an initial declaration ("Shapiro Declaration") as well as a supplemental declaration ("Shapiro Supplemental Declaration"), in which he purported to correct errors that we had identified in his initial calculations.[2] In this declaration, we have considered Dr. Shapiro's declarations together to represent Dr. Shapiro's opinion and will also consider any declaration Dr. Shapiro submits in response.

According to Dr. Shapiro's calculations, 26,866 associates fall into Sub-Class 2, with alleged damages of $8,294,573.87 (reported as $8,684,974.34 in the Shapiro Declaration and reduced by $390,400.47 in the Shapiro Supplemental Declaration.)[3] Dr. Shapiro also reduced his overall damages claim by $2,230,170.60 for payments related to pay periods with reported gross earnings but no reported net earnings, but did not specify how much of this reduction applied to his reported wage claim.[4]

In fact, nearly *all* of the purported damages to Sub-Class 2 are based on Dr. Shapiro's incorrect analysis of Wal-Mart's computerized records. Had he correctly analyzed Wal-Mart's data, he would have found unresolved amounts of *at most* $6,502.65 for 359 associates. Moreover, as discussed below, even a properly done calculation based on the computerized records cannot reveal whether these minimal amounts were actually owed the terminated associates as wages.

More specifically, we found the following:

---

[1] See Class Certification Order, February 13, 2008, pp. 21-22.

[2] See Declaration of Martin M. Shapiro, Ph.D. in Support of Plaintiffs' Motion for Class Certification in the matter of *In Re: Wal-Mart Stores, Inc. Wage and Hour Litigation (Smith/Ballard)*, October 10, 2007 and the Supplemental Declaration Martin M. Shapiro, Ph.D. in Support of Plaintiffs' Motion for Class Certification, December 4, 2007.

[3] See Shapiro Declaration, p. 11 and Shapiro Supplemental Declaration, p. 6

[4] See Shapiro Supplemental Declaration, p. 5.

1. Dr. Shapiro's wage claim of $8,294,573.87 is calculated by aggregating wages he asserts are owed for reported negative hours that are not vacation or regular wage hours ($3,391,198.48) and those allegedly owed in instances where gross earnings appear with no corresponding reported net earnings for a given payroll period ($4,903,375.39).[5]

2. In the negative hours component of his reported wage claim, Dr. Shapiro included all negative hours reflected in the Payroll Database except vacation hours and personal hours (*e.g.*, he included negative sick hours, premium hours and bereavement hours). Negative hours entries appear on the Hours table of the Payroll Database. These hours are classified with pay sequence codes M and V through Z. M indicates a negative adjustment and V through Z indicate a reversal.

In valuing these negative hours, Dr. Shapiro made two critical errors, the corrections of which virtually eliminate this portion of the alleged Sub-Class 2 wage claim: (a) while he conceded that he erroneously included sick hours in the calculations presented in the Shapiro Declaration, he significantly understated the impact of this error in the Shapiro Supplemental Declaration because he subtracted aggregated *hours* rather than *dollars* from his initial estimate of alleged damages; and (b) he incorrectly overvalued the premium hours.

First, had he correctly calculated the wages potentially owed as a result of the negative sick hours, he would have reduced his alleged damages calculation by $3,704,675.58, rather than the $390,400.47 asserted in the Shapiro Supplemental Declaration. Second, had he correctly valued premium hours (using the $1 per hour additional payment paid to associates who work on Sundays, rather than their base pay rate), his valuation of the premium hours would have dropped from $72,503.08 to $8,818.25.[6]

Correcting for both of these errors, then, he would have found that instead of his identified class of 26,866 associates, only 322 associates were associated with *any* negative non-sick, non-vacation, non-personal hours and those hours had a total value of $13,238.54 (with $8,818.25 related to negative premium hours and $4,420.29 related to other negative hours.)

Of the 322 associates with negative hours, 213 had multiple identification ("WIN") numbers, in which 6,396.53 negative hours under one WIN number were exactly offset by positive hours under a second WIN number. In including these negative

---

[5] According to output produced by Dr. Shapiro after the filing of the Shapiro Declaration, $3,781,598.95 was related to negative non-vacation, non-personal hours. This total dropped to $3,391,198.48 as a result of the $390,400.47 erroneous "correction" in the Shapiro Supplemental Declaration. In the Shapiro Supplemental Declaration, Dr. Shapiro also asserted that his total damages related to pay periods with reported gross earnings but no reported net earnings should be reduced by $2,230,170.60 (see Shapiro Supplemental Declaration, p. 5), but he did not break out this adjustment separately for the wage claim and vacation/personal claim (which together totaled $12,337,624.20).

