1  Louis M. Marlin, Esq. [Bar No. 054053]
   Stanley D. Saltzman, Esq. [Bar No. 090058]
2  **MARLIN & SALTZMAN**
   3200 El Camino Real, Suite 100
3  Irvine, CA   92602
   (714) 669-4900 Fax: (714) 669-4750
4  louis.marlin@marlinsaltzman.com
   ssaltzman@marlinsaltzman.com
5  Attorneys For: Plaintiffs and Proposed Plaintiff Class
         In Case Number CV 06 05411 SBA (Ballard)*
6
   *Additional Counsel on Following Page
7

8
                **IN THE UNITED STATES DISTRICT COURT**
9
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11  In Re WAL-MART STORES, INC.        ]   Case Numbers:        C 06 02069 SBA
    WAGE AND HOUR LITIGATION            ]
12                                      ]   **CLASS ACTION**
                                        ]
13  _____    ]   PLAINTIFF CLASS MEMORANDUM OF
                                        ]   POINTS & AUTHORITIES IN OPPOSITION TO
14  This Document Relates To:           ]   DEFENDANT'S MOTION FOR SUMMARY
                                        ]   JUDGMENT/ADJUDICATION DIRECTED
15  Case Nos.                           ]   TOWARD THE PLAINTIFF CLASS
                                        ]
16  C 06 02069 SBA (Smith) and          ]   Date          :     April 22, 2008
    CV 06 05411 (SBA) Ballard           ]   Time          :     1:00 p.m.
17  _____    ]   Courtroom     :     3
                                            Hon. Saundra Brown Armstrong
18

19

20

21

22

23

24

25

26

27

28
    ─────────────────────────────────────────────────────────────────
    Plaintiff Class Opposition to Defendant's Motion for Summary Judgment/Adjudication As To The Class
                                                          Case No. 06-02069 SBA

1 **ADDITIONAL PLAINTIFFS' COUNSEL**

2 Arnold W. Schwartz, Esq. [SBN 63436]
Marcus J. Bradley, Esq. [SBN 174156]
3 **SCHWARTZ, DANIELS & BRADLEY**
29229 Canwood Street, Suite 208
4 Agoura Hills, CA 91301
(310) 478-5838 Fax: (310) 478-1232
5 arnold.schwartz@schwartzdanielsbradley.com
Marcus.bradley@schwartzdanielsbradley.com
6

7 Peter M. Hart [Bar No. 198691]
**LAW OFFICES OF PETER M. HART**
8 13952 Bora Bora Way, F-320
Marina Del Rey, CA 90292
9 (310) 478-5789 Fax: (310) 561-6441
hartpeter@msn.com
10

11 Susan Simmons Seemiller [Bar No. 150546]
**BAILEY PINNEY PC**
12 840 County Square Drive
Ventura, CA 93003
13 (805) 339-9090 Fax: (805) 339-0090
sseemiller@wagelawyer.com
14

15 **BONNIE R. MAC FARLANE** [CA Bar No. 161526]
720 Howe Ave, Suite 113
16 Sacramento, CA 95825
(800) 230-5528 Fax (800) 230-5866
17 bmacfarlane@wagelawyer.com

18

19

20

21

22

23

24

25

26

27

28

---

Plaintiff Class Opposition to Defendant's Motion for Summary Judgment/Adjudication As To The Class
Case No. 06-02069 SBA

# **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   FED R. CIV. P. 56(c) IMPOSES A "HEAVY" BURDEN OF PROOF
     ON THE MOVING PARTY FOR SUMMARY ADJUDICATION . . . . . . . . . . . 2

II.  DEFENDANTS SHOULD NOT BE GRANTED SUMMARY
     ADJUDICATION AS TO SUB-CLASS TWO'S WAGE CLAIM . . . . . . . . . . . 4

     A.   The First Amended Consolidated Complaint Clearly Alleges
          Claims for Unpaid and Earned Wages Due Upon Termination . . . . . . . . . 4

     B.   Defendant's Violations of L.C. §§201-202, Asserted in the First Cause
          of Action, Mandate Payment of the Underlying Wages Owed Plaintiffs . . 7

     C.   Defendant's Violations of L.C. §§201-202 and Wages
          Owed under B & P Code §17200 Allow Plaintiffs' to
          Recover Their Underlying Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. SUB-CLASS NO. 2 IS OWED UNPAID WAGES AND IS ENTITLED
     TO RECOVER THEM FROM DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . 10

IV.  DEFENDANT'S SHOULD NOT BE GRANTED SUMMARY
     ADJUDICATION AS TO PLAINTIFFS' ASSERTED L.C. §§227.3
     AND 203 VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.   WAL-MART SHOULD NOT BE GRANTED SUMMARY ADJUDICATION
     AS TO L.C. §203 BECAUSE WAL-MART "WILLFULLY" FAILED TO PAY
     ALL MONIES OWED TO EMPLOYEES AT TERMINATION . . . . . . . . . . . 15

     A.   Defendant Does Not Cite any Case Law Interpreting
          L.C. §203 in Defining "Willfulness" . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     B.   The Definition of "Willfulness" under L.C. §203 is
          Clearly Set Forth in the California Code of Regulations
          and California Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.   The Evidence Demonstrates that Wal-Mart "Willfully"
          Withheld Wages from Its Employees, as "Willful" is
          Defined under L.C. §203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.  DEFENDANT SHOULD NOT BE GRANTED SUMMARY
     ADJUDICATION ON STATUTE OF LIMITATIONS GROUNDS . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

# TABLE OF AUTHORITIES

__State Cases__                                                                                           __Page__

*Armenta v. Osmose,*
      (2006) 135 Cal.App.4th 314, 325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Barnhill v. Saunders & Company,*
      (1981) 125 Cal.App.3d 1, 7-8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Davis vs. Morris,*
      37 Cal.App.2d 269, 274 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*DuBarry Int'l., Inc. v. Southwest Forest Indus.,*
      231 Cal.App.3d 552, 562 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Trombley,*
      31 Cal.2d 801 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kwan v. Mercedes-Benz of North America, Inc.,*
      23 Cal.App.4th 174, 183 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*On-Line Power, Inc. v. Mazur,*
      (2007) 149 Cal.App.4th 1079, 1086 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Reno v. Baird,*
      (1998) 18 Cal.4th 640, 658 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Road Sprinkler Fitters Local Union No. 669,*
      (2002) 102 Cal.App.4th 765, 782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


__Federal Cases__

*Accord, Seneca Meadows, Inc. v. ECI Liquidating, Inc.,*
      121 F.Supp.2d 248 (W.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Anderson v. Liberty Lobby, Inc.,*
      477 U.S. 242, 252, 106 S.Ct. 2505, (1986) . . . . . . . . . . . . . . . . . . . . 2, 3, 11

*Conley v. Gibson,*
      (1957) 355 US 41, 47-48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cooper Indus., Inc. v. Agway, Inc.,*
      956 F.Supp. 240, 248 (N.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cox v. American Fidelity & Cas. Co.,*
      249 F.2d 616, 618  (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ii

*Doehler Metal Furniture Co. v. U.S.*,
    149 F.2d 130, 135 (2nd Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Maffei v. Northern Ins. Co. Of New York*,
    (9th Cir. 1993) 12 F3d 892, 897 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Newland v. Wal-Mart Stores, Inc.*,
    (Case No. RG05193921, Alameda Co.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Textron Inc. v. Barber-Colman Co.*,
    903 F.Supp. 1570, 1579 (W.D.N.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. vs. Alcan Aluminum Corp.*,
    990 F.2d 711 at 722 (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United Steelworkers of America v. Phelps Dodge Corp.*,
    865 F.2d 1539, 1541-1542 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Wilson v. Amoco Corp.*,
    33 F.Supp,.2d 981, 985 (D.Wyo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


**Statutes and Rules**

Business and Professions Code §17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5-7, 9, 10

California Civil Code §1794(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

California Code of Civil Procedure §1510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

California Code of Civil Procedure §1511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

California Code of Civil Procedure §1513(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

California Code of Civil Procedure §1560(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

California Code of Regulation, Title 8, §13520 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

California Code of Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Federal Rules of Civil Procedure Before Trial*, Section 8:16 . . . . . . . . . . . . . . . . . . . 7

Labor Code §1194 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Labor Code §201(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Labor Code §202(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Labor Code §203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7-10, 14-17, 23, 25

Labor Code §208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 15

Labor Code §216(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Labor Code §226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Labor Code §227.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14, 15

Labor Code §§201-202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5-10

Labor Code §§201-203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1

**<u>INTRODUCTION</u>**

2      Defendant moves for summary adjudication on various grounds as to (a) Sub-Class One's

3 Vacation/Personal Time and Penalty Claims and (b) Sub-Class Two's "Wage" and Penalty claim.

4 Defendant, however, fails to meet the standard for summary judgement/adjudication required by

5 Federal Rule of Civil Procedure 56**.**

6      Wal-Mart attacks Sub-Class Two's wage and penalty claims on four grounds, none of which

7 have any merit.  First, Defendant claims that it is entitled to summary adjudication as to class

8 members' underlying wages because no breach of contract claim was asserted in the First Amended

9 Consolidated Complaint (herein after referred to as "FACC").  However, Plaintiffs do not need to

10 assert a breach of contract claim for underlying wages "unpaid and earned" at the time of termination,

11 as those claims are properly asserted under Labor Code §§201-202 and as predicate claims under the

12 "unlawful" and "unfair" prongs of Bus. & Prof. Code §17200.  In the governing FACC, Plaintiffs

13 made numerous factual allegations regarding the underlying wages due upon termination and

14 specifically requested relief relating to those underlying wages under the above causes of action.

