1    Louis M. Marlin, Esq.    [State Bar No. 054053]
     Stanley D. Saltzman, Esq.    [State Bar No. 090058]
2    **MARLIN & SALTZMAN**
     3200 El Camino Real, Suite 100
3    Irvine, California  92602
     Telephone:    (714) 669-4900
4    Facsimile:    (714) 669-4750
     louis.Marlin@MarlinSaltzman.com
5    ssaltzman@MarlinSaltzman.com
     [See Additional Plaintiffs' Counsel Attached]
6

7    Attorneys for Plaintiffs, individually and on
     behalf of all others similarly situated

8

9             **IN THE UNITED STATES DISTRICT COURT**

10          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                   **OAKLAND DIVISION**

| | |
|---|---|
| In Re WAL-MART STORES, INC. WAGE AND HOUR LITIGATION | Case No. C 06 02069 SBA |
| | **CLASS ACTION** |
| | |
| This Document Relates To: | **DECLARATION OF MARTIN M. SHAPIRO, Ph.D., IN SUPPORT OF PLAINTIFFS' OPPOSITION MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION ON BEHALF OF DEFENDANT WAL-MART STORES, INC.** |
| Case Nos. | |
| C 06 02069 SBA (Smith) and CV 06 05411 SBA (Ballard) | |
| | Date:          April 22, 2008 |
| | Time:          1:00 p.m. |
| | Location:     United States Courthouse Courtroom 3, Third Floor 1301 Clay Street Oakland, CA 94612-5212 |

///
///
///
///
///
///

1

**ADDITIONAL PLAINTIFFS' COUNSEL**

2
3

Arnold W. Schwartz, Esq.    [State Bar No. 063436]
Marcus J. Bradley, Esq.     [State Bar No. 174156]
**SCHWARTZ, DANIELS & BRADLEY**
29229 Canwood Street, Suite 208
Agoura Hills, California  91301
Telephone:     (310) 478-5838
Facsimile:     (310) 478-1232
Arnold.Schwartz@SchwartzDanielsBradley.com
Marcus.Bradley@SchwartzDanielsBradley.com

4
5
6
7
8

Peter M. Hart, Esq.    [State Bar No. 198691]
**LAW OFFICES OF PETER M. HART**
13952 Bora Bora Way, F-320
Marina Del Rey, California  90292
Telephone:     (310) 478-5789
Facsimile:     (310) 561-6441
HartPeter@msn.com

9
10
11
12

Susan Simmons Seemiller [Bar No. 150546]
**BAILEY PINNEY PC**
840 County Square Drive
Ventura, CA 93003
(805) 339-9090 Fax: (805) 339-0090
sseemiller@wagelawyer.com

13
14
15
16

Bonnie R. MacFarlane, Esq.   [State Bar No. 161526]
**LAW OFFICES OF BONNIE R. MAC FARLANE**
720 Howe Ave, Suite 113
Sacramento, California  95825
Telephone:     (800) 230-5528
Facsimile:     (800) 230-5866
BMacfarlane@wagelawyer.com

17
18
19
20
21
22
23
24
25
26
27
28

I, MARTIN M. SHAPIRO, declare as follows,

1.      I am a United States citizen, over the age of 21, and competent to testify to the matters stated herein. I am familiar with the facts set forth herein and if called upon as a witness, I could and would competently testify thereto.

2.      I have a Bachelor's degree from Yale University and a Ph.D. degree from Indiana University with concentrations in Psychology and Mathematics. I also have a J.D. degree from Emory University.  Currently, I am a Professor of Psychology at Emory University located in Atlanta, Georgia. I have been a professor at various institutions of higher learning for over 47 years. My areas of interest are in the application of quantitative and scientific concepts of legal processes; the design, construction and evaluation of test and measurement operations and statistics and quantitative measures. I have also taught courses in advanced statistics.

