1  Louis M. Marlin, Esq. [Bar No. 054053]
   Stanley D. Saltzman, Esq. [Bar No. 090058])
2  Marcus J. Bradley, Esq. [Bar No. 174156]
   **MARLIN & SALTZMAN**
3  3200 El Camino Real, Suite 100
   Irvine, CA   92602
4  (714) 669-4900 Fax: (714) 669-4750
   louis.marlin@marlinsaltzman.com
5  ssaltzman@marlinsaltzman.com
   mbradley@marlinsaltzman.com
6
   Peter M. Hart [Bar No. 198691]
7  **LAW OFFICES OF PETER M. HART**
   13952 Bora Bora Way, F-320
8  Marina Del Rey, CA 90292
   (310) 478-5789 Fax: (310) 561-6441
9  hartpeter@msn.com

10  Attorneys For: Plaintiffs and Proposed Plaintiff Class*

11  *Additional Counsel on Following Page

12
                  **IN THE UNITED STATES DISTRICT COURT**
13
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
14

15  In Re WAL-MART STORES, INC.       ]   Case Numbers:        C 06 02069 SBA
    WAGE AND HOUR LITIGATION          ]
16                                    ]   **CLASS ACTION**
                                      ]
17  _____  ]   CORRECTED NOTICE OF MOTION AND
                                      ]   MOTION FOR AWARD OF INCENTIVE
18  This Document Relates To:         ]   PAYMENTS TO PLAINTIFFS AND FOR
                                      ]   AWARD OF ATTORNEYS' FEES AND
19  Case Nos.                         ]   COSTS; MEMORANDUM OF POINTS &
                                      ]   AUTHORITIES IN SUPPORT THEREOF
20  C 06 02069 SBA (Smith) and        ]
    CV 06 05411 (SBA) Ballard         ]   **Judge:        Hon. Saundra B. Armstrong**
21                                    ]   Date   :       September 28, 2010
                                      ]   Time   :       1:00 p.m.
22  _____  ]   Courtroom :    1, 4TH Floor

23

24

25

26

27

28

                                      i
_____

1  **ADDITIONAL PLAINTIFFS' COUNSEL**

2  **BAILEY PINNEY PC**
   1498 S.E. Tech Center Place, Suite 290
3  Vancouver, Washington  98683
   Telephone:      (360) 567-2551
4  Facsimile:      (360) 567-3331
   bbailey@wagelawyer.com
5  jdpinney@wagelawyer.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Motion and Motion For Incentive Awards and For Attorneys' Fees and Costs
Memorandum of Points & Authorities In Support Thereof                C 06-02069 SBA (BZ)

TO: DEFENDANT WAL-MART STORES, INC., ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:

Please take notice that on September 28, 2010 at 1:00 p.m. in Courtroom number 1 of the above-entitled court located at 1301 Clay Street, Fourth Floor, Oakland, California, Plaintiffs and their counsel will move the Court for Orders as follows:

1.      Awarding each of the four named plaintiffs an incentive award of $25,000;

2.      Awarding Class Counsel attorneys' fees in the amount of $28,666,666;

3.      Awarding Class Counsel reimbursement of costs in the amount of $572,754.85.

Said Motion shall be based upon this Notice of Motion, the attached Memorandum of Points & Authorities, the exhibits thereto, and the declarations of attorneys Marlin, Bradley, Hart, Pinney and the declarations of the four plaintiffs, and such further matters, both documentary and evidentiary, as may be presented at the hearing of said motion.

Dated: August 25, 2010

**MARLIN & SALTZMAN, LLP**
**LAW OFFICES OF PETER M. HART**
**BAILEY PINNEY PC**


By:___/s/_____
          Louis M. Marlin of Marlin & Saltzman
          Attorneys for Plaintiffs and Plaintiff Class

---

iii

Notice of Motion and Motion For Incentive Awards and For Attorneys' Fees and Costs
Memorandum of Points & Authorities In Support Thereof                    C 06-02069 SBA (BZ)

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1 - 25

I.   NATURE OF RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .  1

III.   REQUEST FOR INCENTIVE AWARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.   ATTORNEYS' FEES AND COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

   A.   The Award Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

   B.   Nature of the Case, and its Litigation History . . . . . . . . . . . . . . . . . . . . . . . .  4

   C.   The Pleadings and Pleading Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

   D.   Discovery and Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

   E.   Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

   F.   Post Mediation Settlement Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

V.   ATTORNEY FEE AWARDS IN COMMON FUND CASES . . . . . . . . . . . . . . . . . . .  15

   A.   The Percentage Fee Has Eclipsed the Lodestar Method of Fee Calculation . . . . .  15

   B.   Evolution of the Percentage Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

   C.   The Substantial Risk Taken by Class Counsel Justifies
        An Upward Adjustment From the 9th Cirsuit's Benchmark . . . . . . . . . . . . . . . .  19

   D.   The Attorneys' Fees Requested by Class Counsel Are Well
        Within the Range of Fees Awarded in Comparable Cases . . . . . . . . . . . . . . . . .  20

   E.   The Percentage Award Should Mimic the Market . . . . . . . . . . . . . . . . . . . . . .  21

VI.   CROSS-CHECKING THE "PERCENTAGE OF THE FUND"
      METHOD BY USE OF A LODESTAR CALCULATION . . . . . . . . . . . . . . . . . . . .  23

   A.   Plaintiff's Counsels' Lodestar Is Reasonable . . . . . . . . . . . . . . . . . . . . . . . . .  23

   B.   The Lodestar Enhancement is Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

VII.   COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Exhibit 1 - Exemplar Class Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  filed under separate cover

Exhibit 2 - Time & Task Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  filed under separate cover

iv

1   Exhibit 3 - Exemplar of Privilege Log . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  filed under separate cover

2   Exhibit 4 - 9th Circuit Summary Dismissal Order . . . . . . . . . . . . . . . . . . .  filed under separate cover

3   Declaration of Louis M. Marlin in support of motion . . . . . . . . . . . . . . .  filed under separate cover

4   Declaration of Marcus J. Bradley in support of motion . . . . . . . . . . . . .  filed under separate cover

5   Declaration of Pete M. Hart in support of motion . . . . . . . . . . . . . . . . .  filed under separate cover

6   Declaration of J. Dana Pinney in support of motion . . . . . . . . . . . . . . .  filed under separate cover

7   Declaration of Danton Ballard in support of motion . . . . . . . . . . . . . . .  filed under separate cover

8   Declaration of Nathan Lyons in support of motion . . . . . . . . . . . . . . . .  filed under separate cover

9   Declaration of Barry Smith in support of motion . . . . . . . . . . . . . . . . .  filed under separate cover

10  Declaration of Michael Wiggins in support of motion . . . . . . . . . . . . . .  filed under separate cover

11  [Proposed] Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  filed under separate cover

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

Notice of Motion and Motion For Incentive Awards and For Attorneys' Fees and Costs
Memorandum of Points & Authorities In Support Thereof                    C 06-02069 SBA (BZ)

# TABLE OF AUTHORITIES

**Federal Cases:**                                                        **Page**

*Behrens v. Wometco Enter., Inc.*
    118 F.R.D. 534, 548 (S.D.Fla.1988)
    aff'd, 899 F.2d 21 (11th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Blum v. Stenson*
    465 U.S. 886 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Boeing Co. v. Van Gemert*
    444 U.S. 472 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brotherton v. Cleveland*
    141 F.Supp.2d 907 (S.D.Ohio, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Cambden I Condominium Association, Inc., v. Dunkel*
    946 F. 2d 768 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Central Railroad & Banking Co. of Ga. v. Pettus*
    113 U.S. 116 (1885) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cook v. Niedert*
    142 F. 3d 1004 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*
    37 F.R.D. 240, (S.D. Ohio 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Florin v. Nations Bank of Georgia*
    34 F.3d 560 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hensley v. Eckerhart*
    461 U.S. 424 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Activision Securities Litigatio*
    723 F.Supp. 1373 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Dun & Bradstreet Credit Services Customer Lit.*
    130 F.R.D. 366 (S.D. Ohio 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Linerboard Antitrust Litig.*
    2004 WL 1221350 (E.D. PA June 2, 2004), amended, MDL No. 1261,
    2004 WL 1240775 (E.d. PA June 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Prudential Ins. Co. of America Sales Practice Litigation*
    106 F. Supp.2d 721 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*
    724 F.Supp. 160, 169 (S.D.N.Y.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Warner Communications Sec. Lit.*
    618 F.Supp. 735 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Washington Pub. Power Supply Sys. Sec. Litig.*
    19 F.3d 1291 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Notice of Motion and Motion For Incentive Awards and For Attorneys' Fees and Costs
Memorandum of Points & Authorities In Support Thereof                    C 06-02069 SBA (BZ)