[6] In the Payroll Database, a comparison of the premium hours reported on the Hours table and the value of those hours reported on the DOE table demonstrates that premium hours are valued at $1 per hour.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF DENISE NEUMANN MARTIN ISO WAL-MART STORES, INC.'S MOTIONS FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

hours in his calculation of wage damages, Dr. Shapiro did not account for the offsetting entry of positive hours under the second WIN number for the same associate. Another 16 of the associates had negative entries, totaling $587.28 with a pay sequence code V, indicating that a paycheck had been cut, but never cashed by the associate. From the computerized records, it is not possible to determine the reason the paycheck remained uncashed. Excluding the 213 associates with negative accounting entries related to multiple WIN numbers, we find that only 109 associates of the 26,866 alleged members of Sub-Class 2 have negative hour entries that remain unresolved, for a total value of $5,400.19. This total includes the $587.28 in reversed checks.

3. Dr. Shapiro assumed with no basis that associates with gross earnings reported on the Earnings table of the Payroll Database, but with no corresponding reported net earnings, had not been paid amounts owed to them as wages totaling $4,903,375.39. He assumed, incorrectly, that the only form of payment to associates is a payroll check (represented by a net earnings entry on the Earnings table of the Payroll Database). In so assuming, he made two errors: he failed to consider cash payments in the form of cash draws and he failed to calculate whether, after taxes and other deductions (including these cash draws), associates were owed *any* payment.

In the Shapiro Supplemental Declaration, Dr. Shapiro acknowledged that he had ignored cash payments in his analysis. Cash payments in the Payroll Database appear in the DOE table as a cash draw with two components: (1) a DOE_amount and (2) an arrears amount, if any. When a cash payment exceeds the amount calculated by the Payroll Database as due the associate (based on reported gross earnings, deductions and taxes), the excess payment is recorded in the arrears field. Thus, payments associated with hours uploaded to the Payroll Database will be reported in the DOE_amount field, while payments for hours not entered into the system will be reported in the arrears field.

In attempting to correct his error of failing to include cash draws, Dr. Shapiro added up only the "arrears" portion of cash draws reported for pay periods with gross earnings but no net earnings, asserting that these arrears amounts would reduce his total damages by $2,230,170.60.[7] His "correction" was faulty, however, because he again used the wrong data field – he used the arrears field, when he should have used the DOE_amount field. Moreover, in moving from the gross amount owed to net payments made, Dr. Shapiro also failed to account for payroll deductions and taxes.

Had Dr. Shapiro calculated the amounts owed claimants, after accounting for taxes, other deductions and cash draws, he would have found that no wage payments were due to nearly *all* of the associates he identified as Sub-Class 2 members. For the remaining 250 associates with positive estimated net earnings after deductions, taxes and cash draws, we calculate that the total amount still unresolved for these associates

---

[7] Shapiro Supplemental Declaration, p. 5. Dr. Shapiro did not indicate how much of this purported adjustment was a reduction to his alleged wage calculation and how much was a reduction to his alleged vacation/personal hours calculation.

is at most $1,102.46, assuming there were no additional payroll deductions that should have been taken, which would have reduced this total further.

4. In sum, then, had Dr. Shapiro correctly analyzed Wal-Mart's computerized records, he would have identified only 359 terminated associates were potentially Sub-Class 2 members, with unresolved amounts of only $6,502.65.

We were also asked by counsel to consider the individual claims of the named plaintiffs.[8] We found that three of the four named plaintiffs, D. Ballard, M. Wiggins and B. Smith, were fully compensated by Wal-Mart for any wages owed.

## II. QUALIFICATIONS

I am a Senior Vice President of National Economic Research Associates, Inc. ("NERA"). Prior to joining NERA, I received a B.A. in Economics from Wellesley College and an M.A. and Ph.D. in Economics from Harvard University.