15      Second, Defendant argues that there is "no genuine issue" that underlying wages are not owed

16 to Sub-Class Two.  Defendant cites their expert, Dr. Martin, in support of its contention.  Plaintiff's

17 expert, Dr. Shapiro, explains in his declaration filed herewith why Dr. Martin's conclusions are in error

18 and concludes that substantial sums were owed at termination to members of Sub-Class Two.  In

19 addition, as to Defendant's third argument that the representatives have no standing because no wages

20 or benefits are owed to them, Dr. Shapiro additionally concludes that Dr. Martin's calculations are in

21 error and explains in detail why the representatives are owed additional monies. *See also Plaintiffs'*

22 *Opp to Def. MSJ against the Rep. Plaintiffs, incorporated herein.*  Dr. Shapiro's declaration creates

23 genuine issues of material facts that should be resolved by a jury. *See Maffei v. Northern Ins. Co. Of*

24 *New York* (9th Cir. 1993) 12 F3d 892, 897.

25      Last, Defendant argues that the statute of limitations has run on Sub-Class Two's claims

26 because a one year statute of limitations applies when there is no underlying claim for wages.  As

27

28

1

1  noted above,  Plaintiffs contend that wages are owed to this Sub-Class and those claims were properly

2  asserted under the complaint.  Therefore, Defendant's argument fails.

3      As to Sub-Class One's claims for payment of vacation/personal time accrued and penalties

4  arising therefrom, Defendant again cites the workplace tender rule under Labor Code §208 to support

5  an argument that the class members are not entitled to penalties.  As argued in the class certification

6  motion, the workplace tender rule does not apply in this case because members of Sub-Class One and

7  Two remain unpaid to this day.  Further, Plaintiffs' expert assumed in his calculations of penalties that

8  class members received the funds that were created, and that they were still underpaid.  As shown

9  below, evidence discovered since certification shows that over 99% of class members did in fact

10  receive the funds which Dr. Shapiro assumed they had received, thus completely "mooting" any

11  discussion of the workplace tender rule.

12      Defendant additionally attacks the penalty claims as to all Sub-Classes on grounds that Plaintiff

13  cannot present any evidence that Wal-Mart's actions were "willful."  However, as detailed herein, not

14  only can Plaintiff demonstrate that Wal-Mart knew there was a problem with payment of associates

15  on termination, but it *actually weighed the risks and benefits of either fixing the problem or incurring*

16  *the penalties.*  There can be no doubt that Wal-Mart's main concern was its bottom line, not its

17  employees.  At trial, Plaintiffs will easily meet the "willful" standard within the context of Labor Code

18  §203.

19  I.  **FED R. CIV. P. 56(c) IMPOSES A "HEAVY" BURDEN OF PROOF ON THE MOVING**

20      **PARTY FOR SUMMARY ADJUDICATION**

21      Fed. R. Civ. P. 56(c) requires that a moving party demonstrate to the satisfaction of the court

22  "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a

23  matter of law."   The United States Supreme Court held, in *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

24  242, 252, 106 S.Ct. 2505, (1986), as follows:

25      The mere existence of a scintilla of evidence in support of the plaintiff's position will
      be insufficient; there must be evidence on which the jury could reasonably find for the
26      plaintiff. The judge's inquiry, therefore, unavoidably asks <u>whether reasonable jurors
      could find by a preponderance of the evidence that the plaintiff is entitled to a verdict</u>

27

28

2

– "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." [*Improvement Co. v.*] *Munson*, 14 Wall. [442,] 448 [20 L.Ed. 867 (1872)]. (Emphasis added.)

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts <u>are jury functions</u>, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. <u>The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor</u>. *Id.* at 255. (Emphasis added.)

Rule 56(e) itself provides that <u>a party opposing</u> a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but <u>must set forth specific facts showing that there is a genuine issue for trial</u>. ... the plaintiff must present <u>affirmative evidence</u> in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. We repeat, however, that <u>the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor</u>. If he does so, there is a genuine issue of fact that requires a trial. *Id.* at 256.   (Emphasis added.)[1]

Indeed, it appears well-settled in this Circuit that where there is "the slightest doubt" as to the facts, summary judgment should be denied.  The case of *Cox v. American Fidelity & Cas. Co.*, 249 F.2d 616, 618 (9th Cir. 1957)[2] contains the following directives, quoting from *Doehler Metal Furniture Co. v. U.S.*, 149 F.2d 130, 135 (2nd Cir. 1945):

We take this occasion to suggest that trial judges should exercise great care in granting motions for summary judgment. <u>A litigant has a right to a trial where there is the slightest doubt as to the facts</u>, and a denial of that right is reviewable; but refusal to grant a summary judgment is not reviewable. Such a judgment, wisely used, is a praiseworthy time-saving device. But, although prompt dispatch of judicial business is a virtue, it is neither the sole nor the primary purpose for which courts have been established. Denial of a trial on disputed facts is worse than delay.

(Emphasis added.)  *And see Rains v. Cascade Industries, Inc.*, 258 F.Supp. 974, 976 (C.D.N.Y. 1966), citing and quoting the above passage.

Insofar as plaintiffs (and the Class) has presented facts in opposition to defendant's motion that,

---

[1]This passage and these rules are essentially quoted *verbatim* in *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541-1542 (9th Cir. 1989).

[2]Westlaw shows this case, though somewhat mature, as having never been negatively treated (questioned, disagreed with, or overruled) and still citable.  It is one of the few Ninth Circuit cases on the topic.

3

1   if believed by a jury, could form the basis for a verdict in plaintiff's favor, defendant has failed to meet

2   its burden of proof and the motion should be denied.

3   **II.    DEFENDANTS SHOULD NOT BE GRANTED SUMMARY ADJUDICATION**

4   **       AS TO SUB-CLASS TWO'S WAGE CLAIM**

5       **A.    The First Amended Consolidated Complaint Clearly Alleges**
6           **Claims for Unpaid and Earned Wages Due Upon Termination**

7       Members of Sub-class Two seek to recover unpaid wages, *i.e.,* "hourly pay, salary and

8   geographical assistance pay," that remain unpaid and were due at the time of termination. *See Class*

9   *Certification Order 22:3.* Wal-Mart alleges that it is entitled to summary adjudication as to the Sub-

10  Class Two "Wage" Claim because there is no claim for wages made in the First Amended

11  Consolidated Complaint. Wal-Mart further alleges that Plaintiffs' voluntary dismissal of the breach

12  of contract and Labor Code §1194 claims (the Labor Code is hereafter referred to as L.C.) (the Third

13  Cause of Action in the FACC) bars Plaintiffs' recovery of their underlying wages. This is incorrect.

14  While it is true that Plaintiffs voluntarily dropped their breach of contract action and subsequently

15  entered a stipulation removing L.C. §1194 from the FACC, Plaintiffs alleged and continue to allege

16  claims in the FACC that allow for recovery of their underlying wages due upon termination.