3.      Attached hereto as Exhibit A is a true and correct copy of my Curriculum Vita. My Vita sets forth an accurate representation of my background and experience.

4.      I submit this  Declaration in response to Defendant's Motion for Summary Judgment/Adjudication as to Plaintiffs, Barry Smith, Michael Wiggins and Danton Ballard.

5.      I previously have served as an expert in class action employment cases. I have developed formulae in these cases, based upon the employers' machine readable data, for calculating class wide damages and for apportioning theses damages to the individual class members.

6.      I have been retained as a consultant in the instant cases for Plaintiffs. I also have been retained as an expert in approximately twenty other wage and hour class actions decided or pending against Wal-Mart. Through these other cases involving Wal-Mart, I have gained familiarity with the relevant Wal-Mart electronic databases.

7.      I have attended the depositions of Wal-Mart employees responsible for three of Wal-Mart's computer databases and I have read deposition testimony of other Wal-Mart Information Technology employees responsible for Wal-Mart's in-store computer systems and home-office computer systems. Specific to the instant cases, I have read the deposition testimony

1  of Diana McChristian taken on August 28, 2007 specifically regarding the electronic Payroll data
2  for accrued and available vacation and personal time.

3         8.     I have reviewed Wal-Mart Stores' "Payroll and Scheduling Guide."  The Guide
4  contains descriptions of numerous computer monitor displays for editing data as well as numerous
5  procedures for generating reports.  Separate sections of the guide deal with procedures for
6  terminating employees, determining vacation benefits, determining personal time benefits and the
7  disbursement of cash payments to employees.  The data entry and reporting programs used by
8  Wal-Mart in all Wal-Mart and Sam's Club stores include data transfer methods and report
9  generation programs for time-clock punches and payroll calculations.  The system permits the
10 entry of time-clock data generated by employees swiping their badges through time-clocks or by
11 management adding, changing or deleting time-clock data via computer work stations.  Although
12 these edits modify the time records for payroll purposes, an electronic trail of these deletions,
13 changes and additions is maintained in the Associate database. The time and attendance data in
14 the Associate database are electronically transmitted to a central computing facility at corporate
15 headquarters where they are stored in memory for use in numerous computer operations including
16 payroll calculations.

17        9.     Specifically, I am familiar with Wal-Mart's Associate database which tracks
18 employee time, attendance and payment records at the store level.  In addition to all time-clock
19 entries, the Associate database contains records of each employee's subsequent payroll additions
20 such as vacation pay, sick pay and personal pay, as well as all actual dollar advances or
21 reimbursements.  The Timekeeper-Master table of the Associate database contains records which
22 are created whenever an employee is credited with additional payable hours (such as holiday pay,
23 vacation pay, sick pay, or personal time pay) or dollar amounts for advances and reimbursements.

24       10.    I also am familiar with Wal-Mart's Payroll database.  The Payroll database, using
25 the information uploaded from each store's Associate database, contains the details of Wal-Mart
26 employee's payroll checks, the hours and dollar amounts attributed to work, vacation, personal
27 and other payroll categories.  Wal-Mart's work week ends at midnight Friday, i.e., 12:00 midnight
28 between Friday evening and Saturday morning.  Each store's payroll-related information is

1   uploaded to the Bentonville, Arkansas headquarters early Saturday morning after it is finalized at

2   the store level.  Pay checks are printed on Sunday, delivered to the stores on Tuesday and

3   distributed to employees on Thursday.

4         11.    I also am familiar with Wal-Mart's PeopleSoft database which contains the

5   demographic information for each salaried employee and the job history of each salaried

6   employee.  The PeopleSoft database is the product of a commercial software vendor.  The job

7   histories include hire dates, termination dates and termination reasons.

8         12.    I also a familiar with Wal-Mart's Cash Office database which contains information

9   regarding the cash registers, cash register operators, cash register reconciliation and all cash

10  movements within the store.  The movement of cash within the store includes money infusions

11  into cash register drawers, money pulls from cash register drawers, and disbursements of money

12  from the store whether by cash, check or bank deposits.  Electronic records of the disbursements

13  of money to employees also are entered into the Associate database from which they then flow

14  into the Payroll database.