*Kerr v. Screen Extras Guild, Inc.*
    526 F.2d 67 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lindy Bros. Bldrs., Inc. of Phila. v. American R. & R. San Corp.*
    487 F.2d 161 (3rd Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lindy Bros. Bldrs., Inc. of Phila. v. American R. & R. San Corp. (Lindy II)*
    540 F.2d 102 (3rd Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Paul, Johnson, Alston & Hunt v. Gaulty*
    886 F.2d 268 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rodriguez v. West Publ. Corp.*
    2007 WL 2827379 (C.D. Cal. Sept. 10, 2007)
    aff'd in part, rev'd in part *sub nom. Rodriguez v. West Publ. Corp.*
    563 F.3d 948 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Staton v. Boeing Co.*
    327 F.3d 938, (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Trustees v. Greenough*
    105 U.S. 527 (1881) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vincent v. Hughes Air West*
    Inc.557 F.2d 759 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wing vs. Asarco Inc.*
    114 F.3d 986 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**State Cases:**                                                 **Page**

*Gentry v. Superior Court*
    42 Cal. 4th 443 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Glendora Community Redev. Agency v. Demeter*
    155 Cal. App. 3d 465 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ketchum vs. Moses*
    24 Cal. 4th at 1122 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Lealao v. Beneficial Cal., Inc.*
    82 Cal. App.4th 19 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vo v. Las Virgenes Municipal Water Dist.*
    79 Cal. App. 4th 440 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wershba vs. Apple Computer, Inc.*
    91 Cal. App. 4th at 224 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes:**                                                      **Page**

California *Labor Code* §203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 19

vii

**Secondary Authority:** **Page**

A. Conte, *Attorney Fee Awards,* 2nd Ed. 1993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Charles Silver, *Due Process and the Lodestar Method:*
    *You Can't Get There From Here,* 74 Tul.L.Rev. 1809, 1819-20 (June 2000) . . . . . . . . . 19

Goodrich, Frank and Silver, Reagan, *Common Fund and*
    *Common Fund Problems: Fee Objections and*
    *Class Counsel's Response,* 17 Rev. Litig. 525 (Summer 1995) . . . . . . . . . . . . . . . . . . . 22

*Newberg on Class Actions, Fourth Edition,* §14.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

R. Pearle, *California Attorney Fee* Awards (CEB, 1993) §7.4 . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Richard Posner, *Economic Analysis of Law,* § 21.9 (3d ed. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . .

1

**MEMORANDUM OF POINTS & AUTHORITIES**

2

**I.  NATURE OF RELIEF SOUGHT**

3          By this motion, plaintiffs Danton Ballard, Nathan Lyons, Barry Smith and Michael Wiggins,

4   and their attorneys, seek an order awarding them each an incentive payment of $25,000, and awarding

5   Class Counsel attorneys' fees in the amount of $28,666,666.00 (equal to 33 1/3% of the gross settlement

6   amount), plus reimbursement of costs and expenses in the amount of $572,754.85.

7          These requests were detailed in the notice of settlement served upon class members (Exhibit

8   1 hereto, at Section VI-C). As set forth in the Settlement Agreement of the parties, defendant will not

9   object to the requested incentive awards or to a reasonable request for these awards.  Plaintiffs and

10  their counsel do not anticipate any such objection from defendant.

11

**II. INTRODUCTION AND SUMMARY OF ARGUMENT**

12         Plaintiffs and their counsel have devoted over four years of time to litigation of one of the most

13  contentious and intensive class actions imaginable.  The investigation and discovery of the failure of

14  defendant's final pay system, which caused between approximately $10 million and $12 million of

15  under payments to terminated class members[1], thus triggering the substantial penalties and interest

16  claims which were at the heart of this case, was uncovered as result of their willingness to dedicate the

17  resources and personnel necessary to meet and successfully overcome each and every challenge raised

18  by the various law firms which served at one point or another as defendant's litigation counsel.[2]  By

19  establishing this under payment and uncovering evidence which would potentially expose Defendant

20  to statutory penalties, plaintiffs and their counsel have succeeded in obtaining a settlement with a

21  potential recovery of between seven and eight and a half times the underlying claim, for a potential

22  total of $86 million.  The request for an incentive award of $25,000 each for the four plaintiffs, and

23  attorneys fees equal to 1/3 of the maximum potential recovery is both appropriate and reasonable.

24

25         [1]Defendant's expert appears to have estimated approximately $10 million in under payments, and plaintiffs' expert estimated approximately $12 million.

26

27         [2]In addition, defendant has asserted that it also employed an estimated 50 "contract" attorneys to conduct the massive document review and production ordered in this case - the same documents which then had to be reviewed by plaintiffs' counsel, over an approximately 8 month period of continuous work.

28

1

1   To reach this result, Class Counsel devoted 26,701.7 hours of attorney and para legal time, and

2   spent over $500,000 of their own funds for the benefit of the Class.

3   ## III.  REQUEST FOR INCENTIVE AWARDS

4   As established by the declarations of Danton Ballard, Nathan Lyons and J. Dana Pinney, filed

5   in support of the motion for final approval, the four plaintiffs contributed a great deal of their time and

6   effort to this case.  They responded to written discovery and had their depositions taken.  They served

7   as liaison between Class Counsel and the Class Members, made themselves available to Class Counsel

8   whenever needed, assisted in the analysis and evaluation of documents and evidence, participated in

9   multiple meetings and telephone conferences with Class Counsel, and assisted in the evaluation of

10  Class Member interviews.  Defendant does not object to this incentive award request.

11  Furthermore, Plaintiffs, by taking the lead role in prosecuting these claims against their former

12  employer, assumed a risk to their standing and reputation within the business community.  In today's

13  internet driven society, any potential employer who conducts an internet search of any of the plaintiffs

14  in connection with a job application will easily learn that each served as a representative plaintiff in

15  an action that will potentially cost this defendant $86 million.  It is likely that the courage evidenced

16  by these plaintiffs may well result in their being denied future employment, without ever knowing that

17  their participation in this case was the cause of the same.  It is recognized that ". . . retaliation against

18  employees for asserting statutory rights under the Labor Code is widespread," and that "retaliation .

19  . . cause(s) immediate disruption of the employee's life and economic injury."  (*Gentry v. Superior*

20  *Court* (2007) 42 Cal. 4th 443, 461.)

21  Incentive awards to the class representatives are not only authorized, but entirely  appropriate.

22  (*Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).)  "Because a named plaintiff is an essential

23  ingredient of any class action, an incentive award is appropriate if it is necessary to induce an

24  individual to participate in the suit." (*Cook v. Niedert*, 142 F. 3d 1004, 1016 (7th Cir. 1998); see also

25  *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. PA June 2, 2004), amended, MDL No.

26  1261, 2004 WL 1240775 (E.d. PA June 4, 2004) [Where "class representatives have conferred benefits

27  on all other class members . . . they deserve to be compensated accordingly."]; *Rodriguez v. West Publ.*

28  *Corp.,* 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007), aff'd in part, rev'd in part *sub nom. Rodriguez*

2

1  *v. West Publ. Corp.* 563 F.3d 948 (9th Cir. 2009)[incentive awards should compensate for risks taken,

2  such as "retaliation . . . , discrimination, trouble finding employment, and significant financial risk."].)

3      The proposed incentive awards requested herein total about 1/10th of 1% of the gross settlement

4  value. Incentive awards of 1% of the total settlement fund are routinely approved, such that these

5  requests are 10 times smaller.  (See, e.g., *Brotherton v. Cleveland*, 141 F.Supp.2d 907 (S.D.Ohio,

6  2001) [approving $50,000 enhancement based on $5.25 million settlement]; *Enterprise Energy Corp.*

7  *v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) [awarding $300,000

8  in enhancements based upon $30 million settlement];  *In re Dun & Bradstreet Credit Services*

9  *Customer Lit.,* 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) [awarding $215,000 to several class

10  representatives out of an $18 million fund].)

11      Plaintiffs willingly assumed great risk by acting as Class Representatives, and performed

12  admirably in that role, as a result of which the Class has achieved a significant monetary settlement.

13                          **IV.  ATTORNEYS' FEES AND COSTS**

14      **A.      The Award Requested.**

15      The fee sought relates to all efforts expended by Class Counsel for the complete handling of

16  this case, including any additional work remaining to be performed by Class Counsel in securing final

17  Court approval of the Settlement, and making sure that the Settlement is fairly administered and fully

18  implemented.