Throughout my undergraduate and graduate education, I received training in statistics and the analysis of large databases. In my 16 years at NERA, I have overseen statistical analyses conducted on a variety of large datasets. These datasets have included brokerage firm trading records, which reflect millions of trades by thousands of investors, as well as product liability claims databases, which often contain records detailing the claims of several hundred thousand claimants. In the course of my assignments, I have needed to understand and analyze the interaction of "relational databases" of the sort maintained by Wal-Mart. In such systems, information contained in one database is uploaded to or can be linked to information contained in other databases. As a result of analyzing systems of this type, I recognize the importance of assessing whether the information contained in these databases or tables within the databases is consistent, or whether additional information must be obtained to understand the information included in these datasets.

As reflected on my C.V., I have been retained in a number of Wal-Mart wage and hour

---

[8] The Court's Order on Class Certification denied Plaintiffs' request to certify Sub-Class 3. Accordingly, named plaintiff B. Smith is not a class representative for any currently alleged sub-class. See Class Certification Order, p. 17.

litigations. Through this experience, I am familiar with Wal-Mart's payroll process, as well as the variety of data sources used to track this information. In working with Wal-Mart's databases in these other matters, I have overseen a variety of computational and statistical analyses that have involved many of the same tables and variables that we are analyzing in this case. The analytical tools and database assessments necessary in this matter are not unique and, in fact, are similar to the tools and assessments I have used before. In addition, in other Wal-Mart matters, I have reviewed personnel records of associates, so I am familiar with the types of information and documents contained in these records. In those matters, I have also obtained additional information not found in these databases and documents, including information obtained by conducting interviews with personnel managers and reviewing declarations by both managers and associates.

My C.V. is attached as Exhibit 1.

### III. MATERIALS REVIEWED

In preparing this declaration, we reviewed the following material:

1. First Amended Consolidated Complaint;

2. Order dated May 29, 2007;

3. Order dated February 12, 2008;

4. Plaintiffs' Notice of Motion and Motion for Class Certification; Supporting Declarations and Exhibits, including the Declaration of Dr. Martin M. Shapiro in Support of Plaintiffs' Motion for Class Certification;

5. Supplemental Declaration of Dr. Martin M. Shapiro in Support of Plaintiffs' Motion for Class Certification;

6. Plaintiffs' Reply Memorandum of Points & Authorities In Support of Plaintiffs' Motion for Class Certification;

7. Wal-Mart and Sam's Club Associate Database (Bates numbers WMHOe -500506-021-00000001 Set A, WMHOe -500506-021-00000001 Set B, WMHOe -500506-027-00000001, WMHOe- 500506-023-00000001), Payroll Database (Bates numbers WMHOe -500508-077-00000001, WMHOe -500508-078-00000001), PeopleSoft Database (Bates

numbers WMHOe-500504-110-00000001, WMHOe-500504-117-00000001), Cash Office Database (Bates number WMHOe-500506-029-00000001);

8. Personnel files produced to Plaintiffs containing termination-related documents, including the personnel files for D. Ballard, M. Wiggins, and B. Smith;

9. Dr. Shapiro's SPSS programming and output files produced in November 2007;

10. Termination Payout Chart;

11. Termination Payout Procedures; and

12. California Employer's Guide, 2007, Employment Development Department, State of California.

## IV. NEARLY ALL, IF NOT ALL, OF DR. SHAPIRO'S ALLEGED WAGE CLAIM IS ATTRIBUTABLE TO HIS FLAWED CALCULATIONS

According to Dr. Shapiro's output, 26,866 terminated associates allegedly did not receive full payment of their wages. The alleged wage claim for these terminated associates is comprised of two components:

1. Alleged damages due to negative hours of $3,391,198.48, which equals the $3,781,598.95 originally reported in the Shapiro Declaration less an asserted correction of $390,400.47 in the Shapiro Supplemental Declaration; and

2. Alleged damages due to instances of gross earnings without net earnings for a given payroll period of $4,903,375.39 less whatever portion of a purported correction of $2,230,170.60 in the Shapiro Supplemental Declaration applicable to the wage claim, (as opposed to the vacation/personal time claim). Dr. Shapiro does not specify these allocations in his Supplemental Declaration, reporting only an aggregate purported correction to total alleged damages.[9]

The total wage claim, then, was $8,684,974.34 in the Shapiro Declaration, and was reduced to $8,294,573.87 in the Shapiro Supplemental Declaration on account of the purported negative hours correction and to an unspecified amount below $8,294,573.87 on account of the purported gross earnings without net earnings correction.[10]

---

[9] See Shapiro Supplemental Declaration, p. 5.