17      Furthermore, contrary to the Defendant's argument, the stipulation did not dismiss any claims

18  made for the underlying wages owed upon Plaintiffs' termination. The stipulation, entered and

19  approved by this Court on July 30th, 2007, subsequent to this Court's May 29th, 2007 ruling on

20  Defendants' Motion to Dismiss, removed all overtime language from the First Amended Complaint.

21  ***See Stipulation attached as Ex. "A" to Saltzman Decl.*** As expressly noted in the stipulation, the

22  Plaintiffs agreed to voluntarily dismiss their Third Cause of Action for overtime on account of

23  substantially similar claims which were asserted in the case of *Newland v. Wal-Mart Stores, Inc.* (Case

24  No. RG05193921, Alameda Co.), which was essentially a "time shaving" case. As demonstrated from

25  the language of *Newland* quoted below, the allegations made by the Plaintiffs herein at paragraph 27

26  and other sections of the FACC, are the same allegations made by the *Newland* plaintiffs in

27  paragraph 2 and other sections of their complaint. *Newland* alleged, in part:

28      Plaintiffs have recently discovered substantial evidence, including the videotaped

4

admission of a Wal-Mart executive and certain internal Wal-Mart memoranda, showing that Wal-Mart deleted thousands of hours of time worked from employees' payroll records during the relevant time frame - a practice known in the industry as "time shaving." Plaintiffs believe Wal-Mart perpetrated this practice in at least four different ways: (1) altering employees records to make it appear as if the employees' workdays ended one minute after their meal period concluded, effectively denying employees their pay for the three or four hours of work they performed after the meal period (*i.e.* the "one-minute clock out" practice); (2) deleting overtime hours that employees worked in excess of forty hours (*i.e.* "the forty hour club"); (3) deleting employee punches so that employees would not be paid for an entire day or afternoon of work; and (4) altering employee time records to make it appear as if employees took meal periods when in fact they did not, resulting in unauthorized deductions from the employees' paychecks.

***See Newland Complaint attached as Exhibit "B" to Saltzman Decl.***

The entire stipulation entered into between the parties was premised on the *Newland* case. The Stipulation clearly stated, in part, in its "preamble":

> **WHEREAS, Plaintiffs have determined that the claims relating to alleged unpaid overtime in this action are substantially identical to the claims for unpaid overtime in the *Newland* action;**
>
> . . . .
>
> **WHEREAS Plaintiffs in this matter wish to dismiss the entire third claim for relief and strike all allegations that relate solely to that claim**

***See Stipulation p. 1:2-24, Ex. "A" Saltzman Decl.*** **(Underlining added for emphasis)**

Thus, the stipulation did not remove basic claims for unpaid hours and salary (including GAP) asserted in the FACC. These claims are repeatedly asserted throughout the FACC and, as discussed in the subsections below, are appropriately asserted under both the L.C. §§201 and 202 causes of action, as well as under the Business & Professions Code (hereafter referred to as "B & P) §17200 cause of action. Those code sections regulate the payment of all wages <u>earned and unpaid</u> at the time of termination, without regard to claims for breach of contract or L.C. §1194 violations.

With respect to the specific allegations for unpaid wages asserted throughout the complaint, the following quoted language from the FACC alleges that Wal-Mart failed to pay all unpaid and earned wages due at the time of termination and requests corresponding relief for said violations. All of the language quoted below derives from the FACC as it currently stands, after removing all language stricken pursuant to the stipulation and this Court's order on Defendant's Motion to Dismiss. Beginning with Paragraph 1,

- **"During the relevant time period, Plaintiffs and the Class suffered the following: (i)**

5

1  former employees failed to receive all the wages due them at the time of termination; (ii) current
2  and former employees suffered the loss and forfeiture of accrued vacation wages and personal
   time wages...."

3  •       "Plaintiffs bring this action as a class action to recover statutory damages and
   monies due and owing for all similarly situated current and former employees of Defendant for
4  Defendant's failure to timely pay wages." *Para. 20 under "Factual Allegations"*

5          Under class allegations, the Terminated Sub-Class is defined as follows:

6  •       "All former employees of the Defendant who did not receive all of the wages due
   them at the time of termination, and/or who did not receive their final wages in a timely manner
7  as mandated by California law.  All of the named Plaintiffs are herein members of this sub-
   class." *Para. 33 under "Class Allegations"*
8

9          One of the "common questions of fact and law" asserted under the Class Allegations of the
10 FACC includes the following:

11 •       "Whether, at the time of termination, Plaintiffs and members of the proposed Class
   received all wages due them from Defendant, the amount of any unpaid compensation due, and
12 the amount of penalties due pursuant to California law." *Para. 37, Subsection 2 under "Class
   Allegations"*
13

14         Plaintiffs further make allegations and ask for relief for underlying wages under the First Cause

15 of Action for Violations of L.C. §§201-203, quoted below.  As argued in more detail hereafter, L.C.

16 §§201-202 not only prescribe the time for payment of wages upon termination, but mandate the actual

17 payment of wages "earned and unpaid" at the time of termination.

18 •       "Plaintiffs and members of the Terminated Sub-Class were previously employed by
   Defendant and were terminated within the class period as set forth above.  Defendant failed to
19 pay all wages due to this sub-class at the time of termination and, <u>in addition</u>, failed to pay all
   wages due in a timely manner as mandated by California L.C. §§201 through 203." *Para. 45
20 under "First Cause of Action" (emphasis added)*

21 •       "Defendant's failure to pay wages as alleged herein was willful in that Defendant
   knew that Plaintiff and the Sub-Class members were not receiving all of their earned pay
22 because of at least the following: (1) Defendant received weekly documents showing that
   Plaintiffs, the Class and the Sub-Class members were not receiving their earned wages; (2)
23 Defendants had documents showing what amounts Plaintiffs, the Class and the Sub-Class
   members accrued for vacation pay, personal time and holiday pay...." *Para. 47 under "First
24 Cause of Action"*

25         Plaintiffs also make allegations of failure to pay underlying wages upon termination

26 under the Sixth Cause of Action for Violation of Business and Professions Code §17200, *et. seq.*

27 •       "The actions by Defendant including, but not limited to, the failure to properly
   compensate members of the proposed Class for all vacation compensation (as the same is
28 characterized by California law and the others of the IWC), the failure to pay all monies due at

6

the time of termination of employment, and all other conduct described herein constitute unlawful conduct and violations of law as alleged herein. Such actions are also unfair business practices. As such, said conduct amounts to unfair business practices in violation of California *Business and Professions Code* §17200, *et. seq.* Indeed, Defendant's conduct as herein alleged has damaged Plaintiffs, the Class, and the Sub-Class members by wrongfully denying them earned wages...." *Para. 86 under "Sixth Cause of Action"*

- **"The members of the proposed Class are entitled to restitution of monies due obtained by Defendant."** *Para. 88 under Sixth Cause of Action*

In Para. 89 of the FACC, Plaintiffs additionally request injunctive relief as to unpaid wages upon termination under B & P Code §17200, *et. seq.*:

- **"As a direct and proximate result of the Defendant's conduct, the Plaintiff class is entitled to have this Court grant them a preliminary and permanent injunction as follows: DEFENDANT IS ENJOINED AND RESTRAINED FROM FAILING TO PAY ALL COMPENSATION DUE TO MEMBERS OF THE PLAINTIFF CLASS...."**

As demonstrated by the language quoted above, Defendant has been on notice since the filing of the Consolidated Complaint that Plaintiffs are claiming the underlying wages in addition to the L.C. §203 penalty on behalf of the Terminated Sub-Class. "The Federal Rules provide for 'notice pleading.' The pleadings need not allege facts constituting the claim for relief or defense **[although the FACC certainly does]**. They need only give *fair notice* of the pleader's claim or defense so that opposing parties can respond, undertake discovery and prepare for trial. See *Conley v. Gibson* (1957) 355 US 41, 47-48." *Federal Rules of Civil Procedure Before Trial*, Section 8:16. Furthermore, as demonstrated below, Plaintiffs properly asserted relief for the underlying wages *due upon termination* under L.C. §§201-202 and simultaneously under B & P Code §17200.

**B.**   **Defendant's Violations of L.C. §§201-202, Asserted in the First Cause of Action, Mandate Payment of the Underlying Wages Owed Plaintiffs**

Contrary to Defendants' argument, L.C. sections 201-202 do not merely dictate *when* wages must be paid. Rather, in addition to dictating when wages must be paid, L.C. Sections 201 through 202 also directly mandate the actual <u>payment</u> of wages "*earned and unpaid* at the time of discharge" or resignation. Specifically, the language of the statutes state the following:

/ / /

7

### L.C. § 201 (a):

**If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.**

### L.C. § 202(a):

**If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.**

L.C. §203 then provides a 30 day penalty for wages that an employer <u>willfully</u> fails to pay upon termination:

### L.C. §203:

**If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 202.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.**

Defendant's argument that L.C. §§201-202 only dictate the time and manner of payment would render the statutory requirement of payment of wages "earned and unpaid" entirely and superfluous. The rules of statutory interpretation are clear and mandate that this cannot be the result. "It is a maxim of statutory construction that 'Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage. [citation]" *Reno v. Baird* (1998) 18 Cal.4th 640, 658. Under Defendant's analysis, L.C. §§201-202 would only be relevant in the event of a willful failure to pay wages, because a non-willful failure would not trigger the penalties called for in L.C. §203, and would then leave L.C. §§201-202's separate mandate to pay the wages without meaning.