15        13.    Wal-Mart produced four computer databases:  (1) The Associate database for

16  303,998 hourly employees from January 1, 2001 through June 23, 2007, and 174,742 of them

17  have a termination as their last employment action after March 20, 2002,  (2) The PeopleSoft

18  database for 4,472 salaried employees, 1,508 of whom have a termination as their last

19  employment action after March 20, 2002,  (3) The Payroll database for 156,200 terminated hourly

20  and salaried employees with payroll ending dates from April 5, 2002 through May 25, 2007, and

21  (4) The Cash Office database with entries from August 8,2003 to July 6, 2007.  (Associate

22  database tables from one of the stores were missing and were produced after the completion of the

23  analyses.

24        14.    The above databases contain the following information:

25            a.    Hire date:  The hire date for hourly employees is contained in the asc table

26  of the Associate database.  The hire date for salaried employees is contained in the job table of the

27  PeopleSoft database.  Hire date is required for the calculation of accrued vacation time and

28  accrued personal time.  Accrued vacation time and accrued personal time are based upon the

1    number of service hours.  On each anniversary of an employee's hire date, the employee's accrued

2    vacation time and accrued personal time convert to available vacation time and available personal

3    time, respectively.  On each anniversary of an employee's hire date, unused available vacation

4    time and unused available personal time should be paid to the employee.

5           b.      Service hour:  "A service hour is time for which the Associate receives

6    compensation from the Company, (i.e., hours worked or benefit hours such as bereavement,

7    holiday, illness protection hours, vacation, personal time, jury duty, etc.)."  (Wal-Mart Vacation

8    Policy, PD-64)  At the store level, the number of benefit hours and the time clock badge swipes

9    are contained in the timekeeper tables (tmkp_mstr, tmkp_punch, tmkp_audit) of the Associate

10   database and are summarized daily in the pay-sum table of the Associate database.  At the

11   headquarters level, the number of work hours and benefit hours are contained in the

12   hr_asc_hours_type and the hr_asc_earnings tables of the Payroll database.

13          c.      Associate type:  Hourly employees are either full-time, part-time, or

14   temporary.  Salaried employees are full-time.  An associate's type is contained in the asc table of

15   the Associate database and in the hr_pd_assoc table of the Payroll database.  The accrual of

16   vacation time and personal time is a function of both years-of-service and associate type.

17          d.      Accrued vacation time:  "'Accrued' vacation is the amount of time an

18   Associate accumulates based on his/her service hours during the current year to be taken as paid

19   vacation the next year."  (Wal-Mart Vacation Policy, PD-64)  Full-time employees accrue

20   vacation hours from the start of employment and part-time employees accrue vacation hours after

21   one year of employment.  Full-time employees accrue vacation time at a rate of 0.019231 hours

22   for each service hour in the first year, at a rate of 0.038462 in the second through sixth years, at a

23   rate of 0.057692 in the seventh through fourteenth years, and at a rate of 0.076924 in the fifteenth

24   year and thereafter.  Part-time employees accrue vacation time at a rate of 0.019231 for each

25   service hour in the second year and thereafter.  Accrued vacation hours are contained in the

26   hr_pd_assoc table of the Payroll database.  The number of accrued vacation hours is updated on

27   each biweekly payroll ending date.  I have verified the accuracy of the biweekly accruals by

28

1   applying the appropriate years-of-service multiplier rates to the number of service hours contained

2   in the pay-sum table of the Associate database for each biweekly payroll period.