19      Class Counsel in this case are highly experienced in class action litigation, with a particular

20  emphasis on wage and hour litigation, as detailed in the contemporaneously filed declarations of Louis

21  M. Marlin, Marcus J. Bradley, Peter M. Hart and J. Dana Pinney, which are incorporated herein by

22  reference.  Throughout this litigation, Defendant has been represented by highly competent counsel

23  who vigorously defended their client's position.  At various times, defendant has been represented by:

24  (1) Lafayette & Kumagai LLP, (2) Orrick, Herrington & Sutcliffe LLP, (3) Morgan, Lewis & Bockius

25  LLP, (4) Lane Powell LLP [who remain counsel of record], [5] Gibson, Dunn & Crutcher, LLP [who

26  remain counsel of record], and [6] Greenberg Traurig [counsel of record in the initial months of the

27  Central District litigation in 2006, and much later, lead counsel in connection with the settlement of

28  the consolidated matters before this Court].  These highly respected firms challenged Class Counsel

at every step of this case.  Each challenge was met and overcome.

An enormous amount of work on the part of Class Counsel went into achieving this remarkable resolution.  The case was actively litigated over a period of approximately four years, until the settlement was first agreed to.  Since reaching the settlement, additional work has been required to bring it to the point of moving for final approval.  The work will be outlined in detail below, and together with the analysis of all the factors governing attorney fee awards, class counsel believe that the effort and result justify the requested 33 1/3% fee sought herein.

As a secondary "backup" to the percentage of the common fund requested, class counsel are also providing this Court with a detailed hourly analysis of the work rendered.  Exhibit 2, filed contemporaneously herewith and under separate cover, is a 41 page chart, entitled **Time and Task Chart**, setting forth in detail the tasks performed and hours for all such tasks.  It is being presented in this manner so as to enable this Court to easily follow and understand the extent of the hourly efforts required to bring this matter to a successful conclusion, as well as to assure itself that counsel took all reasonable steps to avoid duplication of efforts, while working towards the common goal of achieving the best possible result for the class.

The **Time and Task Chart** provides this Court with significant details concerning the efforts by Class Counsel.[3]  It presents a compilation of all the time and the tasks to which the work was done, set forth in a manner that enables the reader to follow the entire flow of the litigation, and the services provided.  The following represents a broad summary of those efforts, with perhaps a greater emphasis upon those activities that would not be likely to be reflected in the Court's docket, but which nonetheless drove the entire litigation and the eventual settlement.[4]

### B.    Nature of the Case, and its Litigation History

The matter before this honorable court involves two cases consolidated by agreement of the parties.  The first, *Smith, et.al. v. Wal-Mart Stores, Inc.* was filed in the District Court for the Northern

---

[3]References hereafter to "Category" or "Categories" refer to the specifically identified and numbered categories found in the **Time and Task Chart**.

[4]A great deal of this section of this Memorandum is taken *verbatim* from the Plaintiffs' Motion for Preliminary Approval since that document contained a comprehensive history of the case.

District of California on March 20, 2006. (Categories 1 and 3)  The second case, *Ballard, et.al v. Wal-Mart Stores, Inc.*, was filed in the Central District on May 17, 2006. (Categories 2 and 4)  Both actions sought similar recovery related to Wal-Mart's failure to pay various types of earned wages upon termination of employment.  Each sought penalties under California *Labor Code* §203, as well as other remedies.  (Category 6)

Throughout the course of this litigation, there were always two simultaneously running tracks of case development.  The first track related to that which was most evident to the Court through the pleadings filed (as evidenced by the Court's extensive docket], and the eventual motion to certify the case - this was the portion of the litigation involving ongoing battles over questions of whether common issues of law and fact existed, such that class certification and an eventual class trial would be appropriate.  In relation thereto, this Court was asked to rule on matters including the weight to be attributed to, and the admissibility of expert testimony; the statistical and computer driven conclusions reached by the competing experts; and through numerous discovery battles before Magistrate Judge Zimmerman, what documents and evidence defendant should be compelled to produce.  All of class counsel's work in that track of the litigation was evident to both this Court and/or Magistrate Judge Zimmerman.  (Categories 6, 12 - 14)

However, while that track of the case was critical to the pleadings, and to the eventual certification of the case, it was certainly not the only factor in moving the case towards its ultimate resolution.  Contemporaneously, Class Counsel had to concentrate on developing the facts and evidence needed to prove to the eventual trier of fact not only that vacation and personal time were not paid properly, (track one), but further that Wal-Mart's alleged failures in that regard would meet the "wilful" standard under *Labor Code* §203, so as to support an award of continuing wages (penalties) under that code section.

Since the highest value to the class members in this case lay in the penalties, the development of that phase of the case was the critical second track of this action that was ongoing since day one, but always behind the scenes.  In that regard, most of the many depositions taken of the corporate witnesses, and the vast majority of the documents produced and reviewed, related to the *Labor Code* §203 claim.  Fortunately, through the detailed and painstaking analysis of the over one million

5

1   documents produced, and the critical liability depositions taken relating to defendant's practices and

2   an understanding of the key documents, plaintiffs were able to find support for the presentation of the

3   penalty claim.[5]  Had Class Counsel not been able to expend the huge effort necessary to investigate

4   and analyze this case, the support for arguing a violation of section 203 would have been lacking,

5   leaving only the unpaid earnings claim which, while in the millions, would have been far surpassed

6   by the value of the attorney and para legal hours, and the costs, devoted by them on behalf of the class.

7   (Categories 7, 8, 10, 12).

8          In the course of the document production, Wal-Mart produced most of its documents in what

9   is known as "TIF" format.  Such documents are essentially photocopies, or pictures, of the original

10  pages.  As such, they are not "searchable" via computer programs.  Absent the "search" capability, it

11  would be extremely problematic for class counsel to cross-compare, and cross-search, the voluminous

12  records, and to bring the documents into any meaningful format within the tight time frames governing

13  the scheduled certification filing, and then the trial date.

14         Accordingly, counsel worked with an outside vendor to have the documents converted to a

15  searchable format using "ocr" (optical character recognition) programing, thus enabling all the

16  documents to be accessed and searched with keyword searches so as to locate documents relevant to

17  the wage claims, and also supportive of the penalty claim.  The vendor also generated "load files",

18  enabling class counsel to effectively merge the data into their database software.  This was done at

19  great expense, and was literally being handled on a weekly turnaround, as the documents were being

20  serially produced by the defendant over the course of many months.  By doing this, what would clearly

21  have been an <u>impossible</u> task was reduced to simply a <u>herculean</u> task - and one that was successfully

22  completed by plaintiffs' counsel.

23         Because of this effort, class counsel were able to find the 100 or so "needles in a haystack" they

24  needed to bring together the second track of the case, and to be prepared to present the section 203

25  claim to the finder of fact at trial.  These documents included unique internal emails relating to

26         [5]By example, of the 27 separate deposition sessions taken in cities around the country, Class
27  Counsel took 22 depositions and defended 5.  Of the 22 taken by Class Counsel, only 7 concentrated
    primarily on class certification issues (Category 13), while the rest were primarily liability related
28  (Categories 8, 14 and 22).

1   vacation pay problems, policy memos, and departmental memos dealing with these issues. By the time

2   the parties agreed to the second mediation attempt while the appellate proceedings were pending,

3   plaintiffs were capable of demonstrating to the defendant that they were fully ready, willing and able

4   to present a strong penalty argument at trial - one which could expose defendant to the realistic

5   possibility of such an award being made at trial. While Class Counsel would not presume to speak for

6   defendant or its highly competent counsel, it is more than reasonable to assume that this potential

7   exposure to penalties directly impacted defendant's willingness to agree to pay up to 8 and a half times

8   the amount that it believed had been underpaid.