[10] See Shapiro Declaration, p. 11 and Shapiro Supplemental Declaration, p. 6. Initially, Dr. Shapiro reported alleged damages of $8,684,974.34. In the Shapiro Supplemental Declaration, he reported that

In calculating these alleged wage claim damages, however, Dr. Shapiro misuses and incorrectly interprets the Payroll Database on which he bases his analysis. Had he correctly considered the data provided, he would have found that all but 359 terminated associates were owed no wages, leaving at most $6,502.65 as yet unresolved.

### A. Correcting Dr. Shapiro's Errors Virtually Eliminates Sub-Class 2's Alleged Wage Claim Attributable to Negative Hours

In the Shapiro Declaration output, Dr. Shapiro calculated alleged wage claim damages of $3,781,598.95 due to negative hour entries. In the Shapiro Supplemental Declaration, he conceded that he had erroneously included negative sick hours in his calculation and asserted that excluding these hours reduced his calculation by $390,400.47. However, two errors remain: (1) Dr. Shapiro significantly understated the impact of his erroneous inclusion of negative sick hours in his calculations by subtracting these *hours* rather than their associated *dollar wage amounts*; and (2) Dr. Shapiro incorrectly valued premium hours. A proper calculation reduces this component of the wage claim by $3,776,198.76, rather than by $390,400.47, as asserted in the Shapiro Supplemental Declaration. That is, this component of the wage claim is virtually eliminated.

#### 1. Negative Sick Hours

We identified 20,147 negative hour entries in the output Dr. Shapiro produced in connection with the Shapiro Declaration that, when multiplied by the associates' base pay rate, result in alleged damages of $3,781,598.95.[11] Of these 20,147 negative hour entries, 19,792 entries were classified as negative sick hour entries for a total of 379,525 sick hours, with a total value of $3,704,675.58.

---

$390,400.47 should be subtracted from the amount in the Shapiro Declaration. As explained herein, Dr. Shapiro's "corrected" total remains grossly overstated and is erroneous.

[11] Dr. Shapiro calculates the total wage claim as $8,684,974.34 (see Shapiro Declaration, p. 11.) According to his own output, this calculation is the sum of (1) gross regular wages for which there were no net earnings ($4,903,375.39) and (2) negative hours that are not vacation or regular wage hours ($3,781,598.95.)

Dr. Shapiro agreed in the Shapiro Supplemental Declaration that sick hours should not be included in the wage claim calculation, but in estimating the impact of this error, he erroneously aggregated *hours* rather than the associated *dollar wage amounts*. In particular, he reported that the impact of this error was "20,203 instances of negative sick hours totaling $390,400.47, representing 1.2% of the claim."[12] However, the 390,400.47 figure is, in fact, not a dollar figure, but an aggregated hours figure. Had Dr. Shapiro added up the dollars associated with these negative sick hours (which are included in his estimate of alleged damages as reported in his output file), he would have calculated that these negative sick hours actually erroneously contributed $3,704,675.58 to this component of the wage claim, rather than the $390,400.47 asserted in the Shapiro Supplemental Declaration.

**2. Negative Premium Hours**

The additional $76,923.37 in alleged damages associated with negative hours relates to Dr. Shapiro's valuation of negative premium hours ($72,503.08) and other negative hours ($4,420.29), (*e.g.* bereavement and holiday). Many of these are accounting adjustments as to which Dr. Shapiro considered only half of the adjustment, thereby assigning damages where none exist. As such, Dr. Shapiro's calculations are incorrect and overstated. In addition, he incorrectly valued these negative hours.

Specifically, in translating premium hours into dollars, Dr. Shapiro incorrectly multiplied the number of negative premium hours by the associate's full base pay rate. However, as recorded in Wal-Mart's system, the premium hours are multiplied only by the additional $1 per hour premium pay over the base pay rate to which an associate would be entitled for working on a Sunday. The base pay earned for a premium hour worked is already included as a component of gross regular pay. If, as Dr. Shapiro has assumed, negative premium hours indicate amounts for which associates should have been but were not compensated, at most this figure would equal

---

[12] Note that while Dr. Shapiro refers in this statement to 20,203 negative sick hour entries (totaling 390,400 hours), according to his own output file, he did not include all of these entries in his initial calculation of alleged damages. Instead, he included 19,792 entries totaling 379,525 hours, the figures we report above.