Defendant has cited no caselaw supporting its theory that the statutes mean anything other than what the statutes clearly state - employers must make payment of all earned wages at the time of termination, and within the statutory prescribed time periods. Assertion of a breach of contract action is not the only means to recover said wages. A failure to make payment under L.C. §§201-202 clearly constitutes a violation of the statutory obligation to make such a payment, and triggers a right to sue

8

1    for that statutory violation, and to recover thereunder.  There is a strong California public policy in

2    favor of the payment of all wages owed to an employee upon termination, as evidenced by the

3    existence of the L.C. §203 penalty and as well-documented in California's case law:

4            As stated in the recent California case of *Mamika v. Barca* (1998) 68 Cal.App.4th 487,
              492: "The reasons for this penalty provision are clear. "Public policy has long favored

5            the "full and prompt payment of wages due an employee.' '[W]ages are not ordinary
              debts...[B]ecause of the economic position of the average worker and, in particular, his

6            dependence on wages for the necessities of life for himself and his family, it is essential
              to the public welfare that he receive his pay" promptly.' (*Pressler v. Donald L. Bren*

7            *Co.* (1982) 32 Cal.3d 831, 837)..."Section 203 reflects these policy concerns.  The
              statute is designed to 'compel the prompt payment of earned wages; the section is to

8            be given a reasonable but strict construction' [against the employer].  (*Barnhill v.*
              *Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 7) 'The object of the statutory plan

9            is to encourage employers to pay amounts concededly owed by [them] to [a] discharged
              or terminated employee without undue delay and to hasten settlement of disputed

10           amounts.' (*Triad Data Services, Inc. v. Jackson* (1984) 153 Cal.App.3d Supp. 1, 11)."

11           *DLSE Enforcement Policies and Interpretations Manual Section 4.1.1.*

12   Thus, because Plaintiffs have made a proper claim for wages under L.C. §§201-202, Defendants

13   motion for summary adjudication as to Sub-Class Two's "Wage" claim should be denied.

14       **C.     Defendant's Violations of L.C. §§201-202 and Wages Owed under**
                **B & P Code §17200 Allow Plaintiffs' to Recover Their Underlying**
15              **Wages**

16           Not only has Sub-Class Two asserted a proper claim for underlying wages under L.C. §§201-

17   202, but, as demonstrated by the language quoted in subsection A, they have asserted the same claims

18   under the unlawful and unfair prongs of B & P Code §17200, *et. seq.*  The Defendant correctly points

19   out that this Court, at FN. 6 of its Class Certification Order, noted that it dismissed the unfair business

20   practices claim insofar as it was based on violations of anything other than the L.C. §227.3.  Plaintiffs

21   respectfully note, however, that FN 6 in the Class Certification Order is broader in scope than the

22   actual language contained in this Court's May 29, 2007, order, which of course is the governing order.

23           At the time the Motion to Dismiss was brought, Defendant sought to dismiss Plaintiffs' UCL

24   claim *in toto*.  In the briefing, both sides made concessions as to certain predicate claims for the 17200

25   cause of action, specifically L.C. §§ 227.3, 203, and 226.   The Court's order reflected those

26   concessions as follows:

27           **Accordingly, as the parties are correctly in agreement as to the scope of plaintiff's**
              **UCL claim, Wal-Mart's motion to dismiss the Sixth Cause of Action is granted**
28           **with respect to claims based on §§203 and 226 and denied with respect to claims**

                                              9

1       under §227.3.  *See Cortez, supra, 23 Cal.4th at 177.*

2 *See May 29, 2007, Order on Defendant's Motion to Dismiss, p. 12:20-24, attached as Exhibit "C"*

3 *to Saltzman Decl.*

4       The Court's order did not address Plaintiffs' predicate claims for unpaid wages due upon

5 termination, except with respect Plaintiffs' predicate L.C. §203 penalty provision alleged under the

6 17200 claim.  As the complaint stands today, Plaintiffs predicate unlawful claims of L.C. §§201-202

7 are still alleged, as noted in the language quoted in SubSection A above.  Neither of those sections

8 constitutes a penalty provision, such that they can properly be alleged under Bus. & Prof. Code

9 §17200.  "L.C. sections 201 through 202 call for the *payment of wages upon termination* or

10 resignation of employees working in various fields. L.C. Section 203 *provides penalties* for employers

11 who fail to pay 'any wages of an employee' in violation of those sections." *On-Line Power, Inc. v.*

12 *Mazur* (2007) 149 Cal.App.4th 1079, 1086 (emphasis added).

13       Furthermore, at minimum, the language quoted in SubSection A is sufficient to recover the

14 unpaid wages due upon termination under Bus. & Prof. Code §17200's *unfairness* prong.  Plaintiffs

15 respectfully submit that FN6 in the Class Certification Order inadvertently broadened this Court's

16 May 29, 2007, Order and as noted in the language quoted above, the FACC contains allegations of

17 unpaid wages upon termination that remain in the complaint under Bus. & Prof. Code §17200, *et. seq.*

18 **III.**    **SUB-CLASS NO. 2 IS OWED UNPAID WAGES AND IS ENTITLED TO RECOVER**

19         **THEM FROM DEFENDANT**

20       Commencing on page 11 of its memorandum of points and authorities, defendant argues that

21 no genuine issue of fact exists concerning whether or not wages are owed to Sub-Class No. 2.

22 According to Dr. Martin, there is a "minimal remaining amount of $13,238.54" in unpaid wages.

23 (Defendant's memorandum, 15:18).  The problem with defendant's argument is that the conclusion

24 drawn by their expert, Dr. Martin, that no wages are owed to this sub-class, is disputed by Dr. Shapiro.

25       Here, as will be discussed, there is a clear difference of opinion between the experts, both as

26 to the method for calculating the amount of other wages due, and the specific amount that remains

27 unpaid.  Defendant subtly takes the position that only its expert's opinion should be given the weight

28 and respect of coming from a qualified expert, yet it offers no legal or factual basis for this position

10

Plaintiff Class Opposition to Defendant's Motion for Summary Judgment/Adjudication As To The Class
Case No. 06-02069 SBA

other than the fact that its retained expert disagrees with Dr. Shapiro.  There is a disagreement as to the amount of damages - Dr. Shapiro's current calculation is that it exceeds $2 million (*See, Shapiro expert witness report, paragraph 7, at Ex. "V" Saltzman Decl.*), and Dr. Martin opines it approximates $13,238.54 (moving papers at 15:18).  As the very case cited by the defendant states, "Where the fact of damage has been established, the precise amount of the damage need not be calculated with absolute certainty."  *DuBarry Int'l., Inc. v. Southwest Forest Indus.,* 231 Cal.App.3d 552, 562 (1991).[3]

Plaintiffs' have intentionally avoided the type of personal attack on Dr. Martin that have come frequently in defendant's filings in this case in connection with Wal-Mart's attempt to discredit Dr. Shapiro.  They will not start such attacks now.  It is suffice to say that plaintiffs are confident that they have selected one of the most experienced experts in this field, with a particular background of knowledge concerning Wal-Mart's computerized payroll records.  It is that experience and talent that have led to several judgments against Wal-Mart, totaling in the many of millions of dollars, including the judgment in the *Savaglio* case, based upon the trier of fact finding Dr. Shapiro's conclusions to be entirely reliable.  In *Savaglio,* Dr. Martin was Wal-Mart's expert, and it appears her analysis was less than persuasive.  This is a prime example of why differences in the opinions of experts should be left to the trier of fact - not to the mis-use of the summary judgment procedure. However, it is plaintiffs' position that it is Dr. Martin who has made substantial errors.

The disagreement between the only two experts named in this case must be resolved at trial:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts <u>are jury functions</u>, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  <u>The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 255

Dr. Shapiro's declaration in support of plaintiffs' opposition to this motion establishes that, in

---

[3]Interestingly, if Dr. Martin's conclusion that 322 class members were owed this $13,238.54, then each sub-class member would have been underpaid by approximately $41, and each would be entitled to up to 30 additional days of pay, raising the total value even using Dr. Martin's numbers of over $750,000.  However, as discussed below, Dr. Martin is incorrect.