3              e.      Available vacation time:  "At the Associate's anniversary date of

4   employment, 'accrued' vacation time converts to 'available' vacation time.  'Available' vacation

5   is the amount of paid vacation time an Associate may use during the current year."  (Wal-Mart

6   Vacation Policy, PD-64)  Available vacation hours are contained in the hr_pd_assoc table of the

7   Payroll database.  The number of available vacation hours is updated on each biweekly payroll

8   ending date.  The number of available vacation hours decreases whenever an employee uses

9   vacation hours and the number of available vacation hours increases on each employment

10  anniversary date.  I have verified the accuracy of the biweekly availability by comparing changes

11  in the available hours to the usage and annual insertion of available vacation hours.

12             f.      Accrued personal time:  "'Accrued' Personal Time is the amount of time

13  an Associate accumulates based on his/her service hours during the first year of employment.

14  After one (1) year, 'accrued' personal time converts to 'available' time.  After one (1) year of

15  employment, Associates continue to accrue personal time each pay period based on service

16  hours."  (Wal-Mart Personal Time, PD-65)  Personal time accrues at a rate of 0.007693 hours for

17  each service hour beginning with the start of employment for both full-time and part-time

18  employees.  Accrued personal hours are not contained in the Payroll database.  However, I

19  calculated the number of accrued personal hours on each biweekly payroll ending date.  For full-

20  time and part-time employees, the number of accrued personal hours is 0.007693 hours for each

21  service hour in the pay-sum table of the Associate database for each biweekly payroll period.  For

22  full time employees and for part-time employees after the first year of employment, I have verified

23  the accuracy of the biweekly accruals by applying the appropriate years-of-service multiplier rates

24  to the number of accrued vacation hours in the hr_pd_assoc table of the Payroll database.

25  Personal hours are accrued at 40% of the accrual rate for vacation hours for first-year full-time

26  employees and for all part-time employees after the first year; personal hours are accrued at 20%

27  of the accrual rate for vacation hours for second through sixth year full-time employees; personal

28  hours are accrued at 13.33…% of the accrual rate for vacation hours for seventh through

1  fourteenth year full-time employees; and, personal hours are accrued at 10% of the accrual rate for

2  vacation hours for fifteenth and subsequent year full-time employees.

3          g.    Available personal time: "'Available' personal time is the amount of

4  personal time an Associate has available for use." (Wal-Mart Personal Time, PD-65)  Available

5  personal hours are contained in the hr_asc_hours table of the Payroll database.  The available

6  personal hours bear the hour-type code ZZ and are updated on each biweekly pay period.  Accrued

7  personal hours convert to available personal hours on the anniversary date of the employee's hire

8  date. I have verified the accuracy of the biweekly availability by comparing changes in the

9  available hours to the usage and annual insertion of available personal hours.  Available personal

10  hours also are increased in small increments by the conversion of excess sick hours at the rate of

11  one-half hour of available personal time for each excess sick hour.  I have reviewed the

12  hr_asc_hours table of the Payroll database, and I have observed these small biweekly infusions of

13  available personal time.  (The Payroll database produced by Wal-Mart in the instant cases does

14  not contain a field for sickness protection hours, even though I have seen such a field in the file

15  layout of the Payroll database produced in other cases.)

16          h.    Employee status:  The day-by-day employee status for hourly employees is

17  contained in the pay_sum table of the Associate database; employee status for salaried employees

18  is contained in the job table of the PeopleSoft database; and, employee status for all employees is

19  contained in the hr_pd_assoc table of the Payroll database.  The change in employee status in the

20  Associate, PeopleSoft, and Payroll tables differentiates the active-employee events from the

21  terminated-employee events.

22          i.    Termination date:  Termination date is contained in the asc_ter table of the

23  Associate database for hourly employees and in the job table of the PeopleSoft database for

24  salaried employees.  The asc_ter table for hourly employees also contains "last day worked" and a

25  yes/no indicator of the employee's "eligibility for rehire."  The job table PeopleSoft database

26  contains both an action date and an effective date for every personnel action in the employees job

27  history.