9       The two separate tracks of the litigation unfolded during the action in the following manner.

10          **C.**      **The Pleadings and Pleading Motions**

11      The cases were related in September, 2006 before this Court. After some significant early

12   rounds of motion practice concerning the pleadings, the parties stipulated to the filing of a joint

13   Consolidated Class Action Complaint, which was accomplished in January of 2007. An Amended

14   Consolidated Class Action Complaint was filed (based upon the stipulation of the parties) in March

15   of 2007. (Category 6)

16       Thereafter, defendant brought a Motion to Dismiss, which was the subject of lengthy briefing

17   by both sides. The motion was granted in part and denied in part, with plaintiffs being permitted to

18   file a further amended complaint, which was done. The parties then stipulated to strike the third claim

19   for relief (for overtime pay) and to strike allegations related thereto based upon the fact that an earlier

20   filed action (*Newland v. Wal-Mart Stores, Inc.*) addressed to those issues and was pending in another

21   District Court. This Court entered an order pursuant to that stipulation, and the case was then at issue.

22   (Category 6)

23      On October 10, 2007, plaintiffs filed their Motion for Class Certification, along with all

24   supporting declarations (including that of their expert Martin Shapiro, Ph.D.), various documents, a

25   proposed trial plan, etc. (Categories 20 and 21) Defendant's Opposition to the certification motion,

26   supported by over 40 declarations (plus the declaration of its expert Denise Martin, Ph.D.), an

27   opposition to plaintiffs' trial plan and a memorandum of points and authorities, was filed on November

28   20, 2007. Plaintiffs filed their Reply fourteen days later on December 4, 2007. (Category 21)

7

1   Thereafter, additional motion practice ensued, concerning the defendant's filing of a "sur-reply", and

2   a motion by defendant to strike the Supplemental Declaration filed by Dr. Shapiro in connection with

3   plaintiffs' Reply memorandum.

4        On February 12, 2008, this Court issued its order granting in part and denying in part plaintiffs'

5   motion for class certification. The Court granted the motion to certify with regard to sub-classes 1 and

6   2, and denied the motion as to sub-class 3.[6]

7        The Court's Order re certification triggered an intense reaction by Wal-Mart. (Category 22)

8   Following the order, extensive negotiations between the parties occurred relative to the form and

9   content of the proposed Notice, and related post-certification issues.   Eventually, additional motion

10  practice was conducted concerning these matters.   Thereafter, defendant sought a   stay of all

11  proceedings.   On March 7, 2008, defendant filed a motion to stay the case pending resolution of

12  appellate proceedings, and contemporaneously sought leave to appeal this Court's certification ruling.

13  In addition, on March 13, 2008, defendant filed two motions for summary judgment/adjudication; one

14  as against each of the three representative plaintiffs, and another as against the class a whole.  Plaintiffs

15  filed their oppositions to the same on April 1, 2008, and replies were filed by defendant.  At that time,

16  the trial of this matter was scheduled for June 30, 2008, only three months later.  The trial date was

17  later continued for several months.

18       On May 15, 2008, while the parties were engaged in extensive final pre-trial preparations, the

19  Ninth Circuit issued its order granting Wal-Mart's petition for leave to appeal this Court's order

20  concerning class certification.  Thereafter, the parties stipulated to stay further proceedings herein until

21  resolution by the Ninth Circuit.

22       Full briefing and oral argument before the Ninth Circuit was then undertaken, and the matter

23  fully submitted to that court. (Category 25)  Oral argument before the Ninth Circuit Court of Appeals

24  was held on October 8, 2009.  Thereafter, with the matter fully submitted and pending a decision, the

25  parties engaged in two full days of mediation, several months apart, and eventually reached the

26  ───────────────
           [6]As part of the settlement reached by the parties, even the approximately 26,000 employees

27  who received all wages to which they were due will be entitled to share in the settlement.  This
    inclusion, plus the addition of 4,000 employees from the 13 Distribution Centers in California,

28  represents the slightly expanded settlement class.

1   settlement being presented herein.  At the request of the parties, and as a result of the settlement, the

2   Ninth Circuit panel issued an order under seal on March 20, 2010 staying further proceedings pending

3   this Court's determination as to preliminary and final approval of the settlement.

4              **D.**     **Discovery and Investigation**

5              **(Categories 1, 2, 7, 8, 10 - 17, 19, 20, 23)**

6          Both prior to and following certification, discovery was ongoing at a hectic pace.  To say that

7   a great deal of effort was devoted to discovery and investigation would be an understatement of

8   monumental proportions.  As the almost 400 entries in the Court's docket in this case attests, the

9   discovery phase alone resulted in Magistrate Judge Zimmerman issuing six different discovery orders

10  to resolve substantial discovery disputes.  (Category 12) All of the Orders were in favor of the

11  plaintiffs, and required the defendant to either respond further or produce additional documents, where

12  it had asserted objections claimed to be improper by the plaintiffs.  Plaintiffs' counsel left no stone

13  unturned in pursuit of the evidence deemed necessary to support not only the primary claim relating

14  to unpaid vacation and other wages, but also in relation to the penalty claims flowing therefrom.  This

15  Court rejected all challenges which defendant filed in regard to the various discovery orders issued by

16  Magistrate Judge Zimmerman.

17         Ultimately, in response to several of the discovery orders, defendant produced substantially

18  more than 1 million pages of corporate records and documents, including emails, manuals, directives

19  relating to vacation and other pay plans, and documents from approximately 200,000 individual

20  personnel files.  (Categories 10, 16) According to papers submitted by counsel for Wal-Mart at the

21  time of these discovery battles, Wal-Mart hired and trained teams of contract attorneys to locate and

22  review all the documents it was ordered to produce, and carried out the process of responding to the

23  production orders over a period of almost six months.  Wal-Mart's counsel asserted that these

24  attorneys were able to review between 800 and 1,100 pages of records per day.[7]  This calculates to

25  approximately 1,000 days (four years) of attorney time, if only one person was devoted to the task.

26  In real terms, since a team was put together, then this would be the equivalent of having eight attorneys

27  work full time on the document review for more than six straight months.

28         [7]Docket No. 127, Letter from Lynne C. Hermle to Judge Zimmerman, August 17, 2007.

1   This effort by the defendant is noted because on the opposite side of the production, as the

2   documents were being received by plaintiffs on the rolling production basis, Class Counsel then had

3   the equally herculean task of reviewing and analyzing the very same documents, without the luxury

4   of hiring 50 or more contract attorneys.  (Category 10)  As described above, in order to achieve this

5   review in a timely and effective manner, the documents produced had to be converted from the TIF

6   format in which they were produced, to a searchable format.  This was done on a weekly basis by the

7   outside vendor selected by class counsel.  This analysis continued even while the district court

8   proceedings were stayed pending the Ninth Circuit appellate proceedings - and did not cease until the

9   case was settled at the final mediation held on February 27, 2010.

10   Contemporaneous with the extensive document production, defendant also produced over

11   1,000 pages of "privilege logs" relating to the hundreds of thousands of documents produced.

12   (Category 10)

13   Each log was printed in minute single spaced 8 point type (the size of the font used
     in this indented paragraph) and cross-referenced many thousands of related pages

14   of documents.

15   All the logs were reviewed and analyzed by class counsel, with a view towards potential

16   motions to challenge the asserted privileges.  There were extensive debates during depositions relating

17   to the many privileges asserted by defendant in its document production, as plaintiffs were always

18   concerned that critical documents might be withheld under these privilege assertions, and thus never

19   come to light.  Thus, while motions were never made due to the imposition of the stay by the appellate

20   proceedings, the review and research of these issues was ongoing throughout.  An exemplar privilege

21   log page is attached as Exhibit 3 to this Motion.  Since Class counsel intended, upon the anticipated

22   successful conclusion of the appellate proceedings, to ask that the Court set a trial date in a relatively

23   short time frame, all reviews of the privilege matters had to and were being completed during the trial

24   court stay pending appeal.

25   Equally important to the investigation and development of the case was the analysis of the

26   numerous databases of computerized data provided by Wal-Mart - all of which was fully assembled,

27   re-organized and studied by plaintiffs' expert.  (Category 20)  Due to the manner in which the data was

28   stored by Wal-Mart, and produced to the plaintiffs, Dr. Shapiro literally had to re-create the databases

10

1   in order to reach his conclusions.  Many months of his time were spent doing so, and then analyzing

2   all the resulting reports in order to reach his conclusions.  Class counsel spent hundreds of hours

3   working with Dr. Shapiro, and learning from him. Many days were then spent studying defendant's

4   expert's rebuttal conclusions.   Predictably, her conclusions differed from plaintiffs' expert's

5   conclusions.  Several days were spent in depositions of Dr. Shapiro and Dr. Martin, as well as in

6   analyzing the strengths and weaknesses of their conclusions.  (Categories 14 and 19)

7          In addition, both sides engaged in other extensive written and deposition discovery.  Plaintiffs

8   conducted twenty one deposition sessions of various non-expert witnesses (both PMQ's and selected

9   witnesses), all in Bentonville, Arkansas, since these witnesses could not be compelled to come to

10  California.  (Categories 8 and 20)  Counsel often spent full weeks there at a time, working through the

11  various levels of deponents necessary to develop the claim for penalties arising from the alleged unpaid

12  vacation and other wages.  Often, two class counsel would be there together in order to enable the best

13  possible examinations of the witnesses that were possible so that the attorney taking a deposition was

14  assisted by another attorney equally familiar with the case, with the prior depositions, as well as the

15  massive amount of documents produced.  Wal-Mart regularly deployed four and five lawyers for each

16  deposition taken by plaintiffs.  For two particularly critical corporate witnesses who were deposed on

17  matters relating to computer program and data issues, class counsel flew their expert,  Dr. Shapiro, to

18  Bentonville from Atlanta, so that he could assist during the actual taking of those depositions as they

19  were occurring.  The defendant took the depositions of the four named plaintiffs in Menlo Park,

20  California, as well as Dr. Shapiro in Atlanta, Georgia.

21         All of the investigation and discovery described above was conducted by plaintiffs' counsel

22  with the expectation that the matter would ultimately have to be resolved by trial.  Wal-Mart's

23  reputation as a formidable and tenacious litigation foe was well known before the case was filed, and

24  thus trial presentation was  an underlying theme of all the work done by class counsel from day one.