$8,818.25 (*i.e.*, $1 times total negative premium hours.)

After correctly eliminating sick hours and correctly valuing premium hours, the negative hours portion of Dr. Shapiro's alleged wage claim is reduced from $3,391,198.48 (as erroneously "corrected" in the Shapiro Supplemental Declaration) to $13,238.54. Moreover, this $13,238.54 value for negative hours is associated with negative hour entries for only 322 of the 26,866 alleged class members identified by Dr. Shapiro's analysis as comprising Sub-Class 2.

In fact, according to Wal-Mart's computerized records, most of these negative hour entries represent offsetting corrections of hours entered incorrectly in the data, while others were coded as a reversal. We found that 213 of the associates with 6,396.53 negative hours valued at $7,838.35 had multiple WIN numbers in the Associates Database. The negative entries represent the movement of hours from one WIN number to another for the same associate. Net earnings associated with these hours were canceled under one WIN number and reported under the second WIN number. Therefore, as to those 213 associates, no wages are owed.

For another 16 associates, the negative hours (with a total value of $587.28) were reported with a pay sequence code of V indicating they were associated with an uncashed check. The computerized records do not indicate why the payroll check was not cashed.

In sum, based on the computerized records, there are at most 109 associates with negative hours valued at $5,400.19 that remain unresolved. This total includes the $587.28 in uncashed checks. (See Exhibit 2.)

### B. Correcting Dr. Shapiro's Errors Eliminates All But At Most $1,102.46 of the Alleged Wage Claim Attributable to No Reported Net Earnings

In the Earnings table of the Payroll Database, gross earnings are reported for each pay period under the following categories: regular earnings, overtime earnings and other earnings. Net earnings are also reported for each pay period if a payroll check was cut. In pay periods in which an associate is paid via a cash draw, gross earnings are reported and a cash draw is recorded, but no net earnings are reported. Dr. Shapiro calculates that 21,210 Sub-Class 2 members were owed $4,903,375.39 in regular wages for those pay periods in which he observed

gross earnings, but no reported net earnings.

However, Dr. Shapiro had no basis for concluding that the associates were not fully compensated in these pay periods. By failing to consider cash draw payments made to the associates, he failed to calculate whether there were any additional wages due to the associates for the pay periods in question.

In the Shapiro Supplemental Declaration, Dr. Shapiro acknowledged that he had ignored cash draws in his analysis. Cash draws in the Payroll Database appear in the DOE table with two components: (1) a DOE_amount and (2) an arrears amount, if any. When a cash draw exceeds the amount calculated by the Payroll Database as due the associate (based on reported gross earnings, deductions and taxes), the excess payment is recorded in the arrears field. Thus, payments associated with hours uploaded to the Payroll Database will be reported in the DOE_amount field, while payments for hours not entered into the system will be reported in the arrears field.

Attempting to correct his error of failing to include cash draws, Dr. Shapiro included only the "arrears" portion of payments reported for pay periods with reported gross earnings but no reported net earnings, asserting that these arrears amounts would reduce his total damages by $2,230,170.60 (see Shapiro Supplemental Declaration, p.5). His "correction" was faulty because he again calculated his correction using the wrong data field; he used the arrears field, when he should have used the DOE_amount field. Moreover, in moving from *gross* amount owed to *net* payments made, Dr. Shapiro failed to account for payroll deductions and taxes.

To assess whether there were any wages owed to terminated associates, Dr. Shapiro should have: (1) aggregated gross earnings from the Earnings table of the Payroll Database; and (2) adjusted those gross earnings for taxes (reported on the Tax table in the Payroll Database) and other deductions, including cash draws (reported on the DOE table of the Payroll Database in the DOE_amount field, not the arrears field).[13]

---

[13] Some examples of deductions that occur in moving from gross earnings to net earnings are associates' stock purchases, associates' contributions for medical benefits and cash draws paid to associates.

To confirm that we were able to move accurately from gross earnings to net earnings using the information contained in Wal-Mart's computerized records, we first performed this calculation for over three million pay periods for associates in the Payroll Database for which both gross and net earnings were reported. By accounting for cash draws, deductions and taxes, we were able to match within $5 the net earnings reported in the Payroll Database for 99 percent of these associate pay periods.