11

1   the few days so far available to him to review Dr. Martin's recently produced data, he has found errors

2   in her calculations, as well as unfounded assumptions made by her, as discussed below.  While Dr.

3   Shapiro's evaluation of the just received Martin data continues, he has determined that:

4          •      In his expert opinion, Dr. Martin has erred in connection with the treatment of negative

5   hours in her analysis of wages due for a number of reasons.  Among these are the apparent fact that

6   Dr. Martin assumes that the negative entries are "off-setting corrections of hours entered incorrectly

7   in the data" or "the movement of hours from one WIN number to another for the same associate."  Yet,

8   Dr. Martin offers no basis for these assertions, and for any of the other unsupported characterizations

9   she offers concerning negative hours.  (See, Shapiro declaration ¶¶ 17 - 19); and

10         •      Dr. Martin's treatment of "[n]o reported net earnings" is also incorrect.  Dr. Martin

11  asserts that Dr. Shapiro ignored cash draws in his analysis, which he did not.  (Shapiro declaration ¶¶

12  20 -27).  In addition, Dr. Martin or her staff allegedly conducted a study - one that was entirely faulty.

13  It apparently analyzed 3 million pay periods, using both current and terminating employees, yet this

14  case pertains to the underpayment of terminating employees upon termination, and Dr. Martin fails

15  to offer any such analysis in connection with the sub-class that is the subject of its motion.[4]

16         Here, both experts have analyzed Wal-Mart's own data to reach their conclusions (although

17  Dr. Martin limits her conclusions mainly to criticism of Dr. Shapiro, while studiously avoiding telling

18  the Court how much she believes is ultimately due either sub-class).  Dr. Shapiro's opinion is not a

19  "naked opinion" without analysis.  It is comprehensive, extensive and substantial.  It is improper to

20  grant summary judgment when there are conflicting expert opinions, both of which rely upon evidence

21  presented in the case.  See, *U.S. vs. Alcan Aluminum Corp.,* 990 F.2d 711 at 722 (2nd Cir. 1993);

22  _____

23         [4]Interestingly, this "study" run by Dr. Martin permits a payroll error rate of up to $5 as falling

24  within an acceptable range.  Thus, according to this "study", if in each of the 3 million "pay periods"
    for associates in the Payroll Database for whom both gross and net earnings were reported, those

25  current and/or terminated employees were underpaid by $5, there would be a maximum payroll
    underpayment of $15 million.  In addition, Dr. Martin fails to discuss the 1% of her oversized sample

26  which represents under payments of more than $5.  That would be 30,000 times that she herself

27  acknowledges are incidents of accurate pay.  How many of these "pay periods" relate to terminating
    employees who did not receive all wages upon termination remains a mystery that is not disclosed

28  by Dr. Martin.

1   *Wilson v. Amoco Corp.*, 33 F.Supp,.2d 981, 985 (D.Wyo. 1998); *Cooper Indus., Inc. v. Agway, Inc.,*

2   956 F.Supp. 240, 248 (N.D.N.Y. 1997). It is not for the court to "choose between these [competing

3   expert] opinions at this stage of the proceedings", i.e., defendant's motion for summary judgment.

4   *Textron Inc. v. Barber-Colman Co.,* 903 F.Supp. 1570, 1579 (W.D.N.C. 1995). *Accord, Seneca*

5   *Meadows, Inc. v. ECI Liquidating, Inc.*, 121 F.Supp.2d 248 (W.D.N.Y. 2000). Defendant challenges

6   Dr. Shapiro's analysis. Plaintiffs take the same position as to Dr. Martin, and feel her analysis is shaky

7   at best. Both these challenges of the conclusions must await trial:

8         In that circumstance, however, I believe that *Daubert* teaches that "Vigorous cross-
        examination, presentation of contrary evidence, and careful instruction on the burden

9         of proof are the traditional and appropriate means of attacking shaky but admissible
        evidence. *Daubert*, 509 U.S. at 596..

10 

        *Seneca Meadows, supra,* at 254

11 

12       Finally, and as a further example of what plaintiffs believe to be Dr. Martin's mis-calculation,

13   one can look to the difference of opinion as to the amount of unpaid wages owed to representative

14   plaintiff Danton Ballard. Dr. Martin believes nothing is owed. (Moving papers, footnote 9 on page

15   12). Dr. Shapiro opines that Mr. Ballard is owed $1,731.64. (Shapiro declaration in support of

16   opposition to summary judgment motion <u>against named plaintiffs</u>, ¶19). The reason for the difference

17   in these opinions is fairly clear: Both Dr. Shapiro and Dr. Martin agree that Mr. Ballard was terminated

18   on March 3, 2006, which was a Friday and the end of a pay period. He was only paid for 1 day of that

19   10 working day payroll period, as reflected in Wal-Mart's computerized payroll records. (*Id.*) Dr.

20   Martin in her declaration in support of the defendant's motion for summary judgment never addresses

21   why Mr. Ballard was paid for only one day of a two week pay period, despite having been terminated

22   on the last day of that pay period. Rather, she merely states that, "Plaintiffs base their claim for wages

23   owed upon a faulty entry in the Payroll Database" wherein an entry of wages for an R. Madala was

24   incorrectly recorded in Mr. Ballard's data.

25       Dr. Martin is incorrect. No where in his report does Dr. Shapiro base any part of his analysis

26   on this incorrect "Madala" entry. He bases his analysis on the undisputed fact, as reflected in the

27   records, that Mr. Ballard was terminated on the last day of a payroll period, he was a salaried

28   employee, and he only received 1 day of pay, rather than the 10 to which he was entitled. Plaintiffs'

13

1  believe that the records produced by the defendant support Dr. Shapiro's analysis, and not

2  Dr. Martin's.  The jury will properly be seated to resolve this dispute.

3         Defendant has failed to establish that no genuine issue of fact exists as to wages due Sub-class

4  No. 2.  The motion should be denied.

5  **IV.    DEFENDANT'S SHOULD NOT BE GRANTED SUMMARY ADJUDICATION**

6         **AS TO PLAINTIFFS' ASSERTED L.C. §§227.3 AND 203 VIOLATIONS**

7         Sub-Class One asserts claims for failing to fully pay associates for accrued vacation and

8  personal time when their employment terminated under L.C. §227.3, and penalties thereon.  Wal-Mart

9  argues that it is entitled to summary adjudication as to these claims because it "had no obligation to

10 calculate or tender final pay unless the terminated associate fulfills his/her predicate statutory duty: to

11 be at the store to receive tender of final pay or to expressly request that Wal-mart mail final pay to a

12 designated address."  Wal Mart moving papers, p. 19:4-6.

13        However, as argued by the Plaintiffs at Certification, the workplace tender rule under L.C. §208

14 does not apply to Sub-Class 1 and 2 employees, as to whom Wal-Mart's calculations resulted in an

15 underpayment.  As noted by this Court in its Class Certification Order at FN 15, Dr. Shapiro assumed

16 in his underpayment calculations that class members received the final pay as calculated by Wal-Mart.

17        Wal-mart also curiously asserts, without any apparent basis in fact, that the unpaid
          wages reflected as being "on the books" in the databases might be unpaid because the
18        employee never came to collect their final pay, and therefor the same issue that is fatal
          to Sub-Class No. 3 is also fatal to the other subclasses.  *See* Opp'n at 24; Martin Decl.
19        ¶V. However, Dr. Shapiro asserts, and Wal-Mart does not deny, that the entries in the
          databases were created contemporaneously with either a final cash payout or the cutting
20        of a final paycheck, and Shapiro assumes that the employee received the final pay as
          calculated by Wal-Mart.  The question is therefore one of faulty calculations of final
21        pay by Wal-mart, not whether the amounts as calculated were ever received; the issue
          of whether or not an employee came in to pick up his or her final pay is simply not
22        relevant to Subclasses No. 1 and 2."

23        Plaintiffs now know that the assumption by Dr. Shapiro was extremely well-founded, and that

24 this assumption was likely "not denied" by Wal-Mart (as noted by the Court above) because they knew

25 that the class members did, in fact, almost universally receive whatever final pay Wal-Mart prepared

26 for them, as reflected in its computer records.  In discovery responses received following the

27 certification briefing, Wal-Mart has produced databases reflecting any and all payroll checks which

28 were never cashed by its employees, as well as records showing the amount of final checks escheated

                                                    14

1    to the state. *See Ex. "D" attached to Saltzman Decl.,* reflecting Wal-Mart's Written Response to

2    Request for Production, agreeing to provide all data indicating the amounts of payroll checks uncashed

3    for more than 90 days, and not replaced , escheated or otherwise paid, as well as all funds escheated

4    to the state.