28

1          j.    <u>Termination reason</u>:  Termination reason is contained in the <u>ter_rsn</u> table of

2    the Associate database for hourly employees and in the <u>job</u> table of the PeopleSoft database for

3    salaried employees.

4          k.    <u>Hourly pay- rate</u>:  The hourly pay-rate for hourly employees is contained in

5    the <u>base_pay</u> field of the <u>hr_pd_assoc</u> table of the Payroll database.  The base pay for salaried

6    employees is given as 1/26 of their annual salary.  The hourly pay-rate for salary employees is

7    calculated by dividing the amount in the <u>base_pay</u> field of the <u>hr_pd_assoc</u> table of the Payroll

8    database by 80.

9          l.    <u>Geographical Assistance Pay</u>:  GAP pay is contained in the DOE

10   (Deductions and Other Earnings) table of the Payroll database.  GAP pay, denoted by DOE codes

11   77, R1, R2 and TG, is calculated as a percentage of the employee's base pay.  GAP pay is paid for

12   all service hours – regular pay, overtime pay, vacation pay, personal time pay, etc.

13         m.    <u>Amount of wages due upon termination</u>:  The hours of wages due upon

14   termination for hourly employees is contained in the <u>hr_asc_hours</u> table of the Payroll database.

15   Alternatively, the number of hours is contained in the <u>pay_sum</u> table of the Associate database.

16   To calculate the amount of wages due a terminating hourly employee, multiply by the base hourly

17   pay-rate.  The hours of wages due upon termination for salaried employees is contained in the

18   <u>hr_asc_hours</u> table of the Payroll database.  Alternatively, the number of day's wages due a

19   salaried employee is calculated as the number of work days (five work days in a week) between

20   the beginning of the pay period and the termination date contained in the <u>job</u> table of the

21   PeopleSoft database.  To calculate the amount of wages due a terminating salaried employee,

22   multiply by the number of work days prior to termination by one-tenth of the base pay.  For the

23   salaried employee, the amount of GAP pay paid in previous biweekly pay periods is reduced by

24   the same proportion used to calculate wages.  For the hourly employee, the GAP hourly rate paid

25   in previous biweekly periods is applied to the number of hours owed for the final pay period.

26         n.    <u>Amount of vacation time and personal time due upon termination</u>:  The

27   amount due upon termination for vacation time and personal time is the sum of accrued vacation

28   time, available vacation time, accrued personal time, and available personal time, all described

1  above, plus accrued vacation time and accrued personal time at an accrual rate appropriate to the
2  final pay-out of wages for the last biweekly pay period.   That is, the accrued vacation time and
3  the accrued personal time is updated in the calculation to reflect the hours paid in the final pay-
4  out.  For those employees receiving GAP pay, Gap pay is applied to the final pay-out of vacation
5  and personal hours.

6          o.      Cash pay-out:  The amounts and dates of cash payments made at the store
7  level, by either cash or check, are contained redundantly in the tmkp_mstr  and pay_sym files of
8  the Associate database, in the hr_asc_doe file of the Payroll database, and in the
9  cash_fund_trn_txt, cash_fund_xfer and cft_time_keep_data of the Cash Office database.  The
10  corresponding monetary details upon which the cash payments for wages and benefits are based
11  are included in the ensuing biweekly payroll entries.

12      15.    Wal-Mart has offered the "DECLARATION OF DENISE MARTIN IN SUPPORT
13  OF DEFENDANT WAL-MART STORES, INC.'S MOTIONS FOR SUMMARY JUDGEMENT
14  AND/OR SUMMARY ADJUDICATION."  Pages 7-12 of the DECLARATION deal with the
15  wage claims of plaintiff sub-class 2, as distinguished from the vacation time and personal time
16  claims of plaintiff sub-class 1.