25  Every step of the action was hard fought, and contributed to both side's being able to develop a full

26  and complete understanding of all the legal and factual issues, as well a full appreciation of each side's

27  respective strengths and weaknesses.

28  ///

11

E.      Mediation

After substantial early discovery had been completed, but before the plaintiffs' motion to certify the class had been filed, plaintiffs agreed to defendant's request that they participate in mediation in an attempt to resolve the case.  (Categories 7 - 9)  The parties met in San Francisco, before attorney Mark Rudy, a well respected attorney-mediator specializing in wage and hour class actions.   That one day mediation did not result in any resolution.  However, even the unsuccessful mediation was helpful, in that it allowed the parties an opportunity to exchange ideas and positions in an informal setting, as to the relevant issues in the case, and opened the door to the possibility of further meetings.  Thereafter, as outlined above and throughout the **Time and Task Chart**, extensive further discovery was conducted, the certification motion was eventually granted, trial preparation was ongoing, and then the appellate review began.

Oral argument in the Ninth Circuit was held on October 8, 2009, after the case had been fully brief by the parties and by *amicus*.  (Category 25)  Shortly thereafter, Wal-Mart's Coordinating National Counsel became directly involved in the case and the parties agreed to again attempt to resolve the case by mediation.  (Category 26)  While the appellate decision on certification was pending, the two sides agreed upon a mediator, exchanged extensive mediation briefs, and engaged in the process which led to the settlement.   The parties selected the Hon. Layne Phillips (Ret.), a former United States District Court Judge from Oklahoma, now practicing out of the Newport Beach office of Irell & Manella, to be the mediator.  Judge Phillips had previously mediated many other Wal-Mart matters, and has been successful in resolving many such cases.

Mediation began on December 4, 2009, in Judge Phillips' offices in Newport Beach, California.  After a full day session, the parties were unable to reach an agreement.  However, because progress had been made towards a possible resolution, it was agreed that a second session would be scheduled.  In light of the difficulty clearing dates for the eleven lawyers and the mediator who would be attending the next  mediation session, as well as the corporate executives of Wal-Mart who needed to be present in order to make the decision necessary to achieve a settlement, the parties agreed to meet on Saturday, February 27, 2010 in Bentonville, Arkansas, which is the location of Wal-Mart's corporate headquarters.

12

During the time that elapsed between the first mediation with Judge Phillips in December and the second in February, numerous discussions were held between plaintiffs' counsel and Wal-Mart's Coordinating National Counsel, Brain Duffy, Esq., of the Colorado office of Greenberg Traurig. As a result of these many discussions, which included personal meetings between counsel, issues continued to be narrowed even prior to the February 27 session.

The second session in Bentonville was again presided over by Judge Phillips, this time with the assistance of yet another retired District Court Judge from Oklahoma, the Hon. Thomas R. Brett. Plaintiffs were represented by 6 attorneys - Louis Marlin, Stanley Saltzman and Marcus Bradley of Marlin & Saltzman, attorney Peter Hart of the Law Offices of Peter M. Hart, and A.E. "Bud" Bailey and J. Dana Pinney of Bailey Pinney, PC. The representative plaintiffs were available telephonically. Wal-Mart was represented by Mr. Duffy, his partner Ms. Naomi Beer, attorney Rudy Englund from the Lane Powell firm, attorney Mark Perry from Gibson, Dunn & Crutcher's Washington office, as well as attorney Kurt Krafsky of the Wal-Mart office of general counsel. Wal-Mart also had two high ranking executives present, and others available by phone.

After approximately 13 uninterrupted hours of negotiations on February 27, an agreement in principle was finally reached, and a "term sheet" was signed by counsel for both sides late in the evening.

The key terms of this hard fought settlement provide exceptional benefits to the class members, and amount to nothing less than huge victory. With an underlying claim of between $10 million and $12 million in unpaid wages, defendant has agreed to a maximum payment of $86 million. Within the time frame established by this Court's earlier order, a separate Motion For Final Approval will be filed by September 14, 2010. However, the key parts of this settlement which establish the success of the efforts of Class Counsel are noted as follows:

    a.    Defendant will pay a maximum settlement amount of $86 million, which sum includes payments made to claimants, administration costs, awards of attorneys' fees and costs, and incentive awards to the named plaintiffs.

    b.    The settlement includes Wal-Mart's acknowledgment that the litigation acted as a catalyst for Wal-Mart's implementation of remedial measures which have resolved the

13

final pay problems that form the underlying basis of this case.  For a period of at least three years from the Settlement Effective Date, Wal-Mart will continue to use its improved computer technology, the purpose of which is to assure accurate final payments to terminating California employees.  Wal-Mart shall continue to use this technology, or other technology that Wal-Mart reasonably considers as superior for this purpose, during this time frame, and its use of the same will be reported to plaintiffs' counsel.

c.   Each Class Member who returns a valid and timely Claim Form will be entitled to receive a portion of the settlement under the following formula:

**Salaried Associates Sub-Class**:

Each timely claimant will receive a payment of $600.

**Distribution Center Sub-Class:**

Each timely claimant will receive a payment of $300.

**Hourly Associates Sub-Class:**

The amount remaining after payment to claimants in the Salaried Associates Sub-Class and the Distribution Center Sub-Class is designated as the "Hourly Net Settlement Amount."  From this Hourly Net Settlement Fund, no Claimant shall receive less than Fifty Dollars ($50) and no Claimant shall receive more than Six Hundred Dollars ($600).  Each hourly associate as to whom the records indicate any unpaid wages exist will receive a proportionate share of the funds available, based upon the amount they are owed in relation to the total amount owed to the entire Hourly Associates Sub-Class.

d.   A highly beneficial term of the settlement requires that the Claims Administrator mail a follow up notice (**"reminder post-card"**) to those Class Members who have not responded with the return of either a Claim Form or a Request for Exclusion forty five (45) days before the expiration of the claim period, i.e. exactly half way through the process.

All of the above validates the request for an award of attorneys' fees.

14

F.      **Post Mediation Settlement Activities** (Category 27)

As the Court can no doubt imagine, an $86 million settlement, although agreed to in principle at a mediation, requires ongoing negotiations concerning the specific and detailed terms and conditions of a formal settlement agreement.  The drafting of, and process of reaching agreeing upon, such items as class notice, publication notice, the claim form, etc. took a considerable amount of time.   In addition, Class Counsel  prepared and filed the required Motion for Preliminary Approval of the settlement, and obtained an order for the same from this honorable Court.

As the settlement process continues, Class Counsel will continue to work with the Claims Administrator, and defendant's national counsel, to see that all of the terms and conditions of the settlement are met.  (Category 27) Class Counsel will continue to report to this Court concerning the same until all aspects of the settlement process have been completed.

## V.   ATTORNEY FEE AWARDS IN COMMON FUND CASES

Class Counsel seek an attorney fee award based on a percentage of the gross recovery, which is appropriate, and even desirable in cases like this.  As stated in *Newberg on Class Actions, Fourth Edition*, vol. 4, p. 556, §14.6:

> Unlike the lodestar method which can encourage class counsel to devote unnecessary hours to generate a substantial fee, under the POR [percentage of recovery] method, the more the attorney succeeds in recovering money for the client, and the fewer legal hours expended to reach that result, the higher dollar amount of fees the lawyer earns. Thus, one of the primary advantages of the POR method is that it is thought to equate the interests of class counsel with those of the class members and encourage class counsel to prosecute the case in an efficient manner.