Using the same methodology, we calculated the amounts owed to associates for pay periods in which there were reported gross earnings but no reported net earnings. Proper analysis of the Payroll Database reveals that 20,960 of the 21,210 associates in Sub-Class 2 with reported gross earnings but no reported net earnings were not owed any additional wages. That is, once gross earnings are adjusted for payments, including cash draws, deductions and taxes, no additional amounts are owed these associates. (See Exhibit 3.)

As to the remaining 250 of the associates with reported gross earnings but no reported net earnings, once we accounted for payments, including cash draws, deductions, and taxes, the total amount not yet reconciled is $1,102.46. Moreover, only 62 of the 250 associates have unresolved amounts greater than $5 and only 19 of the associates have unresolved amounts greater than $10. (See Exhibit 4 for list of associates with as yet unresolved amounts.)

By considering only gross earnings and ignoring taxes, deductions and cash draws, Dr. Shapiro estimated that 21,210 alleged Sub-Class 2 claimants were owed $4,903,375.39 in regular wages, when in fact with the proper review and interpretation of the Payroll Database, the as yet unresolved amount is at most $1,102.46.[14]

---

[14] The $1,102.46 is calculated starting with total gross wages (regular, overtime and other) because deductions and taxes are not reported separately for different types of earnings. As such, it is not possible to determine how much of the unresolved net earnings are related to regular and overtime wages versus other wages such as vacation and personal time.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12   DECL. OF DENISE NEUMANN MARTIN ISO WAL-
MART STORES, INC.'S MOTIONS FOR SUMMARY
JUDGMENT AND/OR SUMMARY ADJUDICATION

## V. ACCORDING TO THE COMPUTERIZED RECORDS AND PERSONNEL FILE DOCUMENTS, THREE OF THE NAMED PLAINTIFFS WERE FULLY COMPENSATED BY WAL-MART FOR *ALL* WAGES OWED

We reviewed and analyzed the Payroll Database, Associate Database, PeopleSoft Database and Cash Office Database and personnel files for information on amounts owed and payments made to three of the named plaintiffs: D. Ballard, M. Wiggins, and B. Smith. We found that D. Ballard, M. Wiggins and B. Smith were fully compensated by Wal-Mart for all wages owed. (See Exhibits 5, 6 and 7, respectively, for the relevant portions of the Payroll Database, Associate Database, PeopleSoft Database and Cash Office Database for each named plaintiff.)

### A. Plaintiff D. Ballard

Plaintiffs claim that D. Ballard was not paid for all vacation, personal time and wages reflected in Wal-Mart's records.[15] In fact, according to Wal-Mart's computerized records, Mr. Ballard was fully compensated for all wages owed at termination.

#### a. Gross Wages Attributed to Mr. Ballard in Error

Plaintiffs base their claim for wages owed upon a faulty entry in the Payroll Database. Specifically, the Earnings table in the Payroll Database includes an entry for vacation pay of $2,929.94, regular earnings of $1,486.41, and other earnings of $1.43 in the April 14, 2006 pay period, a month and a half after Mr. Ballard's termination. (See Exhibit 5, Earnings table.) The DOE table also shows a cash draw, with a net amount of $2,840.23, suggesting that Mr. Ballard got paid that amount. The cash draw equals total gross earnings ($4,417.78) less taxes ($1,576.72) less reported net earnings ($0.83). (See Exhibit 5, Earnings table and Tax table.)

Inspection, however, reveals that these amounts are based on a mistaken entry that was reflected in the Payroll Database. These amounts were instead owed (and paid) to R. Madala,

---

[15] See Plaintiffs' Motion for Class Certification, p. 26.

another salaried manager who was terminated during the same pay period in which the erroneous entry appears in the Payroll Database and is attributed to Mr. Ballard. Mr. Ballard was not owed these amounts. Rather, a cash office payment was recorded to Mr. Madala on April 13, 2006 in the amount of $2,840.23. (See Exhibit 8.) Thus, amounts allegedly owed to Mr. Ballard were data entries that were erroneously credited to Mr. Ballard, when, in fact, the funds were both owed and paid to another associate.