5           Dr. Shapiro has analyzed the data produced. *See Shapiro Decl.*, *at ¶ 28.*  As provided, the data

6    was not separated into uncashed checks of current employees versus uncashed checks of terminating

7    employees.  Nonetheless, no matter how it is studied, it reveals that the percentage of uncashed checks

8    is minuscule, and that his assumption that the employees were receiving their termination checks was

9    therefore correct.  The table set forth in ¶ 28 of the Shapiro declaration reveals that out of over 1.6

10   billion dollars in payroll checks issued in California during the relevant time period, only $287,053

11   remain uncashed and unreplaced, representing less than two-tenths of one-percent of all payroll checks.

12   Thus, over 99.8% of all checks were cashed.

13          Dr. Shapiro then considered (even though it would be an unfounded assumption) what the

14   percentage of uncashed checks (all 818 of them) would be if each and every such check was a check

15   issued on termination, and concluded that as against the total of the termination checks, this would still

16   represent less than one-percent of all such checks.  *See Shapiro Decl., at ¶ 28.*

17          As for the 99.8% of the checks issued to terminated employees, the workplace tender rule is

18   of no relevance.  As soon as they received their money, they were underpaid as Dr. Shapiro's reports

19   have indicated.  While we do not know precisely when each check was received, that is irrelevant to

20   sub-classes one and two, and would only have been relevant as to sub-class three, which the Court did

21   not certify.  Thus, the final pay statute was "triggered" as to all those who received their checks, thus

22   mooting Wal-Mart's concerns.  Defendant's argument has no merit.

23          With respect to the remaining class members whose checks were not cashed, but were

24   escheated to the state pursuant to Cal. Code of Civ. Pro. §1513(g),[5] the workplace tender rule is again

25   of no relevance.  According to Cal. Code of Civ. Pro. §1560(a), which regulates the administration of

26   _____

27          [5] "Subject to Sections 1510 and 1511, the following property held or owing by a business
     association escheats to this state: ... (g) Any wages or salaries that have remained unclaimed by the
28   owner for more than one year after the wages or salaries become payable."

1   unclaimed property, Wal-Mart is relieved of liability *only to the extent to which it makes payment to*

2   *the state.*

> Upon the payment or delivery of escheated property to the State Controller, the state shall assume custody and shall be responsible for the safekeeping of the property. Any person who pays or delivers escheated property to the State Controller under this chapter is <u>relieved of all liability to the extent of the value of the property so paid or delivered</u> for any claim which then exists or which thereafter may arise or be made in respect to the property. (emphasis added)

7       Thus, to the extent that the remaining few class members had checks escheated to the state, but

8   whose checks were for less than they were owed, the act of escheating less than was owed could not

9   protect Wal-Mart, and rightfully so.  Dr. Shapiro's declaration, at paragraph 28, again notes that the

10  amount escheated was also extremely small, amounting to less than one percent of all payroll checks

11  issued during the class, and less than three percent of terminating checks issued.  But again, if those

12  persons are included in Dr. Shapiro's analysis of persons underpaid, they still remain underpaid when

13  the money is escheated, or transferred to the state, to be held on their behalf there.  Wal-Mart remains

14  liable for the remaining underlying payments owed and potentially the penalty under L.C. §203.  Thus,

15  contrary to Defendant's arguments, the workplace tender rule under L.C. §208 is entirely irrelevant

16  to this litigation.  Therefore, Plaintiffs' respectfully request that this Court deny Wal-Mart's motion

17  for summary adjudication of Plaintiffs L.C. §§227.3 and 203 claims.

18  **V.    WAL-MART SHOULD NOT BE GRANTED SUMMARY ADJUDICATION AS**

19  **TO L.C. §203 BECAUSE WAL-MART "WILLFULLY" FAILED TO PAY ALL**

20  **MONIES OWED TO EMPLOYEES AT TERMINATION**

21  **A.    Defendant Does Not Cite any Case Law Interpreting L.C. §203 in Defining "Willfulness"**

23      Defendant cites cases concerning the definition of "willful" which have nothing to do with

24  *L.C.* §203. Defendant cites *In re Trombley* 31 Cal.2d 801 (1948), which involves interpretation of *L.C.*

25  §216(a), a statute imposing misdemeanor penalties upon managerial level personnel who fail to pay

26  wages they acknowledge are due and have the ability to pay. The *Trombley* case does not, as

27  Defendants assert, define the term "willfully fails to pay" for both §§ 203 and 216 purposes. It only

28  deals with §216, a criminalization of the failure to pay, and determines that a good faith dispute is a

16

---

1   defense to a §216 allegation. It states in dicta that §203 has "similar" language, as the language of the

2   statute does allow for such a defense under the proper circumstances.  It does not in any way attribute

3   any common definition of the term "willful" to the two statutes.

4        Defendant argues that "a negligent or mistaken employer does not act willfully - even if a

5   pattern of mistakes is shown."  See MSJ, p. 22:9-12.  However, according to the California Code of

6   Regulations, Defendant cannot assert a "good faith defense" when there is no dispute as to whether

7   the underlying wages are due. "A 'good faith dispute' that any wages are due occurs when an employer

8   presents a defense, based in law or fact, which, if successful, would preclude **any** recovery on the part

9   of the employee." *Cal. Code of Regulation, Title 8,* §13520. California's DLSE manual, section 4.2.1,

10  elaborates on the imposition of 203 penalties - "As the C.C.R. states, the "good faith dispute" if

11  successful, would have to preclude **any** recovery by the employee. **In other words, an employer**

12  **cannot withhold all of the wages due an employee based on a purported good faith dispute as**

13  **to a portion of those wages.** Any undisputed wages **must** be paid pursuant to the applicable law."

14  (Emphasis added)  Since Wal-Mart does not dispute that said wages are owed, but rather only claims

15  that they may have been paid, then pursuant to the California *Code of Regulations*, it cannot in "good

16  faith" dispute that portion of the wages outstanding and owing as a defense to the 203 penalties.

17        Furthermore, the case cited by Defendant in support of its argument that a "mistaken" employer

18  is entitled to a "good faith defense" - *Road Sprinkler Fitters Local Union No. 669* (2002) 102

19  Cal.App.4th 765, 782 - does not support its argument.  In that case, fire sprinkler fitters who were

20  misclassified as pipe tradesman, and thus paid a lower per diem wage, sued for the difference in wages

21  and benefits resulting from the misclassification.  The plaintiffs also asserted L.C. §203 penalties and

22  were awarded those penalties at trial.  On appeal, the employer disputed the award of penalties by

23  arguing that "[m]ore than a simple mistake is required to impose the statutory penalties."  *Id.*

24        The Court noted that "G & G [the employer] applies the wrong legal standard and again ignores

25  the factual findings."  *Id.*  The Court contrasted G & G's actions to those of the employer in the

26  *Barnhill, supra,* 125 Cal.App.3d 1, case, where there existed a true legal uncertainty as to whether the

27  wages were owed under prevailing law.  The court found that there was no legal uncertainty as to

28  whether the wages were owed to the fire sprinkler fitters, therefore, G & G had no "good faith defense"

17

1  to the imposition of the penalty.  Here, Wal-Mart has repeatedly acknowledged that it owes its

2  terminating employees all wages, including vacation and personal time, upon termination. Thus, Wal-

3  Mart has no good faith defense, as there is no legal uncertainty as to whether the payments are owed.

4  Because Wal-Mart's "good faith" defense would not preclude "any" recovery in this case, the defense

5  cannot be raised.

6       In further purporting to define "willful" in their MSJ papers, Defendant also cites *Kwan v.*

7  *Mercedes-Benz of North America, Inc.* 23 Cal.App.4th 174, 183 (1994), which involves the definition

8  of "willful" under a consumer product warranty set forth in Civil Code §1794(c). In fact, *Kwan* cites

9  *Davis vs. Morris*, 37 Cal.App.2d 269, 274 (1940) for the proposition that the statutory penalty for a

10  wilful failure to pay wages when due requires "no deliberate evil purpose to defraud workmen of

11  wages which the employer knows to be due". Thus the cases cited by defendant have absolutely no

12  application to the meaning of "willful" as it applies to section 203. As noted in *Kwan, supra,* at 184,

13  "[t]he word 'willful' is used in different statutes with various shades of meaning," and thus should be

14  construed according to the context of the particular statute.