17      16.    I received the background data production for the DECLARATION two weeks ago
18  and the background data production for the March 25, 2008 "EXPERT REPORT OF DENISE
19  NEUMANN MARTIN, Ph.D." five days ago.  The background material for the latter report
20  contains much of the computer code and data associated with the principle findings contained in
21  both documents.  I am still in the process of reviewing the two sets of background material.
22  Therefore, I only shall respond to two points in the analyses described in the DECLARATION:
23  (1) the treatment of negative hours on page 10 of the DECLARATION, and (2) the treatment of
24  "[n]o reported net earnings" on pages 10-12 of the DECLARATION.  My review of both
25  documents remains a work in progress.

26      17.    In the DECLARATION, page 10, negative hour entries are described as
27  constituting  "off-setting corrections of hours entered incorrectly in the data" or "the movement of
28  hours from one WIN number to another for the same associate."  These characterizations of data

1   entries as "incorrect" are merely unsubstantiated assertions.  There is nothing in the database that
2   denotes data entries as "incorrect" and there is nothing in the database with which to pair one
3   positive datum entry with one negative datum entry.  There is nothing in the data to indicate that
4   either data entry of a pair is "incorrect."  If, *arguendo*, the positive and negative data entries could
5   be paired, there is nothing in the database to indicate which member of the pair was "incorrect."

6         18.     Furthermore, I have analyzed the Payroll data again and I was unable to find any
7   instances of one Social Security Number being associated with more than one WIN number in the
8   Payroll data.  I find  nothing in the database to support the conclusion in the DECLARATION,
9   page 10, that, "The negative entries represent the movement of hours from one WIN number to
10  another for the same associate."

11        19.     Therefore, it is my opinion that the treatment of negative hours for wages in the
12  DECLARATION is without merit and does not provide an accurate analysis of negative, unpaid
13  wages.

14        20.     With respect to the second issue, it is asserted incorrectly in the DECLARATION,
15  page 11, that I "ignored cash draws" in my analysis.  The DECLARATION, page 12, continues by
16  describing a study of how to "move accurately from gross earnings to net earnings using the
17  information contained in the Wal-Mart's computerized records."  The study "performed this
18  calculation for over three million pay periods for associates in the Payroll Database for whom
19  both gross and net earnings were reported."  It is concluded that the study was "able to match
20  within $5 the net earnings reported in the Payroll Database for 99 percent of these associate pay
21  periods."

22        21.     The study described in the DECLARATION was conducted on an inappropriate
23  sample.  Although the claims in this case are limited to terminated employees the study was not
24  limited to terminated employees, in fact, based upon the number of currently active and newly
25  terminated employees in any Payroll period, most of the included employees must have been
26  active employees.  Furthermore, the study was limited to employees for whom both gross earnings
27  and net earnings were reported, even though the pay periods of interest were those for whom there
28  was no net pay amount reported for newly terminated employees.

22.    Furthermore, the results of the study demonstrate that the methodology employed in the study could not and did not "move accurately from gross earnings to net earnings." In spite of the fact that the payroll periods were not restricted to newly terminated employee, approximately 1.0 percent of the pay periods, 30,000 pay periods, differed by more than $5.00 from the net pay shown in the database. The error in the 3,000,000 pay periods would amount to a maximum error of $15,000,000, that is, $5.00 times 3,000,000 pay periods.

23. The conclusion in the DECLARATION, page 12, that the methodology was "able to move accurately from gross earnings to net earnings" assumes that a $5.00 error between the database net earnings and the methodology's calculations of net earnings is acceptable. But, there should be no error. A methodology which fails to calculate correctly the net pay due an employee, when all payroll hours, benefits, taxes, and other deductions are stored in the database, certainly is not an accurate methodology. The Wal-Mart Payroll database and the DECLARATION methodology are not using the same formulae. The DECLARATION methodology is "incorrect."

24.    As described in the DECLARATION, page 12, the methodology was applied subsequently to the employees with "reported gross earnings but no reported net earnings." The conclusion in the DECLARATION is that "the unresolved amount is $1,102.46." The conclusion contains a reference to footnote 14. In footnote 14, page 12, it is explained that using the methodology, "it is not possible to determine how much of the unresolved net earnings are related to regular and overtime wages versus other wages such as vacation and personal time."