See, *Boeing Co. v. Van Gemert* 444 U.S. 472, 478 (1980).  The purpose of this equitable doctrine is not only to avoid unjust enrichment of counsel but also to spread litigation costs proportionally among all the beneficiaries so that the active beneficiary does not bear the entire burden alone.  *Vincent v. Hughes Air West, Inc.* 557 F.2d 759, 769 (9th Cir. 1977).

A.      **The Percentage Fee Has Eclipsed the Lodestar Method of Fee Calculation**

The Common Fund Doctrine is predicated on the principle of preventing unjust enrichment.  It provides that when a litigant's efforts create or preserve a fund from which others derive benefits, the litigant may require the passive beneficiaries to compensate those who created the fund.  Both State and Federal courts in California have embraced this doctrine.  *Vincent v. Hughes Air West, Inc.* supra,

15

769.

> The Common Fund Doctrine is the oldest exception to the American rule of fee shifting.

> The Common Fund exception is grounded in the historic power of equity to permit the trustee of a fund or property (or a party preserving or recovering a fund for the benefit of others, as well as himself or herself) to recover costs, including attorneys fees. Those costs and fees are paid out of the fund or property itself, or directly from the other parties enjoying the benefit. R. Pearle, *California Attorney Fee Awards* (CEB, 1993) §7.4, p. 7-5.

It is clear that the availability of $86 million to the class herein constitutes a substantial common fund. This is an enormous recovery, particularly in light of the fact that the underlying claim of unpaid wages is between $10 million and $12 million. Under the foregoing doctrine, courts have historically and consistently recognized that class litigation is increasingly necessary to protect the rights of individuals whose injuries and/or damages are too small to economically justify individual representation. In *Paul, Johnson, Alston & Hunt v. Gaulty* (9th Cir. 1989) 886 F.2d 268, at 271, the Ninth Circuit embraced this principle when it stated:

> Since the Supreme Court's 1885 decision in *Central Railroad & Banking Co. of Ga. v. Pettus*, 113 U.S. 116, 5 S. Ct. 387, 28 L.Ed. 915 (1885), it is well settled that the lawyer who creates a common fund is allowed an extra reward, beyond that which he has arranged with his client, so that he might share the wealth of those upon whom he has conferred a benefit. The amount of such a reward is that which is deemed 'reasonable' under the circumstance.

Accordingly, in the determination of a reasonable common fund fee award, courts award fees to serve as economic incentive for lawyers to bring class actions in order to achieve increased access to the judicial system for meritorious claims and to enhance deterrents to wrongdoing. See A. Conte, *Attorney Fee Awards*, 2nd Ed. 1993, 104, p.6. In this case, it would have been difficult, if not impossible, for all these former Wal-Mart employees to bring separate actions for the small amounts of unpaid compensation. In fact, it cannot be denied that the vast majority of class members likely had no idea that they had been shortchanged in their final pay. Collectively, the result has been that each class member who submits a claim will receive between $50 and $600. When the Ninth Circuit held that the Common Fund Doctrine was available in ERISA cases, the court echoed the foregoing sentiment:

> Having determined that risk multipliers remain available in common fund cases after

16

1   *Dague*, we further note that we have held, in pre-*Dague* case, that a risk multiplier is
2   not merely available in common fund cases but mandated, if the court finds that
    counsel had no sure source of compensation for their services...Moreover, we have
3   observed that the need for such an adjustment is particularly acute in class action suits.
    The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is
4   inescapably contingent. *Florin v. Nations Bank of Georgia* (9th Cir. 1994) 34 F.3d
    560, 564. (Emphasis added)

5       As will be discussed in greater detail in section V - C of this Memorandum, when this case was

6   originally filed, not only was it inescapably contingent, but the prospect of a long drawn-out battle with

7   defendant was almost a certainty. This case was indeed hard fought. The defendant's various law

8   firms asserted all available defenses and challenged Class Counsel in every area properly available to

9   them. In the face of these issues, Class Counsel pursued this matter on behalf of the representative

10  plaintiffs, and the proposed class, and achieved a significant result for the entire class. It is respectfully

11  submitted that the result more than justifies the fee requested.

12      California clearly encourages attorneys to take the enormous risks of time and money necessary

13  to vindicate the public interest, and to protect the public policies underlying the wage and hour laws.

14  To fulfill this policy, California law provides that attorney fee awards should be equivalent to fees paid

15  in the legal marketplace to compensate for the result achieved and risk incurred. See, *Lealao v.*

16  *Beneficial Cal., Inc.* 82 Cal. App.4th 19 (2000).

17      In cases where class members present claims against a potential maximum settlement fund, the

18  appropriate method for determining the percentage of fees to be awarded to counsel is based upon the

19  potential recovery available to the class, not the actual claimed amount. "In *Boeing Co. V. Van Gemert*

20  [444 U.S. 472 (1980)], the Supreme Court settled this question by ruling that class counsel are entitled

21  to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount

22  actually claimed." *Newberg on Class Actions, supra*, at page 570.

23              **B.      Evolution of the Percentage Method.**

24      Ever since the Common Fund Doctrine found its genesis in *Trustees v. Greenough*, 105 U.S.

25  527 (1881), courts have awarded fees on a percentage basis. In arriving at reasonable percentage fee

26  awards, courts consider a variety of factors, but focus on the particular circumstances of the case in

27  fixing a percentage above or below a benchmark. Here, an upward adjustment from the 9th Circuit

28  benchmark of 25% is clearly justified.

During the 1960s and early 1970s following the 1966 amendments to Rule 23, the size of settlement funds began increasing significantly and the fees awarded pursuant to the percentage method, taken out of context, were criticized by commentators and the general press. Then, in 1973, the revision for the Manual for Complex Litigation proposed that all common fund fee awards be based on time reasonably expended on the action. This concept was then embraced in *Lindy Bros. Bldrs., Inc. of Phila. v. American R. & R. San Corp.*, 487 F.2d 161 (3rd Cir. 1973), and *Lindy II*, 540 F.2d 102 (3rd Cir. 1976). Thereafter, a large number of courts adopted *Lindy's* rationale, and courts generally began awarding fees based on the actual time expended (the lodestar) in conjunction with a multiplier of between 2 and 4. *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975).

As time passed and courts were forced to wade through the voluminous, and often complicated and privileged time records, it became evident that utilization of the lodestar method had reached a point of diminishing returns. As the court noted in *In re Activision Securities Litigation*, 723 F.Supp. 1373, 1375 (9th Cir. 1989) :

> The question this court is compelled to ask is, Is this process necessary? Under a cost-benefit analysis, the answer would be a resounding, No! Not only do the *Lindy Kerr* and *Johnson* analyses consume an undue amount of court time with little resulting advantage to anyone, but, in fact, it may be to the detriment of the class members. They are forced to wait until the court has done a thorough, conscientious analysis of the attorney's fee petition.

Since *Blum v. Stenson*, 465 U.S. 886 (1984), where the Supreme Court approved a percentage of the fund as being an appropriate fee award, courts have increasingly rejected the lodestar approach. This trend recognizes the fact that compensating class counsel on a percentage basis (common fund) makes good sense because 1) it is consistent with the private marketplace where contingent fee attorneys are customarily compensated on such a basis; 2) it aligns the interests of class counsel and absent class members in achieving the maximum possible resolution of the case; and 3) it augers for the most efficient and expeditious resolution of the litigation by providing an incentive for early, yet reasonable, settlement. Class Counsel respectfully submit that the award in this case meets all those criteria, such that it should be made on a percentage basis.

One of the nation's most well respected scholars in the field of class actions and attorneys' fees, Professor Charles Silver of the University of Texas School of Law, has concluded that - among

18

its many other benefits - the percentage method is also far superior to the lodestar plus multiplier method in aligning the interests of class counsel with the interests of absent class members:

> **The consensus that the contingent percentage approach creates a closer harmony of interests between class counsel and absent plaintiffs than the lodestar method is strikingly broad**.  It includes leading academics, researchers at the RAND Institute for Civil Justice, and many judges, including those who contributed to the Manual for Complex Litigation, the Report of the Federal Courts Study Committee, and the Report of the Third Circuit Task Force.  Indeed, it is difficult to find anyone who contends otherwise.  No one writing in the field today is defending the lodestar on the ground that it minimizes conflicts between class counsel and absent claimants.

> **It view of this, it is as clear as it possibly can be that judges should not apply the lodestar method in common fund class actions.**  The Due Process Clause requires them to minimize conflicts between absent claimants and their representatives.  The contingent percentage approach accomplishes this.

Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here,* 74 Tul.L.Rev. 1809, 1819-20 (June 2000) (emphasis added; footnotes omitted).