### b. Accrued Vacation Time

Moreover, an evaluation of the complete record for Mr. Ballard shows that he was actually overpaid for his vacation. Because Mr. Ballard held three different positions during the year prior to his termination, his accrued vacation needs to be calculated in three steps:

1. Mr. Ballard was a non-exempt, hourly associate when he began his employment with Wal-Mart on July 30, 2004. On his one year anniversary, he was paid out 34.16 vacation hours for $356.97. In his second year, he accrued vacation and personal time from July 30, 2005 through September 2, 2005 as a non-exempt, hourly associate of 8.48 vacation hours (8.45 hours of regular vacation hours and 0.03 of overtime vacation hours), as reflected in the Paid Associates table. (See Exhibit 5, Paid Associates Table.)

2. He became a non-exempt, salaried manager-in-training on September 3, 2005, first reflected in the pay period ending September 16, 2005. From September 3, 2005 through January 6, 2006, he accrued 27.69 regular vacation hours (9/26 multiplied by 80 base hours) and 0.18 overtime vacation hours (4.75 overtime hours multiplied by 80/2080, the hourly vacation accrual rate).[16]

3. On January 7, 2006, Mr. Ballard became an exempt, salaried, manager. Between January 7, 2006 and his termination date of March 3, 2006, he had accrued an additional 12.31 hours of vacation (4/26 multiplied by 80 hours).

The total accrued vacation at the time of Mr. Ballard's termination, then, was 48.66 hours, for an aggregate value of $1,170.36 (calculated as 48.66 times Mr. Ballard's hourly rate $24.051,

---

[16] Once Mr. Ballard became salaried, the accrual of regular vacation hours was no longer reflected in the Paid Associates Table; instead he was assumed to work 80 hours per bi-weekly pay period and was entitled to 80 hours of vacation per year, or 80/2080 vacation hours per base hour). However, because Mr. Ballard was still non-exempt, while a manager-in-training, he received overtime that was reflected in the Hours Table, which can be used to estimate his overtime vacation hours.

*i.e.,* his bi-weekly pay of $1,673.08 plus his geographic assistance pay ("GAP") of $250.96 divided by 80 bi-weekly hours.)[17]

Yet according to the Salaried Manager Termination Payout Worksheet in Mr. Ballard's personnel file, Mr. Ballard was estimated to have been owed $1,184.03 for accrued vacation as of his termination.[18] (See Exhibit 5.) His accrued vacation was erroneously over-calculated, assuming that Mr. Ballard had been exempt since the time of his one-year anniversary date, rather than recognizing that he was a non-exempt, hourly associate for the first three pay periods, immediately following his one-year anniversary date. As such, Mr. Ballard was credited with 49.23 accrued vacation hours (16/26 multiplied by 80 hours), rather than the 48.66 hours to which he was entitled.

According to the DOE table, Mr. Ballard was credited with $1,184.03 in vacation pay for the pay period ending on March 3, 2006, representing an overpayment of $13.67 in gross vacation wages; and Mr. Ballard received a cash draw of $759.43, which matched the net amount owed on the California Payout Worksheet. (See Exhibit 5, DOE Table and California Payout Worksheet.)

### c. Accrued and Available Personal Time

According to the Hours table of the Payroll Database, Mr. Ballard was paid for 8 hours of personal time in the September 2, 2005 payroll period, while he was a non-exempt associate. At the time Mr. Ballard became a salaried manager-in-training, he had 7.35 personal hours (5.66 available, 1.69 of accrued). However, since Mr. Ballard became exempt at the time he became a salaried manager, the computerized records do not show the time off which Mr. Ballard may have taken away from work between the date when he became an exempt employee and his termination. Wal-Mart's computerized records do not provide a definitive answer or explanation.

---

[17] See Exhibit 5, Salaried Manager Termination Payout Worksheet for Mr. Ballard's base pay rate and GAP rate.

[18] Mr. Ballard's personnel file contains a California Payout Worksheet with his signature that reported gross earnings of $1,376.43, with a net payout of $759.43, as well as a Salaried Manager Termination Payout Worksheet that detailed the components of his gross earnings.

### B. Plaintiff M. Wiggins

A complete review of the record for Mr. Wiggins reveals that he was overpaid by 3.04 hours, or $28.61 (3.04 hours multiplied by his base rate of $9.41).

While a termination date of July 4, 2004 is reported in the Associate Database for Mr. Wiggins, he worked on July 8, 2004, suggesting this termination date may have been entered in error. This interpretation is corroborated by several other sources. Notably, in the Paid Associates table of the Payroll Database, Mr. Wiggins does not receive an "Employee Status Code" of "T" that would have been expected for the pay period ending July 9, 2004 had he been terminated on July 4. (See Exhibit 6, Paid Associates Table.) In addition, the personnel file for Mr. Wiggins does not contain a California Payout Worksheet, a Termination Checklist or an Exit Interview reflecting a termination in July 2004. Furthermore, a review of the Cash Office Database indicates that no cash draw was provided to Mr. Wiggins at that time.