15  **B.   The Definition of "Willfulness" under L.C. §203 is Clearly Set**
      **Forth in the California Code of Regulations and California Case**
16      **Law**

17       The definition of "willful" under *L.C.* §203 is unambiguously set forth in Title 8, California

18  *Code of Regulations*, §13520, as noted in California's DLSE Manual Section 4.2 (Relevant DLSE

19  Manual sections are contained in Exhibit 13):

20       **A willful failure to pay wages within the meaning of L.C. Section 203 occurs when**
      **an employer intentionally fails to pay wages to an employee when those wages are**
21      **due. However, a good faith dispute that any wages are due will preclude**
      **imposition of waiting time penalties under Section 203.**
22
      **A 'good faith dispute' that any wages are due occurs when an employer presents**
23      **a defense, based in law or fact, which if successful, would preclude any recovery**
      **on the part of the employee. The fact that a defense is ultimately unsuccessful will**
24      **not preclude a finding that a good faith dispute did exist. Defenses presented**
      **which, under all the circumstances, are unsupported by any evidence, are**
25      **unreasonable, or are presented in bad faith, will preclude a finding of a 'good**
      **faith dispute.'**
26
      California's DLSE manual section 4.2.2.1 states that "[t]he civil penalty assessed under L.C.
27
28  §203 does not require that the employer intended the action; **merely that the action occurred and**

---

18

---

1   it was within the employer's control. *(Davis v. Morris* (1940) 37 Cal.App.2d 269)" (Emphasis

2   added).

> **The term 'willful,' as it is used in section 203 of the L.C., does not mean that the refusal to pay wages must necessarily be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due, in order to subject him to the penalty. In the case of *May v. New York Motion Picture Corp.*, 45 Cal.App.396, 404, it was held that the term 'willful' in its ordinary use, merely means that one intentionally fails or refuses to perform an act which is required to be done.**

7   *Davis, supra,* 37 Cal.App.2d at 274 (*see also Barnhill v. Saunders & Company* (1981) 125 Cal.App.3d

8   1, 7-8 and *Armenta v. Osmose* (2006) 135 Cal.App.4th 314, 325). Further citing the *May* case, the

9   *Davis* Court further observed the following:

> **In civil cases the word 'willful' as ordinarily used in courts of law, does not necessarily imply anything blameable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done, was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent."**

13   *Davis, supra,* 37 Cal.App.2d at 274.

14

15   **C.    The Evidence Demonstrates that Wal-Mart "Willfully" Withheld Wages from Its Employees, as "Willful" is Defined under L.C. §203**

16

17          Evidence discovered since class certification demonstrates that Wal-Mart not only knew there

18   was a problem with termination pay outs as far back as 2003, but that it actively weighed the risks and

19   benefits of incurring penalties versus its own bottom line. Canetta Reid, Wal-mart's <u>Senior Director</u>

20   <u>of Corporate Employment Compliance and Policy</u>, Ms. Reid initiated a project in 2003 called

21   "Instapay" or "Termination Payout." The project was set to be completed by September, 2003. *(See*

22   *3/3/3  Reid E-Mail attached as Ex. "E"; 8/4/03 Reid E-Mail attached as Ex. "F"; Wage and Hour*

23   *Cross-Functional Compliance Team Minutes for August 28, 2003 Meeting attached as Ex. "G";*

24   *Ex. "H" – Deposition of Canetta Reid dated March 21, 2008 ["Reid Depo." ] 106:10-107:24,*

25   *113:24-114:10)*    In a memorandum authored by Canetta Reid, which describes the project, she

26   expresses concern about Wal-Mart incurring "significant exposure" and "possible fines"if final pay

27   is not paid properly and on time.

28          **Project**

19

**Description: Online web base form for termination pay outs that calculates automatically how much is owed to the Associate.**

**Justification**

**Need to have automated calculation of final pay out amounts to ensure accuracy with the Payroll system.  Failure to pay wages properly could lead to significant exposure for company.**

**Benefit to the Company:**

**Reduction of possible fines imposed for not handling pay outs properly and on time.**

*(see Quarterly Timeline for Online Projects attached as Ex. "I"; See also Ex. "H" – Reid Depo. 62:9-18, 85:13-86:5)*

In two other documents, Wal-Mart describes the justification or benefit to the company in initiating such a program as reducing penalties for improper pay to terminating associates.  In 2004, in a "Business Scope Document," which appears to be created by Wal-Mart's Information Systems Division in conjunction with its Compliance Division, Wal-Mart identifies the benefit of the InstaPay program to the company:

**Business need to help reduce potential penalties for improper pay to terminated associates.**

*(see Business Scope Document attached as Ex. "J"; Deposition of Carl Cole dated 2/20/08 ["Cole Depo."]  9:12-20, 12:9-12, 17:19-18:3, 27:3-10 attached as Ex. "K")*

Furthermore, in a 2006 ISD document entitled "Document of Understanding, Project Name: Instant Payout" Wal-Mart notes "Payback/ROI/Savings to the Company" for the Instant Pay Project:

**There are legal requirements to process check on the same day of termination. The company will experience penalties if they do not comply.**

*(See Document of Understanding attached as Ex. "L")*

In addition to its acknowledgment of possibly incurring penalties for improper termination payout, a document dated September 30, 2004 *(See 9/30/04 Document attached as Ex. "M")* demonstrates that Wal-Mart was specifically aware that its final pay outs were not always accurate, and that there was a gap in payment of hours or benefits accrued in the final pay period which may result in inaccurate final pay out:

**Medium       8/23/2004 Instapay**

20

> **Currently, we are not to pull direct deposits back on terminated associates. Part 2 in final pay are not always accurate.  It is a manual process using last[ed] [sic] version of the payroll resister [register] [sic].**

**Solution**     **Develop a system where final payouts can be calculated automatically and will include all deductions in real time.  Part 1 to have a way to pull direct deposit back before hitting the associates account.**

**New Status**   **Scope Document has been completed and sent to Marion Roller with ISK once she has had a change to review she will send it back and Carl Code will send to legal.**

In her deposition, Canetta Reid, herself a lawyer, denied any knowledge of the above document despite her involvement with the Instapay project at the time. *(Ex. H – Reid Depo. 138:4-141:1)* She did acknowledge, however, that a purpose of the InstaPay program was to eliminate the mathematical errors that occur when calculating final pay for termination associates. *(Ex. "H" – Reid Depo. 27:2-20)*

Despite Wal-Mart's acknowledgment of the issue, the "InstaPay" project remained essentially dormant for approximately four years, despite being listed as a "priority" project for Wage and Hour Compliance from 2003-2007. *(Ex. "H" – Reid Depo. 114:11-15, 148:7-9; Ex. "K" – Cole Depo. 38:9-11, 49:17-22, 55:13-23)* During this time frame, Wal-Mart issued a memo of its stated priority objectives for complying with Wage and Hour laws and specifically with termination pay outs: "Develop and implement effective compliance strategies to ensure compliance with state wage and hour laws with respect to . . . termination pay outs."  The stated "Methods and Means of Measurement" as they pertain to termination pay outs were:

- Work with Legal Department to obtain full understanding of legal requirements under federal law and in all 50 states

- Recommend appropriate system changes

- Develop and implement appropriate policy changes

- Develop written procedure manuals and other training manuals

- Develop appropriate reports for monitoring compliance

*(see Fiscal Year End 2004 Objectives attached as Ex. "N"; see also Fiscal Year End 2005 Objectives attached as Ex. "O")*

21

Nonetheless, during this time frame, Wal-Mart made no progress toward its stated goal of resolving this issue. No audits of compliance were performed and no progress was made toward automating the payout worksheets, despite Wal-Mart's specific knowledge that there existed a problem with termination pay outs. *(see Ex. "H" – Reid Depo. 130:22-131:19)*

Finally, in 2006, when these lawsuits were filed against Wal-Mart, it finally began to move forward on the project again, as reflected in the following email exchange:

> **Email (May 11, 2006):**
>
> **I will schedule a meeting with you to discuss adding a termination payout calculator within the PRE-PCN application. Or at least a link. Who would you like to attend the meeting Payroll or Global HR or both?**
>
> **Problem:**
> **We are receiving lawsuits for stores that do not adhere to the state laws for immediate termination payouts**
>
> **Discussed Resolution:**
> **Create a termination calculator that will automatically calculate the associate's amount due upon termination. With the capability to attach copies of the cashier's check used to pay the associate to the associate record.**
>
> **If I could be of further assistance, please don't hesitate to call.**
>
> **Response Email (May 11, 2006):**
>
> **Carl Cole was working on this last year. Payroll ISD team already got the requirements. The name of the project is Instant Pay....**