25.    Footnote 14 reads, "The $1,102.46 is calculated starting with total gross wages (regular, overtime and other) because deductions and taxes are not reported separately for different types of earnings. As such, it is not possible to determine how much of the net earnings are related to regular and overtime wages versus other wages such as vacation and personal time." Footnote 14, refers to the "$1,102.46" but, of course, the footnote applies to all pay periods because the same methodology was applied to all pay periods. Footnote 14, asserts that "taxes are not reported separately for different types of earnings," but that is not the source of the problem; the same tax rate is applied to all taxable earnings during the same pay period. The taxes could be apportioned to regular pay, overtime pay, other taxable pay, vacation pay and personal time pay.

1  The operative part of footnote 14 with respect to defendant's methodology is that, "it is not

2  possible to determine how much of the net earnings are related to regular and overtime wages

3  versus other wages such as vacation and personal time."

4  26.      The problem with the methodology used for the second issue in the DECLARATION is

5  that it was not designed to distinguish between wages and vacation time.  Therefore, the

6  methodology used by Dr. Martin in the analyses of the second issue described in the

7  DECLARATION is incapable of correctly calculating the unpaid wages.

8       27.      For the above reasons, it is my opinion that the data analyses contained in the

9  DECLARATION OF DENISE NEUMANN MARTIN analyzing unpaid wages are inaccurate and

10  that there continue to be substantial unpaid wages associated with plaintiff sub-class 2.   My

11  analyses will continue as I include further analyses of G.A.P. (Geographical Assistance Pay),

12  employees from one additional store, approximately 4,000 additional terminated employees for

13  whom usable data has not yet been produced and updated data from the period after May 25,

14  2007.

15       28.      I have been asked by counsel to describe statistically the un-cashed Wal-Mart

16  payroll checks. Data as to uncashed and escheated checks was provided to me within the last 45

17  days on disks provided by Wal-Mart during discovery.   I divided the study of payroll checks into

18  three sets: (1) all payroll checks dated between March 20, 2002 and January 1, 2007,  (2)

19  escheated payroll checks dated between March20, 2002 and January 1, 2007 , and (3) un-cashed,

20  un-replaced, and un-escheated payroll checks dated between March 20, 2002 and January 1, 2007.

21  The ending date of the study was selected because un-cashed checks do not have to be escheated

22  until one-year after their issue date.  I compared the data sets (2) and (3) with data set (1), the set

23  of all payroll checks after March 20, 2002 that were discovered by plaintiffs in this case.  The

24  results of the study are shown in the following table.

25

26  / / /

27  / / /

28  / / /

| Data Set | Number | Dollar Value | Number: Percent of All Checks | Dollar: Percent of All Checks |
|---|---|---|---|---|
| All Checks | 3,274,165 | $1,616,362,501 | | |
| Un-cashed & Un-escheated | 818 | $ 287,053 | 0.02% | 0.02% |
| Escheated | 3,671 | $ 741,429 | 0.11% | 0.05% |

It is readily apparent in the above table that un-cashed, un-replaced Wal-Mart payroll checks represent less than two-tenths of one-percent of all payroll checks. This is true for both escheated or un-escheated checks, or the sum of both escheated and un-escheated payroll checks. It is true in terms of the number of checks and the dollar value of checks. Even if it were assumed, without any supporting evidence, that all of the un-cashed, un-replaced and un-escheated checks were checks issued upon termination, the 818 checks would represent less than one-percent of all 86,327 checks issued upon termination and would have a monetary value equal to 1.5% of the $18,596,301 value of such checks.

I declare under penalty of perjury under the laws of the State of California and the laws of the United States that the foregoing is true and correct. Executed on April 1, 2008, in Atlanta, Georgia.

Martin M. Shapiro, Ph.D.