C.     **The Substantial Risk Taken By Class Counsel Justifies An Upward Adjustment From The 9th Circuit's Benchmark**

"The Ninth Circuit has adopted a benchmark of 25% in percentage of fund cases and adjusts this figure upward where the particular circumstances are extraordinary, or downward where, for example, recovery is a certainty." *Newberg on Class Actions*, *supra*, at page 566.  The case before this honorable Court represents the classic example of when an upward adjustment to 33 1/3% is the most appropriate action to take.

When the two consolidated cases were filed, no evidence had yet been found that would arguably be viable as proof of willfulness under *Labor Code* §203.  At the beginning of the case, there were theories and factual support for the primary claim of underpayment of class members at the time of termination.  But, there was no guarantee that detailed and cumbersome investigation and litigation would lead to any recovery, let alone one representing a recovery up to eight and a half times the amount of the ultimately determined under payments.

While hindsight is always "20/20", it does offer an interesting perspective in this matter.  Class Counsel devoted 26,701.7 hours of time (representing $16,640,376.00 in fees) and $572,754.85 of their own funds to bring this matter to a successful completion.  Had the thousands of hours they spent sifting through over a million pages of documents, taking numerous depositions around the country, and retaining an expert (Dr. Shapiro) who was the most knowledgeable non-Wal-Mart employee in

19

the country in connection with defendant's computerized data systems, this case may well have been lost.[8]   At most, it might have merely resulted in defendant being willing to reach a compromise settlement in connection with the approximately $10 million its expert believed might be underpaid. Even had Class Counsel received a 1/3 award in that event, the fees would be in the neighborhood of $2 million or $3 million - literally a small fraction of the value of the fees and costs they would have devoted to this case.

Defendant is widely known to aggressively defend itself it substantial litigation, and it certainly lived up to that reputation here.  As the Court's docket reflects, defendant's counsel spared no effort in an attempt to protect their client, to limit discovery, to defeat class certification, and to appeal to the 9th Circuit.  Class Counsel met each of these challenges and refused to be overwhelmed by the other side.  Class Counsel continually moved the matter forward, never ceding control of the case and never forgetting their obligation to protect the interests of the class by leaving no stone unturned in their case preparation.

**D.    The Attorneys' Fees Requested by Class Counsel Are Well Within the Range of Fees Awarded in Comparable Cases**

The goal in a case such as this is to set a fee that approximates the probable terms of a contingent fee contract negotiated by a sophisticated attorney and client in comparable litigation. (*Lealao* at 48.)  A review of class action settlements shows that the courts have historically awarded fees in the range of 20% to 50%, depending upon the circumstances of the case.  See, *In re Warner Communications Sec. Lit.*, 618 F.Supp. 735 (S.D.N.Y. 1985) . "[T]he fact-specific nature of these fee determinations leaves room for a wide range of awards.  For example, in *Mister v. Illinois Central Gulf Railroad Co.* [S.D. Ill 1993], 40% of a common fund of $10 million was awarded to plaintiffs' counsel in an employment discrimination class action for extraordinary representation."  *Newberg*, *supra* at page 568.In this regard, an article in <u>Class Action Reports</u> points out the following percentages in multi-million dollar cases: *Construction Inc. v. National Council on Compensation Ins. Nos. 89-822*

---

[8]As part of their costs, Class Counsel have paid Dr. Shapiro over $335,000 to assist in uncovering the key information often found deep within defendant's computerized records.  That assistance proved invaluable in building this case.  However, had the case been lost, that money, and the other costs advanced by Class Counsel would not have been recovered.

20

1   *and 89-1186* (W.D. Okla. June 7, 1993) (anti-trust; **34%**); *In re Meldridge, Inc. Securities Litigation*

2   (D. Or. March 19, 1992, and November 1993) 87-426 (**34%**); *Hwang v. Smith-Corona Corp.* (D.

3   Conn. March 12, 1992) No. 89-450 (**35.8%**).

4       In numerous employment class actions involving Wal-Mart as a defendant, fees equal to

5   33⅓% of the potential maximum recovery have been awarded.  See, *In re: Wal-Mart Wage and Hour*

6   *Employment Practices Litigation*, MDL No. 1735 (D.C. Nev 2009) In that matter, an appeal of the

7   district court's overruling of an objection to the attorneys' fee award was based in part on a claim that

8   the 33⅓% fee award based on the <u>potential maximum payment</u> under the settlement agreement was

9   improper.  The appeal was summarily dismissed by the 9th Circuit before briefing had been completed

10  because the Court found the appeal to be "so insubstantial as not to require further argument."  See,

11  Exhibit 4, Order by 9th Circuit.  Thus, the MDL court's award based upon the maximum potential

12  settlement amount was upheld as correct, which is the same basis upon which the fee award in the

13  matter before this Court is sought.  Numerous other cases in various state courts throughout the

14  country have granted fee awards equal to 33⅓% of the maximum potential recovery in cases against

15  this same defendant.[9]

16      **E.    The Percentage Awarded Should Mimic the Market.**

17       *Newberg on Class Actions*, *Fourth Edition,* vol. 4, p. 560, §14.6 contains an interesting

18  discussion of the concept of a market place analysis and why it is so valuable in determining a

19  percentage award:

20  _____

21       [9]Other 33⅓% awards in class actions against Wal-Mart include *Bailey, et.al. vs. Wal-Mart
    Stores, Inc.*, Marion County Superior Court, State of Indiana, Case No. 49D05-0008-CT-1177;

22  *Armijo, et.al. vs. Wal-Mart Stores, Inc., et.al.*, County of Rio Arriba, State of New Mexico, Case No.
    D-0117-CV-2000002211; *Nagy et.al. vs. Wal-Mart Stores, Inc.*, Boyd County, Commonwealth of

23  Kentucky, Case No. 01-CI-00854; *Pickett, et.al. vs. Wal-Mart Stores, Inc., et.al.,* Memphis Judicial
    District, State of Tennessee, Case No. CT-005945-03; *Willey, et.al. vs. Wal-Mart Stores, Inc., et.al.*,

24  Wyandotte County, State of Kansas, Case No. 01C3688; *Mussmann, et.al. vs. Wal-Mart Stores, Inc.,
    et.al.,* Clinton County, State of Iowa, Case No. LA-27486; *Brown, et.al. vs. Wal-Mart Stores, Inc.*,

25  Rock Island County, State of Illinois, Case No. 01 L 85; *Lerma, et.al. vs. Wal-Mart Stores, Inc.,
    et.al.*, Cleveland County, State of Oklahoma, Case No. CJ-2001-1395; *Carter, et.al. vs. Wal-Mart*

26  *Stores, Inc., et.al.,* Colletn County, State of South Carolina, Case No. 06-CP-15-839; *Hale, et.al. vs.
    Wal-Mart Stores, Inc., et.al.,* Jackson County, State of Missouri, Case No. 01-CV-218710; *Ouellette,*

27  *et.al. vs. Wal-Mart Stores, et.al.*, Washington County, State of Florida, Case No. 67-01-CA-326.

28
    _____

                                    21

[Goodrich and Silver[10]] ... suggest that fee awards should be consistent with contingent fee arrangements negotiated in non class litigation:

1. The percentage method is consistent with and is intended to mirror practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee arrangements with their clients. As Judge Posner emphasized in In re Continental Illinois Securities Litigations, "[t]he object in awarding a reasonable attorney's fee...is to simulate the market...**The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." In non-class litigations, one-third contingency fees are typical. In their concurring opinion in Blum, Justices Brennan and Marshall observed that "[i]n tort suits, an attorney might receive one-third of whatever the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.**"

If named plaintiffs have agreed to pay a one-third contingent fee, that is powerful evidence of a reasonable fee. One of the best ways to demonstrate the value of counsel's work to the class is to review the consideration agreed to be paid by the named plaintiffs in their contracts. **If the named plaintiffs have employed their counsel by contingent fee agreements that obligated them to pay one-third of the recovery, it would indeed be inequitable for the members of the class, who will enjoy the benefits of this settlement without incurring the risks of bringing the claim, to pay less than the named plaintiffs.**

The complex nature of this litigation and its successful result leads to the clear conclusion that the fee request herein is reasonable. In *Cambden I Condominium Association, Inc., v. Dunkel*, 946 F. 2d 768 (11th Cir. 1991), the court identified the following as factors to be considered in arriving at a common fund fee determination: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill requisite to perform the legal services properly; 4) the preclusion of other employment by the attorney due to the acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitation imposed by the client or the circumstances; 8) the amount involved and results obtained; 9) the experience, reputation and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. As previously discussed herein, and as clearly detailed in the **Time and Task Chart**, each and every one of these factors favors the award sought by Class Counsel herein.