While this evidence indicates that Mr. Wiggins was not terminated, his payroll check for the pay period ending July 9, 2004 included payment for 4.31 hours of accrued vacation and 1.75 hours of accrued personal time.[19] (See Exhibit 6, Hours Table.) Reflecting the payment of vacation hours that were not yet "available" to Mr. Wiggins, the Paid Associates table of the Payroll Database reported negative 4.31 vacation hours available to Mr. Wiggins in subsequent pay periods. At the same time, the accrued vacation hours reported on the Paid Associates table continued to increase, without reflecting the payment of accrued hours as of July 11, 2004. (See Exhibit 6, Paid Associates table.)

When Mr. Wiggins was actually terminated on October 20, 2004, according to the Paid Associates table, he had 15.99 accrued vacation hours, 0.37 accrued overtime vacation hours and negative 4.31 available vacation hours, for a net amount of 12.05 vacation hours owed. (See Exhibit 6, Paid Associates table.) Corresponding personal hours owed totaled 4.8 hours (12.05 accrued hours multiplied by the 0.4 accrual rate), which matched a negative entry on the Hours

---

[19] First-year hourly associates, such as Mr. Wiggins, accrue personal and vacation hours based on hours of service. First-year hourly associates accrue personal hours at a rate of 0.4 personal hours for every accrued vacation hour.

DECL. OF DENISE NEUMANN MARTIN ISO WAL-MART STORES, INC.'S MOTIONS FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

table of the Payroll Database in the subsequent payroll period. (See Exhibit 6, Hours table.)

While there are no hours entered into the Payroll Database reflecting payments of personal or vacation time, the California Payout Worksheet in Mr. Wiggins' personnel file indicates that he was paid for 15.35 vacation hours upon his termination, as well as 4.54 personal hours. (See Exhibit 6, California Payout Worksheet.) These 15.35 vacation hours match the vacation hours reported as accrued on the Paid Associates table as of the prior pay period, but did not take into account vacation hours accrued since the prior pay period (0.64 hours), overtime accrued vacation hours (0.37 hours) or the prior payment of accrued vacation hours in July (4.31 hours). Accounting both for additional vacation hours accrued as well as the July payment, Mr. Wiggins should have been paid for only 12.05 vacation hours. Thus, Mr. Wiggins' vacation pay was over-calculated by 3.30 hours.

At the same time, Mr. Wiggins' personal pay was under-calculated by 0.26 hours, personal time that had been accrued since the end of the last pay period. Thus, on net, in Mr. Wiggins' final payment, he was overpaid by 3.04 vacation/personal time hours or $28.61, (*i.e.,* 3.04 hours multiplied by his base rate of $9.41).

Mr. Wiggins appeared in person at the Martinez Wal-Mart store on December 3, 2004, and received $155.64, which included 15.35 hours of vacation time and 4.54 personal hours of personal time. The payment was entered into the Cash Office Database on December 3, 2004 with a description of "exit payment". (See Exhibit 6, Payout table.)

**C. Plaintiff B. Smith**

According to the computerized records, on January 2, 2005, Mr. Smith received payment in full of all wages owed to him. The databases do not answer the question of whether Mr. Smith was not available to be paid until he returned to the store on January 2, which was several weeks after his termination. (See Exhibit 7, California Payout Worksheet, signed by Mr. Smith January 2, 2005 and Cash Office Data.)

Moreover, from the computerized records, Mr. Smith's actual termination date is

uncertain. In the Job table in the PeopleSoft Database, the Action variable shows a termination action ("TER") as of December 20, 2004. That same table has an effective date of December 18, 2004. In the Associate Database, Mr. Smith is listed as a terminated associate on December 17, 2004. Finally, a field called Termination_DT in the Employment table of the People Soft Database has a date of December 17, 2004. (See Exhibit 7, PeopleSoft Database and Associates Database Termination codes.)

***

My analysis in this matter is ongoing, and I reserve the right to update or extend this work as new information becomes available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 11th day of March, 2008.

_____
Denise Neumann Martin