*(see 5/11/06 Ards/Shanmugam E-Mail String attached as Ex. "P")*

Plaintiffs anticipate that Defendant may argue that the InstaPay program was developed to protect Wal-Mart from "overpaying" its associates. In her deposition, Ms. Reid testified to having concerns for such "overpayment"[6] Wal-Mart is free to make any argument it wishes to the jury. The preceding documents, however, leave no doubt that Wal-Mart was also concerned about penalties on termination pay, and Ms. Reid reluctantly acknowledged the obvious at her deposition - that Wal-Mart could not be penalized for "overpayment." *(see Ex. "H" – Reid Depo. 85:13-86:5)*

In a 2006 email, (with underlining added for emphasis), in commenting on the Instant Payment

---

[6] Ms. Reid also testified that miscalculations of SDI upon termination pay out occurred. However, this problem was resolved in 2003. *(Ex. "H" – Reid Depo. 92:1-92:11)*

22

1   program, which had not yet been implemented, Shawn Hibdon, a corporate executive working in the

2   Information System Division, actually discussed weighing the risks and benefits of fixing the system

3   versus incurring penalties flowing from noncompliance.

**Possible Issues:**

Direct deposits in transit, we need to compare the state payout requirements to those states in which we can not recoup already deposited funds. **Some analysis may need to be done to determine if the penalties are enough for us to consider losing those direct deposits in transit as we may pay them on the day of termination and they may get to keep previous pay periods direct deposit.** Multiple feeds, I agree all information must be made available so that the proper computations may be done.

**Penalties:**

I agree, we need to know state by state what the penalties are. **Knowing the penalties will assist in determining the true necessity as in some cases the penalties may be a better risk than paying associates twice.** There is already a work around, work sheets are provided to be used when paying out terminated associates. Since this work around is in place it also affords us more time to get an automated system in place if necessary.

13   *(see 9/20/06 Shawn Hibdon E-Mail attached as Ex. "Q"; see also Ex. "H" - Reid Depo. 166:12-*

14   *167:25)*

15       One of the risks identified by Wal-Mart in its decision to move forward with the Instapay

16   program was possibly overpaying terminated associates via direct deposit, after they had been cashed

17   out at the store.  A 2006 document describing the scope of the project identifies direct deposits as a

18   risk or "possible issue":

Direct Deposit in transit at the time of termination. Payout would have to include last pay period as well as current pay period. Money which has been sent to the federal bank system can not be recovered until it is in the account. There are 9 states we can NOT get the funds back. We need the time line at what point we can not get it back.

22       As demonstrated above, until it was sued in 2006, Wal-Mart did not act on this previously

23   identified "priority" of complying with the wage and hour laws and termination pay outs of its

24   employees. Furthermore, a jury could certainly conclude that Wal-Mart appears more concerned with

25   its bottom line than with complying with the wage and hour laws, to the extent it weighed paying

26   penalties rather than complying with the law.  From this evidence, Plaintiffs believe that a jury could

27   easily conclude that Wal-Mart's actions were willful, as defined in L.C. §203.

28       In addition, as cited in Plaintiffs' Motion for Certification, at trial plaintiffs will present

23

1   evidence of Wal-Mart's ability to protect itself from overpayment of wages, while at the same time

2   eschewing the use of its computer facilities to protect its employees from underpayment of wages.

3   This evidence will come directly from the testimony of Wal-Mart executives.  These witnesses have

4   testified in deposition that during one's employment, Wal-Mart's databases relating to vacation or

5   personal time are programed to prevent anyone from being paid for more of said time off than the

6   amount to which they were entitled. *(see Deposition of Diana McChristian dated 4/4/07*

7   *["McChristian Depo., I" attached as Ex. "R" at 149:15 - 23)*  In stark contrast, however, these same

8   Wal-Mart witnesses have also testified that those same databases are not programmed to insure that

9   all accrued vacation and personal hours are in fact paid out to terminating employees upon departure.

10  *(see Ex. "R" – McChristian Depo. I, 27:9-14)*  The final payout system is manual, and has no failsafe

11  backup in the computer, or automated program to insure accuracy, and relies upon a hope that a store

12  level personnel associate will in fact remember or choose to calculate the vacation pay and will then

13  make an accurate estimate of the amount due at the time of termination, including that which has

14  accrued since the preceding pay period.  *(see Ex. "R" – McChristian Depo. I, 62:9 - 65.5)*.

15      As noted, despite having knowledge of a problem with termination pay outs, Defendant took

16  no action to audit whether accurate final pay was being paid to its California employees.  Canetta Reid,

17  designated by Wal-Mart to testify concerning whether audits have been performed by or for Wal-Mart

18  during the proposed class period to assure compliance with laws concerning full and timely payment

19  of wages, acknowledged that no such audits have been performed. *(see Deposition of Canetta Reid*

20  *dated 8/29/07 ["8/29/07 Reid Depo."] attached as Ex. "S" at 11:20 - 12:13)*  Further, when asked

21  whether the annual compliance reviews of the store managers, to whom the manual calculation of

22  vacation and personal hours payout responsibility has been assigned, includes inquiry as to whether

23  those responsibilities have been met, the answer was again in the negative. *(see Ex. "S" - 8/29/07*

24  *Reid Depo., 26:20-27:1)*  Thus, in this fully computerized corporate world, the payment of earned

25  wages in the form of vacation and personal time upon termination has been reduced to a manual

26  operation.  There is no failsafe computer backup notification, let alone payment itself, from the very

27  databases which are programmed to prevent Wal-Mart from overpaying vacation and personal time

28  as it is used, to insure that it is properly paid upon termination.

24

1    Thus, at minimum, there exists a triable issue of fact that Wal-Mart's failure to pay all accrued

2  vacation/personal time and additional wages was not a simple act of omission, but rather an act of

3  willful commission.  As also noted in the Motion for Class Certification, Dr. Shapiro has concluded

4  that Wal-Mart took one of two affirmative steps to adjust its records to account for the failure to meet

5  its obligation to class members.  Either, a negative entry was made in the database that resulted in

6  unpaid compensation being reduced to zero, or unpaid personal time was simply wiped off the books.

7  *(see Shapiro declaration, ¶¶ 30-31, submitted with Plaintiffs' Motion for Class Certification,*

8  *attached as Ex. "T")*.  This, in part, was confirmed by witness McChristian's testimony.  *(see*

9  *Deposition of Diane McChristian dated 8/28/07 ["McChristian Depo. II"] attached as Ex. "U" at*

10  *48:23 - 51:20)*.  Given that this evidence, along with the evidence cited above, could convince a jury

11  that Wal-Mart's actions were willful under L.C. §203, Plaintiffs respectfully request that this Court

12  deny summary adjudication to Defendant.

13  **VI.   DEFENDANT SHOULD NOT BE GRANTED SUMMARY ADJUDICATION ON**

14  **STATUTE OF LIMITATIONS GROUNDS**

15    Defendant argues that a one-year statute of limitations applies to Sub-Class Two's claims

16  because no underlying wages are owed to class members.  Given that Plaintiffs in fact claim that

17  underlying wages are owed to Sub-Class Two class members, Plaintiffs contend that a one-year statute

18  of limitations does not apply to Sub-Class Two's claims.[7]

19    Defendant further argues that any member of Sub-class One whose claim for unpaid wages

20  accrued prior to March 20, 2003 does not have a penalties claim.  Plaintiffs' agree with Defendant's

21  statement and assessment of the law as regards the three-year limitation for the L.C. §203 penalty.

22  **CONCLUSION**

23    WHEREFORE, PLAINTIFFS respectfully request that this Court deny Defendant's Motion

24  for Summary Judgment/Adjudication in its entirety.

25

26  _____

27    [7] Given that Defendant's last sentence in its three-sentence paragraph is a complete *non
sequitur,* Plaintiffs cannot respond to Defendant's complete assertion.

28

1   DATED:  April 1, 2008                          **MARLIN & SALTZMAN**

2

3                                                  By: _____

4                                                       Stanley D. Saltzman, Esq.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Class Opposition to Defendant's Motion for Summary Judgment/Adjudication As To The Class
Case No. 06-02069 SBA