## VI. CROSS-CHECKING THE "PERCENTAGE OF THE FUND" METHOD BY USE OF A LODESTAR CALCULATION

It is sometimes helpful to courts to "cross-check" a percentage award by employing a lodestar

---

[10] Goodrich, Frank and Silver, Reagan, *Common Fund and Common Fund Problems: Fee Objections and Class Counsel's Response,* 17 Rev. Litig. 525 (Summer 1995).

22

1    with a multiplier analysis.  While the lodestar method is generally considered inappropriate in a

2    common fund case where real cash benefits are made available to class members, its use can provide

3    further validation of the appropriateness of the percentage award.  (See, *In re Prudential Ins. Co. of*

4    *America Sales Practice Litigation* 106 F. Supp.2d 721 (D.N.J. 2000).

5         In the case at bar, the declarations of Louis Marlin, Marcus Bradley, Peter Hart and J. Dana

6    Pinney evidence the fact that Class Counsel (including partners, associates and para-legals) devoted

7    26,701.7 hours of time to this litigation.  The **Time and Task Chart** contains a summary at the end

8    which sets forth the hourly contribution by each firm.

9         Here, using the various hourly rates of the law firms who dedicated their efforts to successfully

10   resoling this matter, there is a total lodestar of $16,640,376.  The percentage award sought by Class

11   Counsel, if converted to the lodestar method, would entail a 1.72 multiplier, well within the acceptable

12   range.

13       **A.      Plaintiff's Counsels' Lodestar Is Reasonable**

14       The hourly rate employed by Class Counsel is reasonable. Plaintiff's attorneys are entitled to

15   the hourly rates charged by attorneys of comparable experience, reputation, and ability for similar

16   litigation.  The background and experience of plaintiffs' counsel are fully set forth in their declarations

17   filed in support of this motion.  The basic hourly rates listed for each firm are fair and representative

18   of the clear success they have had in the past in connection with class action litigation

19       Under California law, counsel are entitled to compensation for every hour reasonably spent on

20   the matter.  *Ketchum vs. Moses*, 24 Cal. 4th 1122, 1133 (2001).  Reasonableness of hours is assessed

21   by "the entire course of the litigation, including pretrial matters, settlement negotiations, discovery,

22   litigation tactics, and the trial itself . . . ." *Vo v. Las Virgenes Municipal Water Dist.* 79 Cal. App. 4th

23   440, 447 ) 2000). Here, counsels' sworn declarations attest to the hours spent. (*See Wershba vs. Apple*

24   *Computer Inc.*, 91 Cal. App. 4th 224, at 254-55 (2001) (number of hours reasonably spent may be

25   established by attorney declarations).  The accompanying **Time and Task Chart** provides this

26   honorable Court with comprehensive information concerning exactly how Class Counsel spent their

27   time in protecting the rights of the members of this class.

28       In sum, the reasonableness of plaintiffs' lodestar is manifest. Accordingly, the question

                                              23

1  becomes whether the requested 1.72 multiplier is reasonable by marketplace standards. The requested

2  multiplier is not only reasonable, it is on the low end of awards in comparable cases.

3      **B.      The Lodestar Enhancement Is Reasonable**

4      As the Supreme Court has explained, in determining the reasonableness of attorneys' fees "the

5  most critical factor is the degree of success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436

6  (1983); *see also Glendora Community Redev. Agency v. Demeter* 155 Cal. App. 3d 465, 475 (1984)

7  Here, Class Counsel succeeded resoundingly and unequivocally, obtaining substantial relief far above

8  the amount of the underlying claim for unpaid compensation.

9      The application of a 1.72 multiplier is comparable to what a sophisticated client would have

10 freely negotiated.    In a case such as the one at bar, where Class Counsel have taken substantial risk

11 in bring the action, have faced aggressive opposition from the defense, and have been able to achieve

12 a result that represents a potential recovery far above the underlying claim, it is entirely appropriate

13 to use a multiplier to enhance the lodestar claim of counsel:

14     It is an established practice in the private legal market to reward attorneys for taking
       the risk of non-payment by paying them a premium over their normal hourly rates for
15     winning contingency cases. *See* Richard Posner, *Economic Analysis of Law* § 21.9, at
       534-35 (3d ed. 1986).  Contingent fees that may far exceed the market value of the
16     services if rendered on a non-contingent basis are accepted in the legal profession as
       a legitimate way of assuring competent representation for plaintiffs who could not
17     afford to pay on an hourly basis regardless whether they win or lose. *See Model Rules
       of Professional *1300 Conduct* Rule 1.5(a)(8) (1992); *Model Code of Professional
18     Responsibility* DR 2-106(B)(8) (1980); *Canons of Ethics* § 12, 33 A.B.A.Rep. 575, 578
       (1908). As the court observed in *Behrens v. Wometco Enter., Inc.,* 118 F.R.D. 534, 548
19     (S.D.Fla.1988), *aff'd,* 899 F.2d 21 (11th Cir.1990), "[i]f this 'bonus' methodology did
       not exist, very few lawyers could take on the representation of a class client given the
20     investment of substantial time, effort, and money, especially in light of the risks of
       recovering nothing." And in *In re Union Carbide Corp. Consumer Prods. Business
21     Sec. Litig.,* 724 F.Supp. 160, 169 (S.D.N.Y.1989), the court addressed the negative
       impact the proscription of risk multipliers might have on the important goal of
22     furthering the purposes of federal securities laws:

23     [I]ndividuals damaged by violations of the federal securities laws should have
       reasonable access to counsel with the ability and experience necessary to analyze and
24     litigate complex cases.... A large segment of the public might be denied a remedy for
       violations of the securities laws if contingent fees awarded by the courts did not fairly
25     compensate counsel for the services provided and the risks undertaken.
       For these reasons, courts have routinely enhanced the lodestar to reflect the risk of non-
26     payment in common fund cases.

27     *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299-300 (9th Cir.
       1994)

28

24

In this case, the hours expended equate to $16,640,376 of billable time.  This enormous investment of both time and expenses was always at risk.  Had the second attempt at mediation not been successful, Class Counsel were prepared to aggressively move the matter forward to trial on a contingency basis.  Class Counsel took an enormous risk, and they should be rewarded for assuming that risk and obtaining a stunning result for the class.  A multiplier of 1.72 represents a modest upward adjustment of fees that properly rewards class counsel for the efforts expended as well as the results achieved.

In *Wing vs. Asarco Inc.,* 114 F.3d 986 (9th Cir. 1997) the court approved an $8 million fee in a class action that was achieved by use of a multiplier of 2.  The court noted:

> The judge, no stranger to complex litigation, spoke in awe of class counsel's performance, stressing the first-rate job the lawyers did, their sheer endurance, and the exceptional results obtained, which the court viewed as especially remarkable in light of the quality of opposition counsel and Asarco's record of success in this type of litigation. *Id.*, at 989

Frankly, one could substitute the name "Wal-Mart" for "Asarco" in the above quote and find without any hesitation that it would apply to the case at bar.[11]  Here, the use of a conservative 1.72 multiplier results in an award equivalent to the 33 1/3% sought by Class Counsel.  This "double check" by reference to the lodestar method thus further validates the fee request presented herein.

## VII.  COSTS

Each of the plaintiffs' law firms have provided the Court, as Exhibits to counsels' declarations, with details of the costs they have incurred in connection with this case, and the necessity for the same. The total of all costs to date is $572,754.85, and last page of the **Time and Task Chart** contains a summary of these necessary costs.  Class Counsel respectfully seek recovery of these costs.

## CONCLUSION

Plaintiffs and their counsel respectfully request that this Court enter an Order:

1.     Awarding Plaintiffs Danton Ballard, Nathan Lyons, Barry Smith and Michael Wiggins each an incentive award of $25,000;

---

[11]While Class Counsel certainly hopes this honorable Court is "in awe" of the work they have done and the results accomplished, they do not presume that the Court holds such an opinion by providing this quote.  The spirit of this quote, however, can directly be applied to the efforts of Class Counsel and the results achieved.

1    2.    Awarding Class Counsel attorneys' fees in the amount of $28,666,666;

2    3.    Awarding Class Counsels' costs in the amount of $572,754.85;

3    4.    Such other and further relief as to the Court seems just and proper.

4  Dated: August 25, 2010        **MARLIN & SALTZMAN, LLP**
**LAW OFFICES OF PETER M. HART**
**BAILEY PINNEY PC**

By:    /s/
    Louis M. Marlin of Marlin & Saltzman
    Attorneys for Plaintiffs and Plaintiff Class

26